**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

|  |  |  |
|---|---|---|
| | : | |
| IN RE: APPRAISAL OF | : | **CONSOLIDATED** |
| JARDEN CORPORATION | : | **C.A. No. 12456-VCS** |
| | : | |

**MEMORANDUM OPINION**

Date Submitted: May 1, 2019
Date Decided: July 19, 2019

Stuart M. Grant, Esquire, Cynthia M. Calder, Esquire, Kimberly A. Evans, Esquire, Kelly L. Tucker, Esquire and Vivek Upadhya, Esquire of Grant & Eisenhofer P.A., Wilmington, Delaware, Attorneys for Petitioners.

Srinivas M. Raju, Esquire, Brock E. Czeschin, Esquire, Robert L. Burns, Esquire, Sarah A. Clark, Esquire and Matthew W. Murphy, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware and Walter W. Davis, Esquire, Michael J. McConnell, Esquire and Robert A. Watts, Esquire, of Jones Day, Atlanta, Georgia, Attorneys for Respondent Jarden Corporation.

**SLIGHTS, Vice Chancellor**

This statutory appraisal action arises from a merger whereby Newell Rubbermaid, Inc. ("Newell") acquired Jarden Corporation ("Jarden" or the "Company") (the "Merger") for cash and stock totaling $59.21 per share (the "Merger Price"). Petitioners, Verition Partners Master Fund Ltd., Verition Multi-Strategy Master Fund Ltd., Fir Tree Value Master Fund, LP and Fir Tree Capital Opportunity Master Fund, LP (together "Petitioners"), were Jarden stockholders on the Merger's effective date and seek a judicial appraisal of the fair value of their Jarden shares as of that date.

At the close of the trial, I observed, "[w]e are in the classic case where . . . very-well credentialed experts are miles apart. . . . There's some explaining that is required here to understand how it is that two very well-credentialed, I think, well-intended experts view this company so fundamentally differently."[1] This observation was prompted by the all-too-frequently encountered disparity in the experts' opinions regarding Jarden's fair value. Jarden's expert, Dr. Glenn Hubbard, applying a discounted cash flow ("DCF") analysis, opines that Jarden's fair value as of the Merger was $48.01 per share. Petitioners' expert, Dr. Mark Zmijewski, applying a comparable companies analysis, contends that Jarden's fair value as of

---

[1] Trial Tr. 1315:21–1316:5.

1

the Merger was $71.35 per share.  To put the disparity in context, Dr. Zmijewski's valuation implies that the market mispriced Jarden by over $5 billion.

In a statutory appraisal action, the trial court's function is to appraise the "fair value" of the dissenting stockholder's "shares of stock" by "tak[ing] into account all relevant factors."[2]  The statute does not define "fair value" but our courts understand the term to mean the petitioner's "pro rata share of the appraised company's value as a going concern."[3]  This definition of fair value "is a jurisprudential, rather than purely economic, construct."[4]  Even so, the remarkably broad "all relevant factors" mandate necessarily leads the court deep into the weeds of economics and corporate finance.  These are places law-trained judges should not go without the guidance of experts trained in these disciplines.  In other words, corporate finance is not law.  The appraisal exercise is, at bottom, a fact-finding exercise, and our courts must appreciate that, by functional imperative, the evidence, including expert evidence, in one appraisal case will be different from the evidence

---

[2] 8 *Del. C.* § 262(h).

[3] *DFC Global Corp. v. Muirfield Value P'rs, L.P.*, 172 A.3d 346, 367 (Del. 2017).  *DFC* explained that the statutory definition of fair value has been distilled further to require the court "to value the company on its stand-alone value."  *Id*. at 368.

[4] *Id.* at 367 (citing *Cavalier Oil Corp. v. Hartnett*, 564 A.2d 1137 (Del. 1989)).  As the Court further explained, "the definition of fair value used in appraisal cases is a jurisprudential concept that has certain nuances that neither an economist nor market participant would usually consider when either valuing a minority block of shares or a public company as a whole."  *Id.*

2

presented in any other appraisal case. Different evidence, of course, can lead to different decision paths and different outcomes. After all, the appraisal exercise prescribed by the governing statute contemplates a trial—a good, old-fashioned trial—where the parties carry burdens of proof, present their evidence in hopes of meeting that burden and subject their adversary's evidence to the "crucible of cross-examination" in keeping with the traditions of our adversarial process of civil justice.[5]

Our Supreme Court has had several opportunities recently to provide direction with regard to certain frames of reference this court should consider while

---

[5] *Gilbert v. M.P.M. Enters., Inc.*, 1998 WL 229439, at *3 (Del. Ch. Apr. 24, 1998) (noting that while certain approaches to a DCF valuation might be endorsed in other cases, the experts endorsing those approaches had not been "subject to the crucible of cross-examination" in the appraisal trial conducted by the court and the court would not consider their testimony from other cases). *See also Merion Capital L.P. v. Lender Processing Servs., Inc.*, 2016 WL 7324170, at *16 (Del. Ch. Dec. 16, 2016) (noting that the "relevant factors" informing the fair value determination will "vary from case to case depending on the nature of the [acquired] company"); *DFC*, 172 A.3d at 388 (observing: "[i]n some cases, it may be that a single valuation metric is the most reliable evidence of fair value and that giving weight to another factor will do nothing but distort that best estimate. In other cases, it may be necessary to consider two or more factors."); D.R.E. 702 (recognizing that lay fact-finders may rely upon expert testimony when the expert's "scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue"). In this regard, it is worth noting that submitting the fair value determination to a "court-appointed 'appraiser'" was "essentially required practice under the appraisal statute before 1976." Lawrence A. Hammermesh & Michael L. Wachter, *Finding the Right Balance in Appraisal Litigation: Deal Price, Deal Process, and Synergies*, 73 Bus. Law 961, 976 (2018). Now that expert "appraisers" have been "eliminated as a statutory requirement," it is for the court to decide fair value based on its assessment of the factual evidence presented at trial, including expert evidence, using traditional fact-finding methods. *Id.*

performing the statutory appraisal function.[6]  I will not recount those holdings here as they are well known.  Suffice it to say, as I approached my deliberation of the evidence in this case, my "takeaway" from the Supreme Court's recent direction reduced to this: "What is necessary in any particular [appraisal] case [] is for the Court of Chancery to explain its [fair value calculus] in a manner that is grounded in the record before it."[7]  That is what this court endeavors to do after every trial and what I have endeavored to do here.[8]

---

[6] *See DFC*, 172 A.3d 346; *Dell, Inc. v. Magnetar Global Event Driven Master Fund Ltd.*, 177 A.3d 1 (Del. 2017); *Verition P'rs Master Fund Ltd. v. Aruba Networks, Inc.*, 2019 WL 1614026 (Del. Apr. 16, 2019).

[7] *DFC*, 172 A.3d at 388.

[8] In this regard, I reiterate with renewed appreciation then-Chancellor Chandler's astute observation in the *Technicolor, Inc.* appraisal saga:

> [V]aluation decisions are impossible to make with anything approaching complete confidence.  Valuing an entity is a difficult intellectual exercise, especially when business and financial experts are able to organize data in support of wildly divergent valuations for the same entity.  For a judge who is not expert in corporate finance, one can do little more than try to detect gross distortions in the experts' opinions.  This effort should, therefore, not be understood, as a matter of intellectual honesty, as resulting in the fair value of a corporation on a given date.  The value of a corporation is not a point on a line, but a range of reasonable values, and the judge's task is to assign one particular value within this range as the most reasonable value in light of all the relevant evidence and based on the considerations of fairness.

*Cede & Co. v. Technicolor, Inc.*, 2003 WL 23700218, at *2 (Del. Ch. Dec. 31, 2003), *aff'd in part, rev'd in part on other grounds*, 875 A.2d 602 (Del. 2005), *withdrawn from bound volume, opinion amended and superseded*, 884 A.2d 26 (Del. 2005).

4

The parties have reveled in the statutory mandate that the court consider "all relevant factors." Indeed, they have joined issue on nearly every possible indicator of fair value imaginable, including market indicators (unaffected market price, deal price less synergies, Jarden stock offerings shortly before the Merger) and traditional valuation methodologies (comparable companies and DCF analyses).[9] The result: an unfortunately long opinion, made so by a sense that I needed to traverse every road the parties waived me down right to the bitter end, even if that road did not lead to the desired fair value destination. Appraisal litigation can be unwieldy. This is one of those cases. Apologies in advance to those who read on.

I begin my fair value analysis where I believe I must—with the market evidence.[10] As explained below, I have found Jarden's unaffected market price of $48.31 per share is a reliable indicator of its fair value at the time of the Merger. This finding is supported by credible, unrebutted expert testimony from Dr. Hubbard, including an event study that analyzed the market's response to

---

[9] Respondent's expert undertook a precedent transactions analysis as well but the parties did not engage on this valuation approach at trial, so I will not address it here. *See* JX 1816 at ¶11.

[10] *DFC*, 172 A.3d at 369–70 (observing that "[m]arket prices are typically viewed [as] superior to other valuation techniques because, unlike, e.g., a single person's [DCF] model, the market price should distill the collective judgment of the many based on all the publicly available information about a given company and the value of its shares.").

earnings and other material announcements. Dr. Hubbard's expert analysis of the Unaffected Market Price is corroborated by credible evidence, including that Jarden had no controlling stockholder, its public float was 93.9%, it was well covered by numerous professional stock analysts, its stock was heavily traded and it enjoyed a narrow bid-ask spread. As important, there was no credible evidence that material information bearing on Jarden's fair value was withheld from the market as of the Merger. This market evidence was persuasive and I have given it substantial weight in my fair value determination.

As noted, the Merger consideration, or "deal price," was $59.21 per share. Respondent proffers this evidence as a reliable indicator fair value, particularly when synergies are "backed out" as required by our law.[11] Petitioners respond that the sale process leading to the Merger was highly flawed because Jarden's lead negotiator was willing to sell Jarden on the cheap and the Jarden board of directors (the "Board") failed to test the market before agreeing to sell the Company to Newell. After considering the evidence, I agree with Petitioners that the sale process left much to be desired. Jarden's lead negotiator acted with little to no oversight by the Board and, in doing so, got way out in front of the Board and Jarden's financial

---

[11] *See ACP Master, Ltd. v. Sprint Corp.*, 2017 WL 3421142, at *31 (Del. Ch. July 21, 2017) (collecting cases and noting that if the court were to rely upon "deal price, it would have to determine the value of synergies and back them out.").

6

advisors in suggesting to Newell a price range the Board would accept to sell the Company before negotiations began in earnest. There was no pre-signing or post-signing market check. Moreover, the contemporaneous evidence regarding deal synergies was conflicting and the parties' experts acknowledged that valuing the synergies and assessing which party took that value in the Merger was especially difficult in this case. For these reasons, I have placed little weight on the deal price less synergies beyond considering that evidence as a "reality check" on my final fair value determination.

As additional market evidence of Jarden's fair value, Respondent points to Jarden's decision to finance a sizeable acquisition just prior to the Merger (in the midst of negotiations) with an equity offering valued at $49.00 per share. When the market reacted poorly to the acquisition, Jarden announced that it would buy back up to $50 million in Jarden shares at prices up to $49.00 per share as a signal of confidence to the market. This contemporaneous evidence of Jarden management's internal valuation of the Company, performed to facilitate Jarden's acquisition strategy in furtherance of its standalone operations, is relevant market evidence of fair value. While far from dispositive, Jarden's internal efforts to value itself as a going concern for business, not litigation, purposes provides a useful input.

In keeping with their theme that the market evidence is not reliable, Petitioners have focused on "traditional valuation methodologies" to carry their burden of

proving Jarden's fair value as of the Merger. Their valuation expert opines that a comparable company/market multiples analysis provides the best evidence of fair value, and that methodology supports his conclusion that Jarden's fair value at the Merger was $71.35 per share. The credibility, or not, of this methodology depends in large measure on the quality of the comparables. And then the appraiser must select an appropriate multiple. After considering the evidence, I am satisfied that Petitioners' comparable companies analysis is not credible because Jarden had no reliable comparables. Consequently, I give no weight to the results derived from this valuation approach.

Not surprisingly, both parties proffered expert evidence regarding Jarden's fair value based on DCF and, not surprisingly, the experts' DCF analyses yielded results that were solar systems apart. After carefully reviewing the evidence, including the valuation treatises submitted as evidence in support of the experts' conclusions, I am satisfied that both experts utilized inputs in their DCF models that were not justified and that skewed the results.[12] Accordingly, I have utilized the

---

[12] To the extent the parties sought to rely upon valuation texts or articles addressing valuation methodologies, they were directed to submit these sources as evidence in the case. Unlike a law review article cited by a party in support of a legal proposition, a text or scholarly article addressing economic or valuation principles contains factual matter, the admissibility of which must be tested under Delaware's Uniform Rules of Evidence. In my view, it is not proper for parties to an appraisal case, or any other case for that matter, to refer to, or expect the court *sua sponte* to refer to, a scholarly work addressing a matter that has been the subject of expert testimony without first having the work received as evidence in the case or at least tested under evidentiary standards. Nor is it proper, in my view, for parties to an appraisal case to cite to decisions of this court, or our Supreme Court, for the

most credible components of both expert's analyses to conduct my own DCF valuation, in my best effort to obey our appraisal statute's "command that the Court of Chancery undertake an '*independent*' assessment of fair value" when performing its mandated appraisal function.[13]  As explained below, my DCF analysis reveals a valuation of $48.13 per share.

After considering all relevant factors, I have appraised Jarden's fair value as of the Merger at $48.31 per share.  This value, derived from the unaffected market price, is consistent with Jarden's DCF value and the less reliable, but still relevant, deal price less synergies value.

## I.  FACTUAL BACKGROUND

I recite the facts as I find them by a preponderance of the evidence after a four-day trial beginning in June 2018.  That evidence consisted of testimony from twenty-eight witnesses (twenty-five fact witnesses, some presented live and some

---

proposition that a particular valuation methodology should be applied to value the target company.  While legal authority may support the contention that a valuation methodology has been accepted by Delaware courts as generally reliable, I see no value in referring to the factual conclusions of another court in another case while appraising the fair value of another company when attempting to fulfill the statutory mandate that I determine the fair value of this Company.

[13] *Dell*, 177 A.3d at 21 (quoting *Golden Telecom, Inc. v. Global GT LP*, 11 A.3d 214, 218 (Del. 2010) (emphasis in original)); *see also Gholl v. eMachines, Inc.*, 2004 WL 2847865, at *5 (Del. Ch. Nov. 24, 2004) (noting that both parties bear a burden of proof in a statutory appraisal trial and holding that, "[i]f neither party satisfies its burden . . . the court must then use its own independent business judgment to determine fair value.").

by deposition, and three live expert witnesses) along with more than 2,000 exhibits. To the extent I have relied upon evidence to which an objection was raised but not resolved at trial, I will explain the bases for my decision to admit the evidence at the time I first discuss it.

## A. Parties and Relevant Non-Parties

Prior to its acquisition by Newell on April 15, 2016 (the "Merger Date"), Jarden was a consumer products company that held a diversified portfolio of over 120 quality brands.[14] This portfolio included well-known goods like Ball jars, Coleman sporting goods, Crock-Pot appliances and Yankee Candle candles.[15] Jarden was incorporated in Delaware with headquarters in Boca Raton, Florida, and corporate offices in Norwalk, Connecticut and Miami, Florida.[16] Prior to the Merger, Jarden traded on the New York Stock Exchange.[17] Following the Merger, the combined company was re-named Newell Brands, Inc. ("Newell Brands").[18]

---

[14] Stip. Joint Pre-Trial Order ("PTO") ¶¶1, 6, 36.

[15] PTO ¶41. Trial Tr. 49:20–50:10 (Lillie). Because consumable household staples primarily comprised Jarden's product offerings, Jarden's growth correlated to Gross Domestic Product ("GDP") growth. JX 860 at 1 ("As we suspected [Jarden] is a GDP growth business").

[16] PTO ¶36.

[17] *Id.* ¶39.

[18] *Id.* ¶1.

Petitioners are Verition Partners Master Fund Ltd., Verition Multi-Strategy Master Fund Ltd., Fir Tree Value Master Fund, LP and Fir Tree Capital Opportunity Master Fund, LP.[19] Petitioners acquired their Jarden shares after the announcement of the Merger and were stockholders as of the Merger Date. They collectively hold 2,435,971 shares of Jarden common stock.

## B. The Company

Jarden traces its origins to Alltrista Corporation, a company that was spun off in 1993 from Ball Corporation's canning business.[20] In 2000, Martin Franklin and Ian Ashken acquired Alltrista after having initiated a stockholder campaign to unseat Alltrista's board and senior management.[21] By 2001, Franklin and Ashken served as Alltrista's Chief Executive Officer and Chief Financial Officer, respectively, and renamed the company Jarden.[22] In August 2003, James Lillie joined the Jarden team as Chief Operating Officer.[23] Their shared goal was to create the "best consumer products company in the world."[24]

---

[19] *Id.* ¶¶14–35.

[20] JX 1780 (Franklin Dep.) at 5:14–18.

[21] JX 1778 (Ashken Dep.) at 77:11–17.

[22] JX 1778 (Ashken Dep.) at 9:3–5; JX 1780 (Franklin Dep.) at 5:20–25.

[23] PTO ¶62.

[24] JX 1777 (Lillie Dep.) at 195:17–23.

Franklin served as CEO and Chairman of the Board until 2011,[25] when Jarden reorganized its management structure. The Company created the "Office of the Chairman," comprising Franklin as Executive Chairman, Ashken as Vice Chairman and CFO,[26] and Lillie as CEO.[27] As a result of this reorganization, Franklin surrendered direct control of Jarden's day-to-day operations, but remained chiefly in charge of capital distribution and M&A activity.[28] Lillie and Ashken took over the day-to-day operation of the Company.[29] Ashken also maintained a dominant role in Jarden's financial planning and acquisitions.[30]

As a holding company,[31] Jarden maintained a unique, decentralized structure. Its various businesses functioned autonomously, allowing them to pursue outside opportunities and synergies.[32] The respective business unit heads exercised full control over the development of their individual strategic plans.[33] Even so, the

---

[25] PTO ¶54.

[26] JX 1778 (Ashken Dep.) at 8:24–11:5.

[27] Trial Tr. 368:3–19 (Franklin).

[28] Trial Tr. 367:15–22, 467:20–22 (Franklin).

[29] JX 1778 (Ashken Dep.) at 11:9–10, 15:20–22.

[30] *Id.* at 10:20–11:10.

[31] PTO ¶38.

[32] JX 1777 (Lillie Dep.) at 11:5–12:24, 49:6–50:13.

[33] JX 502 at 5; JX 1804 (Polk Dep.) at 17:15–21.

businesses stayed in constant communication with Jarden senior management regarding operations.[34]

## C. Jarden Experiences Strong Growth from 2001–2015

Jarden pursued a two-pronged growth strategy, focusing on internal growth and growth via acquisitions.[35] In this regard, management set a goal of 3 to 5% annual internal revenue growth,[36] 10 to 15% earnings per share ("EPS") growth, 3 to 5% organic top-line growth, 7 to 10% EBITDA growth and 20 to 50 basis points of gross margin growth.[37] These targets produced laudable results. From 2010 through 2015, Jarden saw average organic yearly revenue growth of 4.8%, the top of its targeted range.[38] In fact, Jarden was regarded as "best in class by any measure in terms of shareholder returns over 15 years, 10 years, 5 years, 3 years, 1 year."[39] Jarden's margins experienced continued expansion and it met or exceeded its

---

[34] *Id.*

[35] JX 502 at 6.

[36] *Id.* at 21.

[37] JX 1192 at 11; JX 1777 (Lillie Dep.) at 11:5–14; JX 1775 (Sansone Dep.) at 101:5–20, 146:21–147:3.

[38] JX 786 at 17.

[39] Trial Tr. 423:1–9 (Franklin).

guidance in all but one quarter of its existence.[40]  By 2015, Jarden generated over $1.2 billion in segment earnings and revenues of almost $9 billion.[41]  This reflected an increase in revenue of 4.8% year over year in fiscal year 2015.[42]

Given its impressive results, it is not surprising that Jarden's stock performed well and traded efficiently.  In 2012, Jarden joined the "S&P 400."[43]  By the end of 2015, Jarden's market capitalization topped $10.2 billion, placing it among the top 20% of all US publicly traded firms.[44]  More than twenty professional financial analysts followed Jarden, reporting regularly on the Company's business operations and forecasts.[45]  In addition to its high average trading volume, Jarden's "bid-ask spread" was just 0.02% and its public float was approximately 94% of its outstanding stock.[46]  Jarden's stock trading price historically responded to the announcement of value-relevant information as one would expect in a semi-strong efficient market.[47]

---

[40] Trial Tr. 451:14–18, 451:19–21(Franklin); Trial Tr. 81:10–11 (Lillie) ("Q. That was one quarter miss in 13 years?  A. Yes."); JX 1779 (Tarchetti Dep.) at 265:16–266:7.

[41] Trial Tr. 53:12–24 (Lillie); JX 1459 ("Consistent with its guidance, the Company expects that net sales for 2015 will be approximately $8.6 billion").

[42] JX 1519 at 47.

[43] *See* JX 1816 at ¶47.  The S&P 400 refers to the Standard & Poor's MidCap 400 index.

[44] *Id.*

[45] *Id.* at ¶¶46–48 and Figure 11; JX 1439.

[46] JX 1816 at ¶¶45–48.

[47] *Id.* at ¶¶48–50; *see also* Trial Tr. 1019:24–1020:23 (Hubbard).

M&A drove Jarden's growth.[48]  With Franklin at the helm, Jarden acquired over 40 companies and brands, its stock grew over 5,000% and its sales progressed from approximately $305 million in 2001 to over $8.6 billion in 2015.[49]  Franklin and his team were not only well-known "deal-makers" in the public markets,[50] they were among "the best performers in the sector."[51]

Under Franklin's leadership, Jarden management constructed a well-conceived convention for singling-out and completing acquisitions.[52]  Jarden avoided acquisitions that would insert it in spaces where major pure-play competitors, like Proctor & Gamble, operated.[53]  Jarden, instead, concentrated on acquiring top brands in niche markets.[54]  This strategy developed secure trenches

---

[48] Trial Tr. 370:17–18 (Franklin) ("We were building a business, both organically and by acquisition."); JX 578 at 33.

[49] JX 1519 at 40, 44; JX 30 at 36; JX 502 at 19; JX 1459.

[50] JX 1519 at 40.

[51] Trial Tr. 125:12–22 (Gross); JX 502 at 25; JX 1773 (Talwar Dep.) at 21:19–22:3, 27:6–10.

[52] The strategy included targeting: (i) category-leading positions in niche consumer markets; (ii) with recurring revenue and margin growth channels; (iii) robust cash flow characteristics, including substantial EBITDA multiples; (iv) a successful management team; and (v) strong transaction valuations, with value-generating presynergies. JX 502 at 25.

[53] JX 1778 (Ashken Dep.) at 24:25–25:21; JX 1773 (Talwar Dep.) at 28:4–13.

[54] *Id.*

that presented barriers to others who might look to compete with Jarden's niche product lines.[55]  It also enabled Jarden globally to expand its brands.[56]

**D. Jarden Shifts Its Strategic Focus**

Jarden's businesses sold their products across a vast spread of distribution channels, including business-to-business, direct-to-consumer ("DTC"), e-commerce retailers, and club, department store, drug, grocery and sporting goods retailers.[57] In 2014, Jarden committed to expanding its DTC operations by promoting then-Vice President of International Development, Leo Trautwein, to Vice President of Direct to Consumer and Revenue Development.  Trautwein, along with Jarden management, developed a DTC Council that comprised of representatives from Jarden and each of its individual business units.[58]  The DTC Council aimed to detect

---

[55] JX 1777 (Lillie Dep.) at 133:2–21; JX 1773 (Talwar Dep.) at 27:11–24.

[56] JX 502 at 11.

> [We] . . . looked at everything.  Again, it goes back to being professional opportunists, in terms of building a business.  You've got to—you know, we were a fairly unusual group.  We started from a $200 million business 15 years prior, to becoming a 10-plus billion dollar business 15 years later. It wasn't done from sitting behind a desk.  We were building a business, both organically and by acquisition.

Trial Tr. 370:11–18 (Franklin).

[57] PTO ¶40.

[58] JX 763 at 25.

DTC best practices and put in place DTC initiatives.[59] It set meaningful benchmarks to enhance DTC sales.[60] In their July 2015 Board presentation, Jarden management expected online sales to represent 13% of Jarden's total sales by 2019, equating to 15.9% of total EBITDA.[61] The DTC initiative, on the other hand, was expected to yield a 55–60% return on investment.[62] As it turned out, from 2012 through 2016, Jarden's DTC e-commerce sales (i.e., not including brick and mortar DTC sales) experienced a more than 270% increase in five years—expanding from roughly $237 million to $643 million.[63]

**E. Jarden Makes Two Major Acquisitions Just Prior to the Merger**

Jarden completed two of the largest acquisitions in its history in 2015. In July 2015, Jarden acquired the Waddington Group, Inc. for approximately $1.35 billion.[64] Waddington manufactures plastic consumables for the $14 billion U.S. food sector

---

[59] JX 514 at 10.

[60] JX 1393.

[61] JX 763 at 22.

[62] *Id.* at 17.

[63] JX 1795 at 21.

[64] PTO ¶110.

market.[65]  The acquisition was projected to yield revenue of $840 million in 2016 with an approximately 20% EBITDA margin.[66]

In November 2015, Jarden acquired the parent company of Jostens, Inc. for $1.5 billion.[67]  Jostens was a market leader in manufacturing and marketing yearbooks, rings, caps and gowns, diplomas, regalia and varsity jackets, mainly selling to schools, universities and professional sports leagues.[68]  Jarden predicted the Jostens acquisition would not only offer Jarden "unique access to the difficult-to-enter academic market,"[69] but also would allow Jarden to grow a number of its existing distribution channels and develop new ones, intensifying Jarden's DTC impact.[70]  Jostens provided superior market positions, steady financial performance, strong margins and attractive cash flow to Jarden's portfolio.[71]  Indeed, Jostens'

---

[65] JX 527 at 23, 26.

[66] *Id.* at 23; JX 606 at 3–4.

[67] PTO ¶113.

[68] JX 726 at 15.

[69] *Id.*

[70] Trial Tr. 455:3–9 (Franklin) ("Q. And in 2015, you were spending real money on direct-to-consumer and expanding your distribution channels.  Correct?  A. Well, we bought a business that expanded our distribution capabilities.  We bought Jostens for the same kind of reason.  It gave us a different access into schools.").

[71] JX 726 at 11; JX 823 at 3–4.

gross margins were anticipated to better Jarden's overall margins and, in fact, the transaction was instantly accretive.[72]

Overall, Jarden anticipated that these two acquisitions would push Jarden's total annual revenues over the $10 billion threshold. At the same time, however, they simultaneously would increase Jarden's debt to a point where Jarden would be unable to make another substantial acquisition for at least another year.[73]

## F. Franklin Considers a Sale of Jarden

Jarden was not Franklin's only business interest. In 2013, Franklin founded Platform Specialty Products Corporation ("Platform"), a specialty chemicals production company, with financial backing from Bill Ackman.[74] In 2014, Franklin founded Nomad Foods Ltd. ("Nomad"), a frozen foods company headquartered in the U.K.[75] Franklin also ran a "family investment vehicle" called Mariposa Capital.[76] Mariposa entities often acquired orphan brands, like its acquisition of

---

[72] JX 726 at 12.

[73] JX 1816 at ¶¶46–48, Figure 11; JX 1439.

[74] PTO ¶234. As of the Merger Date, Ashken was a director of Platform. *Id.* ¶61; JX 576 at 2.

[75] PTO ¶235. As of the Merger Date, Lillie was a director of Nomad. *Id.* ¶63.

[76] JX 1780 (Franklin Dep.) at 359:15–16; PTO ¶97. Lillie and Ashken were also investors in Mariposa. Trial Tr. 527:11–13 (Franklin).

Royal Oak in 2016.[77] In 2017, after the Merger, Franklin created a special purpose acquisition vehicle, J2 Acquisition Limited ("J2"), that raised more than $1 billion in order to buy consumer-focused brands.[78] Franklin also looked forward to pursuing business ventures with his sons, as his father did with him.[79]

In early July 2015, during a meeting between Franklin and Roland Phillips of Centerview Partners relating to Nomad, Phillips mentioned that Newell's CEO, Michael Polk, wanted to meet Franklin.[80] As discussed below, Newell had previously retained Centerview to assist with Newell's search for transformative M&A opportunities.[81] Understanding that Polk would likely want to talk about a Newell/Jarden transaction, Franklin told Phillips he would take the meeting, he

---

[77] PTO ¶282. But for the Merger, Franklin would have pursued the Royal Oak transaction for Jarden. Trial Tr. 559:4–560:5 (Franklin). Jarden's lead independent director, Michael Gross, also participated in the Royal Oak acquisition. *Id.*; JX 1807 (Gross Dep.) at 14:22–15:10. Gross and Franklin have been close personal friends for 30 years. JX 1807 (Gross Dep.) at 15:14–18.

[78] PTO ¶249; JX 1807 (Gross Dep.) at 93:7–8. Ashken and Lillie were also investors in J2. JX 1770.

[79] JX 765; JX 1804 (Polk Dep.) at 71:20–72:12; JX 1779 (Tarchetti Dep.) at 164:14–165:3.

[80] JX 533; JX 490; PTO ¶125; Trial Tr. 584:12–585:24 (Polk). Phillips previously worked opposite Franklin in a transaction with Nomad. Trial Tr. 585:14–18 (Polk); Trial Tr. 373:6–18 (Franklin).

[81] Trial Tr. 576:5–13 (Polk); JX 490; JX 524; PTO ¶123.

20

"would gladly take equity, [and he] ha[d] no issue with someone else running the combined business."[82]

Later that month, Franklin met with Bill Ackman, his Platform partner, and expressed his willingness to sell Jarden so he could devote more energy to Platform and Nomad.[83] Ackman emailed Warren Buffett the following day and indicated that Franklin would entertain a negotiated sale of Jarden to Berkshire Hathaway.[84]

Franklin was not authorized by the Board to entertain discussions regarding a sale of Jarden nor did he disclose to the Board his discussions with Phillips or Ackman.[85]

## G. Newell and Franklin Meet

Like Jarden, Newell was a major consumer products company with a vast portfolio of products sold under brands like Sharpie, Paper Mate, Elmer's, Rubbermaid, Lenox, Graco and Baby Jogger.[86] In 2011, Newell implemented a

---

[82] JX 533; PTO ¶125.

[83] JX 576 at 2.

[84] *Id.*

[85] JX 1807 (Gross Dep.) at 28:9–19; JX 1788 (L'Esperance Dep.) at 121:10–122:3; JX 1786 (Wood Dep.) at 157:25–158:14.

[86] PTO ¶79. Newell was a member of the NYSE and the S&P 500. PTO ¶84. It was followed by at least 16 financial analysts and, like Jarden, its stock exhibited the attributes of a narrow "bid-ask spread," a high average trading volume and a large public float. JX 1816 at ¶57, Figure 15.

strategic roadmap known as the "Growth Game Plan" under the direction of its new CEO, Polk.[87] This plan incorporated an initiative known as "Project Renewal" to streamline the Company's business structure and decrease costs.[88]

For many years, Newell operated as a traditional holding company, much as Jarden did, owning several portfolio businesses that essentially functioned as independent companies.[89] In 2010, Newell retooled by implementing an integrated operating company model as contemplated by Project Renewal.[90] Newell "delayered the structure of the company, . . . releas[ing] a whole bunch of money" that was invested back into Newell's brands.[91] As a result, Newell doubled its brand expenditures, creating fast-tracked growth and amplified margins for its business.[92] By the fall of 2014, Newell realized that the "investment firepower" Project Renewal generated "was going to wane" by late 2018.[93] It needed a new growth plan.

---

[87] Trial Tr. 566:21–567:8 (Polk).

[88] Trial Tr. 567:9–569:3 (Polk); *see also* Trial Tr. 721:22–722:5 (Torres).

[89] PTO ¶80. Trial Tr. 566:11–20 (Polk).

[90] Trial Tr. 566:11–20 (Polk).

[91] Trial Tr. 567:20–569:3 (Polk).

[92] Trial Tr. 571:2–7 (Polk).

[93] Trial Tr. 571:20–572:2 (Polk).

22

In late 2014, Newell initiated a strategy of pursuing "transformational M&A" opportunities that would generate larger scale and market share in its central businesses, in addition to new prospects for growth.[94] This new strategy prompted Newell to engage Centerview to produce a list of possible targets for Newell and to arrange "get-to-know-you meetings" as requested.[95] While Jarden was included on Centerview's list, it was the target "least familiar" to Newell since it "had been built [steadily] through acquisitions from 2001 onward" and was, therefore, in Newell's eyes, a "relatively new company."[96] Polk had reservations about Jarden because it was seen as a "company of diversified niche categories," when Polk was "looking for scaled brands and big, global categories."[97] Even so, Polk asked Centerview to arrange the "get-to-know-you meeting" with Franklin.[98] As noted, Franklin agreed to take the meeting.[99]

---

[94] Trial Tr. 572:6–574:19 (Polk).

[95] Trial Tr. 576:12–582:1 (Polk). *See* JX 655; JX 860.

[96] Trial Tr. 581:10–17 (Polk).

[97] Trial Tr. 581:18–582:1 (Polk).

[98] Trial Tr. 584:12–24 (Polk); Tr. 373:19–24 (Franklin).

[99] Trial Tr. 375:5–14 (Franklin). As Franklin explained, "[i]f a CEO wants to meet with me, I'll always want to meet with him." Trial Tr. 376:17–20 (Franklin).

Franklin and Polk's first meeting took place at the Barclays' investor "Back-to-School" conference on September 9, 2015 (the "Back-to-School Meeting").[100] The conversation exposed their different perspectives regarding the roles they played at their respective companies—Franklin defined his role at Jarden as creating value and "[t]hat's it," while Polk defined his role at Newell as building stronger brands and a stronger company.[101] In other words, Franklin focused on M&A, while Polk concentrated on organic growth.[102] Near the meeting's end, Franklin directed the conversation to where he believed Polk wanted it to go by confirming that his team was open to "strategically connecting" with Newell.[103] The meeting closed with both Franklin and Polk agreeing to continue the conversation about a potential deal.[104]

Polk reported back to the Newell board that Franklin "cut straight to the chase about being willing to sell his company and offered a deeper discussion over the next few weeks."[105] At this point, however, Franklin still had not informed Jarden's

---

[100] JX 902; PTO ¶¶127, 129.

[101] Trial Tr. 588:3–13 (Polk).

[102] Trial Tr. 586:14–21 (Polk).

[103] Trial Tr. 376:13–20 (Franklin); Tr. 588:22–589:7 (Polk).

[104] JX 902 at 2.

[105] *Id.*

Board that he was entertaining Newell's overture.[106] Indeed, it was not until several days after the Back-to-School meeting that Franklin made individual calls to members of the Board to let them know about his discussions with Polk.[107]

For his part, Polk warmed quickly to the idea of acquiring Jarden, believing that Jarden would provide scale and immediate cost synergies once Newell consolidated Jarden's operations per Project Renewal.[108] As Polk explained, "we believed we had the potential, based on what we could see through the public data, to apply the playbook we'd just run on Newell Rubbermaid to a broader set of categories that looked very similar to the categories that we were managing as part of [Newell]."[109]

On October 5, 2015, Franklin and Polk met again, this time on Franklin's yacht in Miami, along with Ashken, Lillie and Mark Tarchetti, Newell's then-Chief

---

[106] JX 1788 (L'Esperance Dep.) at 54:13–22; JX 1786 (Wood Dep.) at 25:2–7, 26:10–19. The Board met on September 28, 2015, but the minutes do not reflect any discussion of a potential transaction with Newell or Franklin's September 9th meeting with Polk. *See* JX 691; PTO ¶131.

[107] Trial Tr. 378:24–380:18, 480:16–17 (Franklin); JX 1788 (L'Esperance Dep.) at 57:2–23, 58:22–59:3 (Franklin called board members to advise them on meeting); JX 1807 (Gross Dep.) at 26:24–27:12 (same); JX 1786 (Wood Dep.) at 28:20–29:8, 33:20–34:4 (same).

[108] Trial Tr. 566:9–20 (Polk).

[109] Trial Tr. 598:10–16 (Polk); JX 1779 (Tarchetti Dep.) at 29:18–30:9, 32:10–33:9 (explaining Jarden "was by far the most likely [acquisition] candidate to reapply the Newell Rubbermaid business model" of consolidation, which "could release a large amount of value").

Development Officer (the "Boat Meeting").[110]  While Franklin informally provided some advance notice of the Boat Meeting to certain members of the Board, he did not obtain Board approval to meet with Newell and certainly did not have Board approval to discuss the financial parameters of a deal.[111]  But that is precisely what he did.

Franklin advised Newell's team that Newell's offer for Jarden would have to "start with a six" and would have to include a significant cash component if Newell's goal was to gain control of the combined company.[112]  According to Franklin, he arrived at this number based, in part, on his understanding of Jarden's value as determined in connection with the Jostens acquisition which was underway as of the

---

[110] JX 685 at 2; JX 902 at 2; PTO ¶132.  Trial Tr. 383:23–384:8 (Franklin).  Following the Merger, Tarchetti became the President of the combined entity.  JX 1779 (Tarchetti Dep.) at 14:17–21.

[111] JX 1788 (L'Esperance Dep.) at 58:9–21; JX 1786 (Wood Dep.) at 31:12–25; PTO ¶133. I note that Franklin's testimony that he did not intend to negotiate definitive deal parameters during the Boat Meeting was credible.  Trial Tr. 486:11–16 (Franklin). It appears, instead, that Franklin intended to lay out certain expectations and then "tell[] [the] Newell [team that] if they had different expectations, they shouldn't bother spending time, effort, and money."  Trial Tr. 489:14–17 (Franklin).  As Franklin explained, "I didn't want to go down the path of having any real substantive conversations unless they understood that we were looking for a real premium."  Trial Tr. 469:2–22 (Franklin); *see also* Trial Tr. 384:21–385:2 (Franklin); JX 1778 (Ashken Dep.) at 64:4–9 (explaining "we sort of made it very clear that Jarden wasn't for sale; but if we got an extraordinary offer our job was to create value for our shareholders, so we would always listen to whatever Mike had to say").

[112] JX 1794 (Christian Dep.) at 159:9–160:14; JX 1780 (Franklin Dep.) at 72:2–3; JX 1804 (Polk Dep.) at 85:24–86:7; JX 1779 (Tarchetti Dep.) at 305:24–306:10; PTO ¶134.

Boat Meeting.[113] He also wanted to state a number he believed Newell had the "ability to pay,"[114] and he assumed a price of $70.00 or higher was "laughable."[115] At the time of the Boat Meeting, Jarden's stock was trading in the high $40s.[116] Therefore, by this metric, a price "starting with a six," by any measure, would be a premium for Jarden's stockholders.[117] According to Franklin, even if $60 per share undervalued Jarden,[118] Franklin believed Jarden stockholders would reap additional value by sharing in the upside of the Merger with stock in the combined company.[119]

On the other side of the table, Polk expressed Newell's hope that a merger would open substantial synergies given the Newell team's demonstrated ability to

---

[113] JX 2502; JX 1778 (Ashken Dep.) at 64:17–65:4, 97:14–98:2; JX 1785 (LeConey Dep.) at 27:10–21; Trial Tr. 369:22–370:2, 471:11–472:16 (Franklin). While Jarden had asked Barclays to prepare some preliminary combination models and to do some "rough math" prior to the Boat Meeting (Trial Tr. 472:7–8 (Franklin); JX 688), Jarden had no formal analysis of its standalone value, nor had it retained a financial advisor when Franklin set the range for a transaction at $60–$69 per share. JX 1789 (Welsh Dep.) at 135:14–136:3; Trial Tr. 470:18–471:8 (Franklin).

[114] JX 1780 (Franklin Dep.) at 95:15–19. *See also* Trial Tr. 473:24–475:1 (Franklin) (explaining his sense of Newell's financial limits).

[115] Trial Tr. 391:24–392:10 (Franklin).

[116] Trial Tr. 385:10–14 (Franklin).

[117] Trial Tr. 385:24–386:4 (Franklin); Trial Tr. 666:6–7 (Polk) ("And I interpreted that to be between 60 and 69, which is a very wide range."); *see also* JX 1778 (Ashken Dep.) at 65:21–23 (referring to a price in the $60s as "a very, very, very, very full price").

[118] Trial Tr. 474:14–475:1 (Franklin); JX 1780 (Franklin Dep.) at 103:3–13.

[119] Trial Tr. 475:18–476:22 (Franklin).

consolidate business functions and utilize the resulting cost savings to produce growth.[120] Jarden's team had a more modest outlook on possible synergies in the early stages of the discussions, but became progressively more "excited" by the opportunity to unlock significant transaction synergies as the negotiations advanced.[121]

Although he had not sought Board approval to meet with Newell, Franklin briefed the Board on the Boat Meeting within a matter of days, including his admonition to Newell that an offer would need to "start with a six."[122] The Board was supportive and encouraged Franklin and his team to continue the discussions with Newell within Franklin's outlined parameters.[123]

Jarden did not formally engage Barclays until November 2015. Even so, Franklin contacted Welsh, his personal Barclays banker, on October 16, 2015, after the Boat Meeting.[124] Franklin told Welsh he already signaled to Newell that Jarden

---

[120] Trial Tr. 598:3–16 (Polk) (explaining that "the logic for the deal" was the expectation of synergies by recreating the success of Project Renewal); *see also* JX 674 at 2 (Polk noting that "there are <u>tons of synergies</u> because they have not done what we have done with Renewal (they are a holding company)") (emphasis in original).

[121] Trial Tr. 387:13–388:23 (Franklin); *see also* Trial Tr. 664:3–665:8 (Polk).

[122] Trial Tr. 391:24–392:10 (Franklin).

[123] JX 1788 (L'Esperance Dep.) at 60:5–13 (discussing Franklin's view that any offer "needed to start with a 6 handle" and explaining that "[g]iven where the stock was trading, that made a lot of sense"); *see also* JX 1786 (Wood Dep.) at 49:3–11.

[124] Trial Tr. 548:22–549:4 (Franklin); JX 1789 (Welsh Dep.) at 135:14–136:3.

would agree to sell at $60 per share and instructed him to start developing an analysis supporting a transaction in the range of $60–$69 per share.[125]

## H. The Ebb and Flow of the Negotiations

On October 9, 2015, Newell distributed a press release revealing that Tarchetti and another executive would leave Newell at the end of the year.[126] Franklin was "very upset" Polk had not informed him that "his chief lieutenant" was on his way out of Newell.[127] Franklin was so upset, in fact, that he entertained the idea of "stopping the conversations at that point" because he "didn't want to look stupid in front of [the Jarden] board . . . [by] having a conversation with someone that wasn't serious."[128] Within days of the announcement, Franklin and Polk had a "tough conversation" where Polk explained that Tarchetti would stay with Newell if the parties agreed to a deal.[129] After this, Franklin "got over it" and negotiations continued.[130]

---

[125] JX 769; JX 785; JX 915; JX 977; JX 1073; JX 1203; JX 1862; Trial Tr. 550:16–20 (Franklin); JX 1789 (Welsh Dep.) at 137:22–138:18.

[126] Trial Tr. 392:8–15 (Franklin); *see also* JX 1778 (Ashken Dep.) at 62:23–63:2.

[127] Trial Tr. 392:16–393:6 (Franklin).

[128] *Id.*

[129] Trial Tr. 393:7–394:2 (Franklin).

[130] *Id.*

As the parties were discussing a Jarden/Newell combination, Jarden was closing the Jostens deal. On October 14, 2015, Jarden announced it would acquire Jostens and finance the acquisition through an equity offering priced at $49.00 per share and additional debt.[131] The next day, Jarden presented five-year projections to potential financing sources that reflected net sales growth of 3.1% (the "Lender Presentation").[132]

The market reacted negatively to the Jostens acquisition.[133] Jarden's stock price dropped approximately 12% over the following two weeks and analysts' reduced their Jarden price targets accordingly.[134] The Board determined that Jarden needed to project confidence to the market. Accordingly, in early November 2015, it approved a stock buy-back up to $50 million at prices capped at $49.00 per share.[135] Jarden ultimately repurchased 276,417 shares on November 2, 2015, at an

---

[131] JX 2502 at 2, 10.

[132] JX 775.

[133] JX 871 at 1; JX 1779 (Tarchetti Dep.) at 259:14–261:13.

[134] On October 13, 2015, the day prior to the Jostens announcement, Jarden's stock price was $50.69. Jarden's stock price fell to $44.80 by the end of October 2015. PTO Ex. A; *see also* JX 1816 at ¶¶66–68.

[135] Trial Tr. 404:1–9 (Franklin). Franklin testified, "we were buyers up to [$]49, which we considered full value at the time." Trial Tr. 404:16–18 (Franklin).

average price of $45.96 per share, and repurchased an additional 775,685 shares on November 3, 2015, at an average price of $48.05 per share.[136]

On October 15, 2015, Franklin caused Jarden to enter into a mutual confidentiality and standstill agreement with Newell, and the parties began preliminary due diligence.[137] True to form, Franklin did not seek Board authorization to begin diligence on Jarden's behalf.[138] The next day, also without the Board's authorization, Franklin and Polk spoke on the phone to continue negotiations on the cash and stock components of a deal, and Franklin introduced the concept of Jarden taking seats on the combined company's board.[139]

On October 22, 2015, Franklin, Ashken and Lillie met with Newell representatives at Jarden's offices in Norwalk, Connecticut (the "Norwalk Meeting") and shared non-public information, including a set of three-year financial projections.[140] The three-year projections, apparently created in connection with the negotiations, incorporated financials for both the Waddington and Jostens

---

[136] JX 900 at 2.

[137] JX 1565 at 85; PTO ¶135. Trial Tr. 394:23–395:4 (Franklin).

[138] JX 1780 (Franklin Dep.) at 136:12–15; JX 1565 at 85. *See* Trial Tr. 492:5–10 (Franklin) (explaining Jarden's Board learned of the confidentiality agreement).

[139] PTO ¶136.

[140] JX 786 at 110; PTO ¶138; Trial Tr. 396:17–397:2 (Franklin); Trial Tr. 602:24–603:15 (Polk).

acquisitions,[141] and forecast 5% revenue growth, i.e., growth at the high end of Jarden's historic guidance range of 3% to 5%.[142]

Entering into negotiations with Newell, Jarden had set the market standard for average annual revenue growth within the 3% to 5% range.[143] These growth figures were meant to reflect Jarden's "organic growth" range, but they included revenue from "tuck-in" acquisitions, where a Jarden portfolio company would acquire a target.[144] Other public companies operating as holding companies typically do not include tuck-in acquisitions when projecting "organic growth."[145] Nevertheless, even when tuck-in acquisitions are excluded, Jarden generally performed in line with its target growth range.[146]

At trial, Lillie justified giving Newell projections at the very top of the Company's 3%–5% guidance range by explaining that 5% was a "round

---

[141] JX 786 at 110; JX 1777 (Lillie Dep.) at 131:7–12, 148:6–149:5.

[142] JX 786 at 111; *see also* Trial Tr. 827:19–828:11 (Waldron).

[143] JX 1777 (Lillie Dep.) at 24:16–25:8.

[144] Tuck-in acquisitions usually amounted to less than 1% of Jarden's yearly revenue. *See, e.g.*, JX 380 at 11; JX 1778 (Ashken Dep.) at 20:6–16; JX 432 at 5; JX 380 at 3, 11.

[145] Trial Tr. 929:9–930:9 (Zenner).

[146] JX 1816 at ¶30; JX 1831, Ex. 5A. Jarden achieved "organic growth" of 4% (including tuck-in acquisitions) and adjusted organic growth of 3.2% (excluding all acquisitions), from 2011 to 2015. *Id.*

number[]."[147] He went on to explain that, while the projections given to Newell were not "wildly optimistic," Jarden internally projected growth "in the fours."[148] Polk took notice of Jarden's "really aggressive" projections.[149] He and his team determined that it was best to stick with the 3.1% growth projections as stated in the Lender Presentation when evaluating the transaction.[150]

In November 2015, Jarden's financial advisor, Barclays, asked Jarden management for projections extended to 2020.[151] In response, Lillie told Barclays to "extrapolate out" the three-year forecast at a continuing growth rate of 5% (the "November Projections").[152] Barclays used these five-year projections in its analyses of the potential transaction and in its fairness opinion.[153]

---

[147] Trial Tr. 106:13–107:3 (Lillie).

[148] Trial Tr. 106:1–9 (Lillie); JX 1777 (Lillie Dep.) at 252:15–253:6.

[149] Trial Tr. 604:3–12 (Polk) (explaining Newell did not use Jarden's projections because "I didn't believe 6 percent and 5 percent compounded. Those were really aggressive growth rates in the environment."); *see also id.* 604:22–605:21 (Polk) (explaining that Newell utilized more realistic projections when analyzing Jarden's value).

[150] JX 1252 at 12; JX 1247 at 29.

[151] JX 927 at 1.

[152] *Id.*

[153] JX 1045 at 31; JX 1205 at 44. With only minor adjustments for 2015 year-end actuals, the November Projections were also included in the Company's proxy statement regarding the Merger.

In addition to negotiating price terms during the Norwalk Meeting, Newell and Franklin began to discuss specifics regarding change-in-control payments that would be due to Franklin, Ashken and Lillie in the event of a merger.[154] And, again, Franklin did not seek Board approval before undertaking these discussions.[155]

Following the Norwalk Meeting, Franklin, Ashken, Lillie and John Welsh of Barclays on behalf of Jarden, and Polk and Tarchetti on behalf of Newell, met for dinner.[156] Franklin believed whether the transaction would be consummated depended on whether Tarchetti stayed at Newell.[157] Accordingly, he asked Tarchetti to share his thoughts on the potential transaction.[158] Tarchetti declined to respond, explaining he believed Newell still lacked adequate information to evaluate the transaction.[159] Franklin was not happy.

---

[154] JX 791 (Tarchetti told a colleague that "Martin change of control" was on a list of discussion points Franklin brought to the meeting on October 22); JX 1807 (Gross Dep.) at 33:20–35:4.

[155] JX 1807 (Gross Dep.) at 38:12–16, 67:13–25; JX 1788 (L'Esperance Dep.) at 89:6–8; JX 1786 (Wood Dep.) at 67:12–15, 68:11–13.

[156] Trial Tr. 397:8–10, 399:6–10 (Franklin); *see also* JX 1789 (Welsh Dep.) at 154:4–10.

[157] Trial Tr. 397:15–398:4 (Franklin) ("I thought it was a little odd that, you know, a potential $20 billion transaction would all hinge on the whims of the guy who is not the CEO, who is not even on the board . . . .").

[158] *Id.*

[159] Trial Tr. 398:5–20 (Franklin); JX 1779 (Tarchetti Dep.) at 201:6–202:7.

After this "difficult dinner" among the negotiators, Franklin told Ashken and Lillie, "I'm done. I don't want to deal with this."[160] Likewise, Polk said he thought about "pull[ing] the plug" on the negotiations.[161] After a "conciliatory" call between Lillie and Tarchetti, however, the parties decided not to "let a bad dinner get in the way of looking at whether this makes sense[,]" and negotiations continued.[162]

The Board held its first formal meeting to discuss a potential Newell transaction on October 28, 2015.[163] There was no discussion of a pre-signing market check.[164] Instead, the Board focused its attention on Newell and directed that negotiations continue.[165]

In the meantime, Newell retained both Goldman Sachs ("Goldman") and Bain & Company ("Bain") as additional financial advisors to assist in evaluating a possible acquisition of Jarden.[166] Tasked with performing a thorough evaluation of

---

[160] Trial Tr. 398:16–20 (Franklin).

[161] Trial Tr. 615:5–14 (Polk); *see also* JX 799 at 2.

[162] JX 1779 (Tarchetti Dep.) at 221:24–222:9; Trial Tr. 398:21–399:5 (Franklin).

[163] JX 815; PTO ¶140; JX 1807 (Gross Dep.) at 35:9–36:17; JX 1786 (Wood Dep.) at 58:9–14.

[164] JX 1786 (Wood Dep.) at 94:22–95:6; JX 1807 (Gross Dep.) at 46:17–20; JX 1785 (LeConey Dep.) at 87:2–13; JX 1789 (Welsh Dep.) at 162:20–163:9.

[165] JX 815.

[166] JX 1779 (Tarchetti Dep.) at 246:17–247:7; Trial Tr. 725:7–14 (Torres).

Jarden's product categories, Bain's initial assessment was that Jarden's portfolio demonstrated strong performance across many promising product segments,[167] but its historic organic growth rate, once "tuck-in" acquisitions were separated, was at most 3.5%.[168] Early in the process, Centerview had projected that potential synergies of $500 million to $900 million would result from a combination with Jarden.[169] By the end of October 2015, Bain was estimating that the combination had the "potential to create $700M–$800M in cost synergies."[170] Bain's assessment encompassed "annualized savings" that would recur annually.[171]

Through due diligence, Newell discovered "almost every deal Jarden had done, which were profound in number, had been left standalone with almost no cost synergies or revenue synergies realized."[172] As a result of this holding company

---

[167] Trial Tr. 734:12–14 (Torres). Bain continued to analyze Jarden's category growth rates through closing. It eventually determined that Jarden's categories "were relatively weak and were actually losing market share," like the Coleman brand that lost distribution to dominant outlets such as WalMart. This prompted Bain to downgrade its category growth rate for Jarden to 2.5% as of closing. Trial Tr. 737:16–738:8 (Torres). When additional information became available post-closing, Bain further decreased Jarden's category growth rate to 2.2%. Trial Tr. 739:2–8 (Torres).

[168] Trial Tr. 753:1–7 (Torres).

[169] Trial Tr. 600:16–601:7 (Polk); *see also* JX 1309 at 80.

[170] JX 706 at 3; Trial Tr. 746:22–23 (Torres).

[171] Trial Tr. 741:4–742:2 (Torres).

[172] JX 1779 (Tarchetti Dep.) at 251:9–14; Trial Tr. 722:8–16 (Torres).

structure, Newell and its advisors believed that Jarden presented a substantial opportunity to replicate Newell's Project Renewal success by combining Jarden's businesses into Newell's operating company structure.[173]

## I. Newell Makes an Offer and Jarden Negotiates

On November 10–11, 2015, the Newell board met to discuss, among other things, whether to make an offer to acquire Jarden.[174] On the first day, Tarchetti presented the results of the diligence efforts so far, in addition to management's perspective on the benefits of a merger with Jarden.[175] On the second day, Bain and Goldman presented their analysis of potential synergies.[176] Bain opined that the potential Newell/Jarden "combination would enable ~$600M in cost savings opportunities, with potential upside to ~$700M."[177] Goldman appraised cost synergies based on comparable transactions ranging from 2.1% to 14.0% of revenue,

---

[173] Trial Tr. 598:10–16, 686:17–687:13 (Polk) (the "logic for the deal" was to apply the Newell integration playbook to Jarden's businesses); *see also id.* 699:6–9 (Polk) ("the costs associated with [Jarden's] decentralized model, that's where the synergies were").

[174] JX 957 at 1.

[175] *Id.* at 1–2.

[176] *Id.* at 3 (Bain "highlighted three key benefits of the deal: transformational scale; high cost synergies; and likely above average revenue synergies due to channel overlap and the ability to apply the Growth Game Plan to selected categories at [Jarden]").

[177] JX 973 at 42; Trial Tr. 767:2–24 (Torres).

with a median of 10.0%, translating to roughly $850 million of annual cost synergies resulting from the acquisition.[178]

Despite Bain and Goldman's synergies estimates, Newell and its advisors structured their deal model on an estimate of $500 million in annual cost synergies.[179] With this estimate, Newell's model priced Jarden at $57.00 to $61.00 per share.[180] Within these parameters, the Newell board understood that if its management team did not realize the $500 million synergies estimate, then Newell shareholders would not receive any increase in EPS.[181] After the advisors' presentations, the Newell board authorized management to negotiate an acquisition of Jarden at a price between $57.00 and $60.00 per share, with cash consideration up to $21.00 per share.[182]

On November 12, 2015, Polk sent Franklin an offer whereby Newell would acquire Jarden in a cash-and-stock transaction consisting of $20.00 cash plus a fixed exchange ratio of 0.823 Newell shares for each share of Jarden common stock,

---

[178] JX 943 at 11.

[179] Trial Tr. 614:4–18, 678:12–16 (Polk).

[180] *Id.*

[181] Trial Tr. 678:12–16 (Polk) ("The deal architecture assumed $500 million of gross synergies. If we didn't deliver $500 million of gross synergies, we would not have delivered the operating margin outcomes, and we would not have delivered accretive EPS.").

[182] Trial Tr. 616:12–23 (Polk); JX 957 at 9.

representing total per share consideration of $57.00.[183]  The offer reflected an 18%

premium over Jarden's then-current share price ($48.19) and a 19% premium to

Jarden's 30-day volume-weighted average share price ($47.89).  Newell arrived at

the cash and stock mix to preserve Newell's investment grade credit rating and

dividend policy.[184]  Polk's offer letter made clear that Newell "expect[ed] that

Mr. Franklin would join the Newell Brands Board of Directors given the role he has

played in Jarden's performance and strategy to date," and allowed that Newell was

"open to adjusting the size of our board and taking on a limited number of

[additional] members from Jarden's board."[185]

The Board met that day to discuss Newell's offer.[186]  Barclays made a

presentation regarding the adequacy of Newell's $57.00 offer in which it provided a

preliminary valuation of Jarden based on Jarden's historic market price as well as

comparable companies, precedent transactions and DCF analyses.[187]

While the $57.00 per share offer was higher than Jarden's stock had ever

traded, the Board unanimously decided "it was not inclined to engage in discussions

---

[183] JX 986; PTO ¶142.

[184] JX 986 at 2.

[185] *Id.*

[186] JX 976 at 1–2; PTO ¶143.

[187] JX 977.

and possible negotiation with [Newell] on the economic terms set forth in the [offer] [l]etter," and authorized management to "seek to obtain a revised proposal with more favorable proposed terms."[188]  The Board "emphasized that the Company was not for sale and that it would consider a potential business combination with [Newell] only on terms that appropriately valued the relative contribution (including revenue and EBITDA) of each standalone company to the pro forma combined company."[189]

The Board authorized Franklin to continue negotiations with Newell, but did not authorize him to make a counteroffer because, as director Robert Wood testified, doing so would "tie their hands."[190]  Franklin, however, recalled, "the board basically authorized [him] to go back and have further discussions and . . . push the envelope to try to come back to them with an enhanced offer from Newell."[191]

During the November 12 Board meeting, Franklin suggested that the Board formally engage Barclays as the lead banker for the Company and UBS Group AG as "co-investment banker."[192]  Jarden thought a transaction of this magnitude

---

[188] JX 976 at 2–3; Trial Tr. 405:12–16 (Franklin).

[189] JX 976 at 2; PTO ¶145.

[190] JX 1786 (Wood Dep.) at 91:22–25; *see also* JX 1807 (Gross Dep.) at 48:3–8 ("Q. Did Jarden to your knowledge ever make a counteroffer to Newell?  A. Not that I'm aware of. Q. Did the Board ever discuss parameters of the counteroffer?  A. Not that I'm aware of.").

[191] Trial Tr. 406:2–5 (Franklin).

[192] JX 976 at 3.

justified having two banks on board to guide the Company through the process.[193]

Barclays, in particular, had a longstanding, fruitful relationship with Franklin and it knew Jarden well.[194] Accordingly, Franklin believed Barclays was positioned to provide Jarden with "genuine good advice" on the potential merger.[195] And he believed UBS would serve as a well-informed source for "second opinions."[196] The retention of UBS, however, did cause Jarden director Ros L'Esperance to recuse

---

[193] Trial Tr. 562:4–5 (Franklin) ("The board wanted a second advisor."); *see also* JX 1778 (Ashken Dep.) at 100:12–101:6.

[194] Trial Tr. 407:2–15 (Franklin). Barclays earned about $180 million from all of Franklin's businesses, including nearly $70 million from Platform alone in the four years between Platform's founding and the Merger Date. JX 1805; Trial Tr. 546:11–17 (Franklin). Barclays' history with Franklin and his businesses earned Franklin "Platinum client" status. JX 438; JX 1789 (Welsh Dep.) at 50:25–54:4. The Board made no inquiry regarding the thickness of Franklin's relationship with Barclays and there is no indication that either Franklin or Barclays made any effort to disclose their past relationships to the Board. *See* JX 976; JX 1070.

[195] Trial Tr. 407:16–408:3 (Franklin).

[196] Trial Tr. 560:22–24 (Franklin). Franklin explained to the Board that UBS had done work for the Company in the past for free, and described the UBS engagement in connection with the Newell transaction as giving UBS a "kiss." Trial Tr. 561:19–562:12 (Franklin) ("I described it at one point as giving them a kiss. It was a way of saying thanks for all the work that you've done that you didn't get compensated for. We—you know, you're on par with a couple of other firms to do this advisory work for us for the board, and we're happy to have you do that work."). Petitioners argue that this means UBS was paid for doing no work and that the payment diverted value from stockholders. This is not a fair characterization of UBS's role. The record reflects that UBS prepared Board decks, led discussions at Board meetings and was generally available to the Board as a sounding board. Trial Tr. 560:22–24 (Franklin); JX 1785 (LeConey Dep.) at 35:23–36:10. Whether UBS's compensation was fully earned is beyond the scope of this appraisal proceeding.

herself from all deliberations and votes of the Board, as she led UBS's Client Corporate Solutions Group.[197]

On November 16, 2015, Jarden and Newell, along with their financial advisors, met to continue negotiations over the potential transaction.[198] In advance of the meeting with Newell, the Jarden management team scheduled an evening Board dinner anticipating there would be new developments in the negotiations that would require the Board's prompt attention.[199] In yet another demonstration of Franklin getting ahead of his Board, Franklin announced to the Newell team at the outset of the meeting that their $57.00 offer was too low and then made a counteroffer of $63.00 per share—$21.00 in cash with the balance in stock of the combined company.[200] The Newell team balked. Not only did they decline the

---

[197] Trial Tr. 408:4–15 (Franklin); JX 1807 (Gross Dep.) at 44:10–14; JX 976 at 3; PTO ¶146. *See* JX 1565 at 89 ("With respect to UBS, it was noted that Ms. Ros L'Esperance is the Head of Client Corporate Solutions of UBS, and as such she would be recused from all deliberations and votes of the Jarden board, if any, in respect of the possible business combination with Newell Rubbermaid.").

[198] Trial Tr. 408:24–409:8 (Franklin); JX 1001 at 1.

[199] Trial Tr. 411:4–10 (Franklin).

[200] Trial Tr. 409:1–8 (Franklin); Trial Tr. 618:24–619:3 (Polk); JX 1789 (Welsh Dep.) at 214:2–9; JX 1779 (Tarchetti Dep.) at 297:3–12, 300:8–16; JX 1807 (Gross Dep.) at 48:3–8; JX 1016 at 3; JX 1786 (Wood Dep.) at 91:15–92:2; PTO ¶148.

counteroffer on the spot, they also refused to raise their $57.00 offer.[201]  Discussions

turned "acrimonious" and the meeting abruptly adjourned.[202]

After the meeting, Ashken emailed the Board to advise that the parties were

at impasse and there was no need for the scheduled Board dinner.[203]  According to

Ashken, "[a]s far as we were concerned the deal was dead."[204]

## J.  Newell Increases Its Offer

On November 21, 2015, Newell submitted a revised offer to acquire Jarden

for $21.00 in cash plus a floating exchange ratio between 0.85 to 0.92 Newell shares

for each Jarden share to be determined based on Newell's trailing 10-day unaffected

volume weighted average price ("VWAP") at the time of signing, with a target price

of $60.00 per share.[205]  This revised proposal was a 30% premium over Jarden's

---

[201] Trial Tr. 410:2–7 (Franklin).

[202] JX 1778 (Ashken Dep.) at 116:22–119:20 ("[A]s we explained to them, we were not sellers.  If you want to buy it, buy it.  But don't waste our time.  And it was a pretty acrimonious meeting.  And it didn't make any difference to us whether we bought or sold."); *see also* Trial Tr. 410:8–24 (Franklin).

[203] JX 1778 (Ashken Dep.) at 116:13–21.

[204] JX 1778 (Ashken Dep.) at 119:6–9.  Franklin similarly explained: "I went back to the board and said, This deal is dead.  We tried to get a better offer out of them, and they refused."  Trial Tr. 504:23–505:1 (Franklin).

[205] JX 1069; JX 1066 at 2; JX 1149; PTO ¶153; JX 1064 at 2; *see also* Trial Tr. 619:18–620:5 (Polk) ($21.00 was "the limit to what we could afford" in cash consideration).  According to Franklin, Newell "blinked" and agreed to increase its offer.  Trial Tr. 412:19–413:2 (Franklin).

then-current stock price ($46.33) and a 27% premium over Jarden's 30-day VWAP ($47.43). Newell reiterated that it expected the potential merger to produce annual cost synergies of approximately $500 million.[206] It also renewed its offer for Franklin, Ashken, Lillie and a new independent director to join the board of the combined company.[207]

The Board convened the following day to discuss the $60.00 per share offer. After discussions with its financial advisers, the Board determined that the offer would be accepted and that Newell would be granted exclusivity during a period of confirmatory due diligence.[208] Outside director Robert Wood testified that the Board viewed the revised offer "much more favorably,"[209] and explained that while the Board thought Jarden's forecast of 5% growth over the next three years was achievable, "the [B]oard's level of concern [regarding future growth] was higher"

---

[206] JX 1064 at 3; *see also* JX 1779 (Tarchetti Dep.) at 307:4–8 ("So by this stage, we'd obviously recommended to the board that we should try to consummate the transaction because we believed the synergies would create a lot of value for both parties.").

[207] JX 1064 at 3.

[208] JX 1070 at 2; PTO ¶¶155, 157. Franklin went over the terms of the revised offer, discussing the increased proposed cash consideration from $20.00 to $21.00 per share and the formula for determining the exchange ratio. JX 1070 at 1. Barclays also presented its analysis of the updated offer, including a revised valuation analysis of Jarden as a standalone company. JX 1079 at 27–28.

[209] JX 1786 (Wood Dep.) at 112:5–6.

following recent acquisitions.[210]  Specifically, the Board had come to appreciate that Jarden could not sustain historic growth without pursuing "bigger and bigger acquisitions," a strategy the Company had found was increasingly difficult to execute.[211]  As a result, Wood and the other directors believed the $60.00 offer provided more value for shareholders than Jarden could deliver as a standalone company.[212]

Franklin believed the $60.00 offer represented a 13.5x EBITDA multiple, "a high multiple, by any standard, for our business . . . [and] the highest multiple, by far, our company would have ever traded or been valued."[213]  By way of comparison, just a few weeks before Newell delivered its revised offer, Jarden had acquired Jostens for $1.5 billion, representing a 7.5x EBITDA multiple.[214]  The Board also concluded that Jarden stockholders stood to benefit from any synergies on top of the

---

[210] *Id.* at 55:7–15.

[211] *Id.* at 55:10–56:9.

[212] *Id.* at 49:3–11.  *See also* JX 1778 (Ashken Dep.) at 68:19–23, 69:23–70:4 ("When we looked at it and we thought, you know, if we can realize something that begins with a 6 for our shareholders is that more than we could expect if we continue to run the operations and did all the stuff?  And we felt the answer was yes.").

[213] Trial Tr. 415:2–11 (Franklin).

[214] Trial Tr. 415:19–23 (Franklin).

$500 million estimate baked into the purchase price, by remaining invested in the combined company following the Merger.[215]

As noted, the Board agreed to mutual exclusivity.[216] This, of course, disabled any market check prior to consummation of the Merger.[217] The Board thought "Newell was the best and most likely acquirer of our business" and there were no other "companies that had the same fit in terms of synergies and ability to pay as Newell."[218] From the Board's perspective, Jarden was a "very diverse business" operating in siloed industries that were not of interest to other large consumer product companies.[219] Accordingly, the Board and management understood that

[215] Trial Tr. 684:13–685:22 (Polk) (explaining that $500 million in synergies was assumed in the deal model, but "if there's future value to be created, more synergies, more growth, then any equity owner benefits from that"); *see also* Trial Tr. 415:2–15 (Franklin). Franklin described the $60.00 offer as "a full and fair price by any measure." Trial Tr. 444:5–10 (Franklin).

[216] JX 1070 at 2–3; PTO ¶¶155, 157. During the exclusivity period, Franklin and Ashken continued to negotiate the terms of the Merger Agreement, but also negotiated for Franklin, Ashken, and Lillie to continue with the combined company as paid consultants through Mariposa. *See* JX 906; JX 1061; JX 1074.

[217] JX 1786 (Wood Dep.) at 102:6–8 (explaining the Board's view that "it would not be value enhancing and perhaps very distracting to management to run an auction"). Respondent acknowledges that the Board never considered authorizing its bankers to reach out to other potential strategic buyers or financial sponsors. *Id.* at 94:22–95:6.

[218] *Id.* at 100:13–23.

[219] Trial Tr. 419:21–420:5 (Franklin); *see also* Trial Tr. 918:10–921:11 (Zenner) (explaining that other large consumer product companies had targeted businesses and were probably not interested in a diversified company like Jarden). Until Newell surfaced, no potential acquirer had expressed interest in Jarden during its entire 15-year history. Trial Tr. 425:10–13 (Franklin).

Jarden would likely continue standalone unless a unique opportunity for a business combination came along.[220] Newell provided that opportunity.

## K. Jarden and Newell Finalize Deal Documents

Over November 29 and 30, 2015, Jarden and Newell convened at Jarden's Norwalk, Connecticut offices, where the Newell team continued its diligence and presented its strategic plan for the combined company.[221] Both Newell and Jarden knew from the outset that a deal could only be done if a substantial portion of the consideration was Newell stock.[222] Because Newell understood this and appreciated the magnitude and significance of Jarden's assets to the combined company, Newell committed that certain Jarden directors would be offered a seat on the Newell board post-closing.[223] Newell specifically wanted Franklin to sit on the combined board to provide a positive signal to the market of his confidence in the future of the combined company.[224]

---

[220] JX 1786 (Wood Dep.) at 129:2–130:14; JX 1778 (Ashken Dep.) at 65:5–10.

[221] JX 1565 at 90; JX 1116 at 194–242.

[222] Trial Tr. 475:2–7 (Franklin); Trial Tr. 617:5–18 (Polk).

[223] Trial Tr. 621:9–13 (Polk).

[224] Trial Tr. 620:17–20 (Polk); Trial Tr. 406:24–407:1 (Franklin) ("[I]t would almost look odd if I didn't agree to serve as a director in the go-forward company."); JX 1779 (Tarchetti Dep.) at 120:3–16, 124:6–18 (discussing Franklin's role as the "face of Jarden" and the importance of having Franklin on the board of the combined entity, which would serve as an endorsement of the Merger); JX 1803 (Cowhig Dep.) at 153:24–154:3.

The parties understood that Newell's management team would lead the combined company since capturing synergies through the implementation of Project Renewal was the "logic for the deal."[225] Franklin, Ashken and Lillie each were subject to two-year non-competition covenants in event they were terminated following a change of control.[226] Newell wanted to draw out these non-competition covenants to four years.[227] It also wanted to have access to Franklin, Ashken and Lillie as consultants post-closing if needed.[228] Accordingly, Newell, Franklin, Ashken and Lillie negotiated an "Advisory Services Agreement" that extended their non-competes but also provided for Mariposa (on behalf of the three executives) to be paid an annual consulting fee of $4 million for three years ($12 million in total).[229] The Advisory Services Agreement provided that Mariposa "shall, upon the request of [Newell], devote up to an average of 120 hours per fiscal quarter" to Newell, and

---

[225] Trial Tr. 686:17–687:13 (Polk) ("We wanted as part of—the deal terms, to get control of the company. Because there was no way that, without our leadership of the change agenda, those synergies were going to be realized."); JX 1778 (Ashken Dep.) at 153:15–19.

[226] JX 1778 (Ashken Dep.) at 163:13–14.

[227] *Id.* at 163:14–19 (explaining Newell was "very keen to have [the noncompete period] be four years" because Newell "had had a bad experience" before with competition from a past executive); *see also* JX 1807 (Gross Dep.) at 58:16–59:9 (noting Newell was "requiring that the management team extend their non-compete agreements from two to four years," which was a "big ask" since management was in the prime of their careers).

[228] Trial Tr. 526:18–20 (Franklin); JX 1779 (Tarchetti Dep.) at 347:15–349:7.

[229] JX 1233 at 2–3.

that Franklin and Ashken waived "any and all fees and compensation" they would have ordinarily received as directors of Newell during the term of the agreement.[230]

## L. The Leak

On December 7, 2015, *The Wall Street Journal* reported that Newell and Jarden were discussing a potential business combination, though the article did not reveal the specifics of who would be buying whom or the transaction consideration.[231]  In reaction to this news, Newell's shares traded up 7.4%, closing at $48.16 and Jarden's shares traded up 3.7%, closing at $50.09.[232]

Following the leak, and resulting impact on the companies' stock prices, the parties agreed that it no longer made sense to calculate the final exchange ratio based upon the 10-day trailing VWAP as of the day of signing.[233]  Ashken contacted Tarchetti to re-negotiate and the parties ultimately settled on a fixed ratio of 0.862,[234]

---

[230] *Id.*

[231] JX 1150 at 1–2; JX 1148; PTO ¶164.  According to one witness, Newell's counsel leaked news of the Merger to a reporter.  JX 1779 (Tarchetti Dep.) at 322:23–323:9.

[232] PTO, Exs. A, B.

[233] Trial Tr. 424:1–5 (Franklin); Trial Tr. 658:16–659:2 (Polk) (explaining that after the leak, Newell "had to" negotiate a fixed exchange rate because "we would have had exposure, potentially, if the stock had run one way or the other"); JX 1779 (Tarchetti Dep.) at 325:17–23 (fixing the exchange ratio was "in the interest of both parties because the stock prices were very volatile, and it was against the spirit of the agreement to not reflect the fact that there had been a leak"); JX 1778 (Ashken Dep.) at 136:12–17 (same).

[234] JX 1195 at 1.

resulting in total merger consideration at that time of $60.03 based upon Newell's closing stock price on December 11, 2015.[235]

The 10-day trailing VWAP through the last unaffected day prior to the leak, was $44.60.[236] If Jarden held firm to the original agreement, on top of the $21.00 in cash, Jarden stockholders would have received 0.874 shares of Newell stock for every share of Jarden stock they owned.[237] In other words, Jarden stockholders would have received $120 million more in consideration if not for the renegotiation.

## M. Jarden and Newell Stockholders Approve the Merger

On December 10, 2015, the Board met to discuss the status of negotiations and to assess whether the transaction continued to make sense. Lillie opened the meeting by presenting the 2015 estimated financial results that demonstrated 4.4% growth in organic net sales over 2014.[238] Barclays also presented a summary of the transaction's proposed terms and an analysis of Jarden's standalone value.[239] The meeting minutes emphasize that "the Company has not been and is not currently for sale and that remaining independent (as a standalone entity) is the sole alternative to

---

[235] JX 1241 at 5; Trial Tr. 507:1–19 (Franklin).

[236] JX 1218 at 2. Had Jarden negotiated for a 0.90 exchange ratio, Jarden stockholders would have received $380 million in additional equity. *Id.*

[237] *Id.*

[238] JX 1207 at 3.

[239] JX 1205.

the proposed business combination with Newell, which offers unique revenue and cost synergies and long-term value accretion opportunities for the Company's stockholders."[240]

Jarden's negotiating team had been discussing change of control payments with Newell for several weeks but raised the subject with the Board for the first time at the December 10 meeting.[241] Ashken recommended to the Board that he, Franklin and Lillie receive their 2017 and 2018 Restricted Stock Awards ("RSAs") should the transaction with Newell be approved.[242] The RSAs would not have been due under the existing employment agreements but Franklin's team instructed Barclays to include the RSAs in the shares outstanding calculation used for its valuation analyses of the transaction and they had already presented that share calculation to Newell.[243] John Capps, Jarden's General Counsel, advised the Board that Jarden was legally obligated to grant the RSAs even though the agreements themselves

---

[240] JX 1202 at 1.

[241] Id.

[242] Id.

[243] JX 906 at rows 15–17; JX 1057; JX 1072 at 1–2.

were, at best, ambiguous on the point.[244] Ultimately, the Board's Compensation Committee recommended that the Board award the 2017 and 2018 RSAs.[245]

The Board met next on December 13, 2015. Barclays presented the revised proposed deal terms and its revised valuation of Jarden as a standalone company.[246] Barclays also orally presented its opinion that the proposed merger was fair from a financial point of view to Jarden and its stockholders.[247] After hearing from Barclays and reviewing the final deal terms, the Board approved the Merger.[248] The Board also approved the separation agreements and amendments to the employment agreements with Franklin, Ashken and Lillie.[249] The final Merger Agreement

---

[244] JX 1786 (Wood Dep.) at 158:15–159:5. In addition to his work as Jarden's General Counsel, Capps has served as General Counsel for Platform since 2016. S&P Global Market Intelligence, *Platform Specialty Products* (ESI:NYSE) (2019). Capps was also to be a beneficiary of any grant of 2017 and 2018 RSAs. JX 1565 at 146–147.

[245] JX 1231 at 18. There is no evidence the Compensation Committee ever looked at the employment agreements. JX 1231 at 16; JX 1807 (Gross Dep.) at 66:12–22, 81:15–82:2 ("I don't even know if I've seen it before.").

[246] JX 1232; JX 1231 at 2.

[247] JX 1231 at 2; *see* JX 1255. Barclays delivered its written fairness opinion the following day. JX 1255.

[248] JX 1231 at 4. The Jarden board reiterated "its belief that the combined company's long-term value, prospects and benefits from the merger would exceed the value that could be realized by Jarden's stockholders were Jarden to continue operating on a stand-alone (independent) basis." *Id.* at 3.

[249] *Id.* at 4, 9. The amended employment agreements for Franklin, Ashken and Lillie extended the term of their non-competes upon termination from two years to four years. JX 1326 at 15. They also confirmed the acceleration of certain RSAs in connection with the transaction. JX 1326 at 15; *see also* Trial Tr. 638:11–16 (Polk) (explaining that the negotiations concerning the RSAs were between the Jarden executives and the Jarden

provided that Jarden stockholders would receive 0.862 shares of Newell stock plus $21.00 in cash for each Jarden share, representing a value as of signing of $60.03.[250]

The Newell board also met on December 13 to consider the final transaction terms and to receive Goldman and Centerview's final presentations.[251] In their analyses, both Goldman and Centerview used five-year projections for Jarden, assuming 3.1% revenue growth during FY18–20, consistent with the Lender Presentation and below the 5% revenue growth forecast in the November Projections.[252] Goldman maintained its estimate of $500 million in annual cost synergies.[253] Centerview estimated $500–$700 million in synergies.[254] After the

---

board). Franklin, Ashken and Lillie had three-year "evergreen" employment agreements. Under those agreements, they each were guaranteed their 2017 and 2018 RSAs, which the Board agreed to grant prior to the Merger. JX 1778 (Ashken Dep.) at 142:23–143:4, 146:4–7; Trial Tr. 517:9–19 (Franklin). Using Newell's stock price as of the Merger Date to determine the exchange ratio cash equivalent, Franklin received a total of $71.04 per share in Merger-related consideration, Ashken received a total of $76.11 per share and Lillie received an equivalent of $81.69 per share. JX 1818 at ¶40.

[250] JX 1231 at 2. The final Merger consideration represented a premium of 24.3% over the unaffected market price of $48.31 on December 4, 2015 (the last day of trading before the leak) and a premium of 24% over the VWAP of $48.35 for the 30-day period prior to December 11, 2015. *Id.*

[251] JX 1251 at 1–2.

[252] JX 1252 at 12; JX 1247 at 29; *see also* JX 775 at 5. Newell also used numbers in line with the Lender Presentation projections in its internal modeling and in the presentation made to rating agencies on December 7, 2015. JX 1154 at 41.

[253] JX 1230 at 10.

[254] JX 1228 at 7. Bain's report in advance of the meeting estimated total annual synergies ranging from $585 million to $1 billion, comprised of $500–$700 million in cost synergies and $85–$320 million in revenue synergies. JX 1139 at 50. Bain was "very comfortable"

presentations by its advisors, the Newell board approved the terms of the final Merger Agreement and the parties announced the Merger.[255]

## N. The Market Reacts

The Merger announcement, released on December 14, 2015, stated "[Newell] anticipates incremental annualized cost synergies of approximately $500 million over four years."[256] In response to the announcement, Jarden's stock price closed at $54.09, roughly 12% above the unaffected trading price of $48.31 from December 4, 2015.[257] The delta between Jarden's stock price and the implied Merger Price (i.e., the merger arbitrage spread) slowly narrowed following the announcement and ultimately converged in the days leading up to the closing.[258]

Newell's stock price rose 7.4% on December 7, 2015, when financial media outlets first reported the parties were negotiating.[259] When the final terms of the transaction were made public on December 14, 2015, however, Newell's stock price

---

Newell would meet at least the low end of its estimate range. Trial Tr. 773:14–22, 774:17–775:6 (Torres).

[255] PTO ¶¶179, 181.

[256] JX 1269 at 3.

[257] PTO, Ex. A.

[258] JX 1816 at ¶53. Jarden's stock price never closed above the implied Merger price prior to closing. *Id.* at ¶54.

[259] *Id.* at ¶58.

declined by 6.9% to $42.15.[260]  After accounting for market fluctuations, Newell's stock price after the announcement of the Merger terms reflected, at best, a neutral market response.[261]

On February 26, 2016, Jarden reported its 2015 year-end results, including a considerable loss in operating income and net income as compared to the prior two years.[262]  A few days later, on February 29, 2016, Lillie shared weak results for the first quarter of 2016 with the Board.[263]  Lillie also shared the final 2016 budget, which was adjusted downward to reflect year-end revenue of $9.79 billion (as compared to the $10.15 billion in the November Projections).[264]

During March and April 2016, before the Merger closed, Jarden management prepared updated multi-year projections for the period 2016 to 2020 (the "April

---

[260] *Id.* at ¶59.

[261] *Id.* at ¶¶59–60.

[262] JX 1519 at 68.  Net income fell by nearly 40% as compared to 2014 year-end.  *Id.*  Jarden also adjusted its guidance downward twice during 2015.  JX 454 at 4, 17, 41.  And, in November 2015, Lillie advised investors that Q4 2015 organic growth would be in the 2–4% range, not the 3–5% range as earlier reported.  JX 1034 at 1.

[263] JX 1514 at 1–2; *see also* Trial Tr. 622:15–17 (Polk) (noting that Jarden fell below its goals for Q1 2016).

[264] *Id.*; Trial Tr. 440:22–441:1 (Franklin); *see also* JX 1510; Trial Tr. 823:13–19, 856:1–6 (Waldron).  The 2016 budget assumed Jarden would remain a standalone company. Trial Tr. 830:16–21 (Waldron).

Projections").[265]  The original version of the April Projections reflected a "bottoms

up build" from the business units and forecast a 4.4% compound annual revenue

growth rate.[266]  This was well below the 5.0% forecast in the November

Projections.[267]

Jarden and Newell stockholders voted to approve the Merger on April 15,

2016.[268]  As of the closing, the mix of cash and Newell shares valued Jarden at

$59.21 per share.[269]

[265] JX 1562 (revised multi-year plan projecting $9.816 billion in total revenue); *see also* Trial Tr. 833:5–834:11 (Waldron).  Newell asked for a copy of Jarden's updated multi-year plan in mid-March 2016, which Jarden provided.  Trial Tr. 833:5–834:11 (Waldron). Newell later asked Jarden to reevaluate the operating cash flow assumptions in the plan. After doing this, Jarden circulated a revised version on April 1, 2016.  Trial Tr. 832:24–838:3 (Waldron).  *See also* JX 1563; JX 1597; JX 1598.  While this revision included minor adjustments, the annual revenue and EBITDA projections remained the same as those estimated in the unrevised plan.  *Id.*

[266] Trial Tr. 834:12–835:11 (Waldron).

[267] JX 1598; JX 1565; *see also* JX 1826 at ¶88, Figure 16.  Newell incorporated the revised multi-year plan into its own multi-year forecast.  Newell's forecast, however, assumed growth at 3.5%.  JX 1691 at 95; Trial Tr. 626:4–627:15 (Polk).

[268] PTO ¶183.  Over 97% of voting Jarden stockholders approved the Merger (representing 83% of the outstanding shares).  JX 1663 at 7.

[269] JX 1816 at ¶10.  The per share decrease in consideration from $60.03 to $59.21 reflects the change in Newell's stock price from signing to closing.

## O. Post-Closing

By January 2016, Bain shortened the time Newell would realize $500 million in recurring annual cost synergies from four years to three.[270] By May 2016, Bain raised its projection of potential cost savings to a range of $900 million to $1 billion.[271] In February 2017, Newell announced it would meet the initial estimate of $500 million in annual cost synergies by Q3 2018, and doubled the size of its total cost synergy target from $500 million to $1 billion, to be reached by 2021.[272] Newell also announced its intention to divest several businesses—both historical Jarden and Newell—and to exit certain product lines.[273] In early 2018, Newell announced it would sell businesses accounting for almost 50% of its customer base and approximately one-third of its revenue.[274]

The Jarden/Newell integration did not go smoothly.[275] Newell Brands (the combined company) faced an uphill battle with the divestitures of highly-

---

[270] Trial Tr. 780:14–781:2 (Torres); *see also* JX 1373 at 11.

[271] Trial Tr. 781:18–782:20 (Torres); JX 1691 at 7.

[272] Trial Tr. 783:4–784:7 (Torres).

[273] JX 1666; JX 2015; Trial Tr. 447:16–18 (Franklin); Trial Tr. 796:22–797:11, 798:20–799:11, 800:20–801:24, 802:18–804:3 (Torres).

[274] JX 1801; JX 1802; Trial Tr. 802:18–803:4 (Torres). Franklin strongly objected to this strategy. JX 1808; JX 1809; JX 1825; JX 1807 (Gross Dep.) at 16:9–14.

[275] JX 1803 (Cowhig Dep.) at 191:13–20.

profitable and valuable businesses.[276] In early 2018, Franklin resigned from the Newell Brands board in spectacular fashion, publicly proclaiming that Polk was "ruining the company" and calling for Polk's ouster.[277] Ashken, L'Esperance and long-time Newell director, Dominico De Sole, left the Newell Brands board soon after.[278]

After leaving, Franklin, Ashken and Lillie united with Starboard Value LP, an activist hedge fund, to advance a slate of directors to challenge the Newell Brands board.[279] Carl Icahn entered the mix and ultimately was successful in placing his slate of five directors on the Newell Brands board, thereby effectively ending the Franklin/Starboard-led challenge.[280] In the fallout of the proxy contest, Tarchetti, President of Newell Brands, resigned.[281]

---

[276] Newell Brands announced an agreement to sell Waddington in April 2018 for $2.3 billion, almost $1 billion more than the price Jarden paid less than three years prior. Trial Tr. 450:18–451:2 (Franklin) ("Q. Okay. Waddington, you bought for 1.35 million [sic] in July of 2015. Correct? A. Correct. Q. And Newell sold that business this year for 2.3 billion. Right? A. Correct. Q. They made almost a billion on that. Right? A. Yes.").

[277] Trial Tr. 447:2–11 (Franklin); JX 1808; JX 1809; JX 1823; JX 1834.

[278] JX 1803 (Cowhig Dep.) at 184:17–188:12; JX 1809.

[279] Trial Tr. 447:12–15 (Franklin); JX 1809.

[280] JX 1822.

[281] Newell Brands, Inc., Form 8-K at 3 (dated May 17, 2018).

## P. Procedural Posture

Between June 14, 2016 and August 12, 2016, four petitions for appraisal were filed in connection with the Merger.[282] By order of the Court dated October 3, 2016, the four appraisal actions were consolidated.[283] On July 5, 2017, Merion Capital LP, Merion Capital II LP and Merion Capital ERISA LP were dismissed from the consolidated action after reaching settlement agreements with Jarden.[284] On July 7, 2017, Dunham Monthly Distribution Fund, WCM Alternatives: Event-Driven Fund, Westchester Merger Arbitrage Strategy sleeve of the JNL Multi-Manager Alternative Fund, JNL/Westchester Capital Even Driven Fund, WCM Master Trust, The Merger Fund, The Merger Fund VL and SCA JP Morgan Westchester were also dismissed, again after reaching settlement agreements with Jarden.[285]

The Court held a four-day trial in June 2018. Three experts testified. For Petitioners, Dr. Mark Zmijewski evaluated the standalone value of Jarden on the Merger Date by conducting a market multiples analysis and a DCF analysis, ultimately relying on his multiples (comparable company) analysis for his fair value conclusion. He opined that Jarden's fair value on the Merger Date was $71.35 per

---

[282] PTO ¶11.

[283] D.I. 13.

[284] D.I. 35.

[285] D.I. 37.

share.  Dr. Zmijewski holds the Charles T. Horngren Professorship at the University of Chicago Booth School of Business.

For Respondent, Dr. Glenn Hubbard evaluated the standalone value of Jarden on the Merger Date by analyzing market evidence, including Jarden's unaffected market price and the Merger Price less synergies, and traditional valuation methodologies, including comparable companies and DCF.  Based on his DCF analysis, which he correlated to the market evidence, Dr. Hubbard opined that Jarden's fair value on the Merger Date was $48.01 per share.  Dr. Hubbard holds the Russell L. Carson Professorship in Finance and Economics in the Graduate School of Business of Columbia University, where he is also the Dean.[286]

Respondent also presented the testimony of Dr. Marc Zenner, a retired investment banker.  Dr. Zenner testified that the projected synergies estimates reported in the joint proxy statement issued by Jarden and Newell in connection with the Merger were conservative and that the synergies were taken by Jarden stockholders.  He also opined that the Board's decision not to hold an auction for Jarden was reasonable because Jarden's size and diverse product portfolio made it unlikely that a merger partner more suitable than Newell would have emerged.

---

[286] The expert reports were submitted under seal.  At the close of this case, the Court will unseal the reports.  Perhaps the legal and business academies will find interesting, and worthy of study and classroom discussion, how two such well-credentialed experts in their fields reached such wildly divergent conclusions regarding the fair value of the same company as of the same date.

Following post-trial briefing and argument, the Court wrote to the parties, as previewed at the conclusion of post-trial oral argument, to advise that it would postpone the issuance of its post-trial opinion in this case until our Supreme Court issued its decision in *Aruba*.[287] The parties submitted brief (and unsolicited) letters regarding *Aruba* on April 30 and May 1, 2019, at which time the matter was submitted for decision.

## II. ANALYSIS

Delaware's appraisal statute, 8 *Del. C.* § 262(h) provides, in part:

> Through [the appraisal] proceeding, the Court shall determine the fair value of the shares exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation, together with interest, if any, to be paid upon the amount determined to be the fair value. In determining such fair value, the Court shall take into account all relevant factors.[288]

"Section 262(h) unambiguously calls upon the Court of Chancery to perform an independent evaluation of 'fair value' at the time of a transaction . . . [and] vests the Chancellor and Vice Chancellors with significant discretion to consider 'all relevant factors' and determine the going concern value of the underlying company."[289] "By instructing the court to 'take into account all relevant factors' in

---

[287] D.I. 154.

[288] 8 *Del. C.* § 262(h).

[289] *DFC*, 172 A.3d at 364 (quoting 8 *Del. C.* § 262(h)).

determining fair value, the statute requires the Court of Chancery to give fair consideration to 'proof of value by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court.'"[290] Since "'[e]very company is different; [and] every merger is different,' the appraisal endeavor is 'by design, a flexible process.'"[291]

I have carefully considered all relevant factors. I have weighed those factors according to the credible evidence in the record and applied "accepted financial principles" as derived from that evidence.[292] To follow is my independent evaluation of Jarden's fair value as informed by my findings of fact.

## A. Merger Price Less Synergies

Respondent has proffered the Merger Price less synergies as a reliable indicator of fair value, and for good reason. Our Supreme Court has stated, "a buyer in possession of material nonpublic information about the seller is in a strong position (and is uniquely incentivized) to properly value the seller when agreeing to buy the company at a particular deal price, and that view of value should be given considerable weight by the Court of Chancery absent deficiencies in the deal

---

[290] *Dell*, 177 A.3d at 21 (quoting *Weinberger v. UOP*, 457 A.2d 701, 713 (Del. 1983)).

[291] *Id.*

[292] *Id.* at 22.

process."[293]  This court has heeded the Supreme Court's guidance and regularly rests its appraisal analysis on the premise that when a transaction price represents an unhindered, informed and competitive market valuation, that price "is at least first among equals of valuation methodologies in deciding fair value."[294]

In *PetSmart*, I observed, "[a]fter years of striving for it, Vince Lombardi finally arrived at the understanding that perfection in human endeavors is not attainable."[295]  "Even in the best case, a process to facilitate the sale of a company, constructed as it must be by the humans who manage the company and their human advisors, will not be perfect."[296]  With that said, I am mindful of our Supreme Court's guidance in *Dell*, where the Court observed that certain factors, including "fair play,

---

[293] *Aruba*, 2019 WL 1614026, at *6.

[294] *In re Appraisal of AOL Inc.*, 2018 WL 1037450, at *1 (Del. Ch. Feb. 23, 2018).  *See also In re Appraisal of PetSmart, Inc.*, 2017 WL 2303599, at *27 (Del. Ch. May 26, 2017) (collecting cases).

[295] *In re Appraisal of PetSmart, Inc.*, 2017 WL 2303599, at *27 (citing Chuck Carlson, *Game of My Life: 25 Stories of Packer Football* (Sports Pub. 2004) (quoting Coach Lombardi as opening his first Packers team meeting in 1959, after twenty years of coaching, by saying: "Gentleman, we are going to relentlessly chase perfection, knowing full well we will not catch it, because nothing is perfect.")).

[296] *Id.* (citing *Merlin P'rs LP v. AutoInfo, Inc.*, 2015 WL 2069417, at *14 (Del. Ch. Apr. 30, 2015) (observing that no "real-world sales process" will live up to "a perfect, theoretical model")).

low barriers to entry, [and] outreach to all logical buyers," are reflective of the kind of "robust sale process" that will discover a company's fair value.[297]

The "sale process" for Jarden, if one can call it that, raises concerns.  To be sure, there was no need for a full-blown auction of Jarden.  In this regard, Dr. Zenner's testimony, corroborated by other evidence, was credible.[298]  Moreover, there were signs of arms-length, provocative negotiating between Jarden and Newell.[299]  This is not surprising given that Jarden's negotiators owned millions of Jarden's shares and had every incentive to negotiate a good deal.[300]  But the evidence

---

[297] *Dell, Inc.*, 177 A.3d at 35.

[298] Dr. Zenner testified that auctions are less effective as companies increase in scale and complexity.  Trial Tr. 915:3–14, 916:17–917:17 (Zenner).  For sale transactions over $5.4 billion, as here, only one in five are the product of an auction.  *Id*.; JX 1817, App'x C-5. *See also* JX 1827 at ¶¶53–54 (explaining that the most logical strategic partners were too small to buy the Company); JX 1786 (Wood Dep.) at 101:18–102:11 (Jarden routinely "looked at likely people we could have business combinations with or that we could acquire . . . [and] didn't think there was anybody out there who would come in and make a preemptive offer to buy the company"); Trial Tr. 921:12–923:16 (Zenner); JX 1817 at ¶95 (explaining that financial sponsors were not interested in Jarden because its leverage was too high); Trial Tr. 419:6–8 (Franklin) ("In 15 years of building the company, I haven't had one company come and sort of make an offer to buy Jarden."); JX 1789 (Welsh Dep.) at 143:5–10 ("The combination with Newell was viewed to be a highly strategic combination that couldn't necessarily be replicated with other counterparties. . . ."); JX 1785 (LeConey Dep.) at 88:3–4 ("UBS was not aware of any other buyers that were interested in acquiring all of Jarden.").

[299] Trial Tr. 504:23–505:1 (Franklin) ("I went back to the board and said, This deal is dead. We tried to get a better offer out of them, and they refused."); JX 1778 (Ashken Dep.) at 119:6–9; *see also* JX 1807 (Gross Dep.) at 41:3–15.

[300] JX 1816 at ¶169, Figure 23.

revealed a troubling theme. Franklin immediately took charge and, consistent with a stereotypical "cut to the chase" CEO mentality,[301] he laid Jarden's cards on the table before the negotiations began in earnest and before the Board and its financial advisors had a chance to formulate a plan. Petitioners are right to complain that Franklin's approach may well have set an artificial ceiling on what Newell was willing to pay.

Franklin did not inform the Board he was meeting with Polk at the Back-to-School Meeting or the Boat Meeting, and he certainly did not receive authority from the Board to suggest a price ("beginning with a 6") at which the Board might agree

---

[301] I appreciate Franklin was no longer CEO when he negotiated with Newell. With regard to M&A, however, his role as Executive Chairman was tantamount to that of a typical CEO. Trial Tr. 367:15–22, 467:20–22 (Franklin).

to sell the Company.[302]  Franklin made counteroffers unauthorized by the Board.[303]

He negotiated his change-in-control compensation with no authorization from

(or knowledge of) the Board.[304]  And he recommended Barclays as the lead financial

[302] JX 1788 (L'Esperance Dep.) at 54:13–22, 58:9–21, 121:10–122:3; JX 1786 (Wood Dep.) at 25:2–7, 26:10–19, 31:12–25, 32:2–17, 157:25–158:14.   Franklin's revelation at the Boat Meeting that he would like to exit from Jarden in order to have more time to pursue business ventures with his sons also made an impression on Polk and, when coupled with his direction regarding an acceptable offer price, likely communicated to Newell that he was eager, maybe overly eager, to do a deal.  *See* JX 765 (Tarchetti reporting that Franklin revealed "his desire for an exit, which as the company figurehead is difficult. He says he would like to inve[st] in business with his sons having taken some money off the table (assuming he has about 0.5bn if this happened")); Trial Tr. 71:20–72:12 (Polk); Trial Tr. 164:14–165:3 (Tarchetti).  There is other evidence in the record that Franklin was perceived as an anxious seller.  *See* JX 576 (Bill Ackman's July 2015 email to Warren Buffett, copying Franklin, attempting to interest Buffett in acquiring Jarden); JX 533; JX 1786 (Wood Dep.) at 157:25–158:14; JX 860 (Centerview set up the first meeting between Franklin and Polk, marketing Jarden to Newell as a "willing seller."); JX 902 at 2 (Polk stating that Franklin "cut straight to the chase" about his willingness to sell Jarden).

[303] JX 1807 (Gross Dep.) at 38:12–16, 48:3–8, 67:13–25; JX 1786 (Wood Dep.) at 72:9–18, 91:15–92:2; JX 1788 (L'Esperance Dep.) at 89:6–8.

[304] JX 1049.  The Board justified the compensation awards after the fact.  JX 1212 at 15; JX 1565 at 146.  Moreover, as Franklin and Ashken were telling Newell they were entitled to the 2017 and 2018 RSAs, Jarden's Compensation Committee had not discussed the possibility of awarding those grants.  JX 1145; JX 1202.  The Board was told by in-house counsel Capps—who was also receiving 2017 and 2018 RSAs—that Jarden was contractually obligated to make these awards even though the agreements at issue were not clear on the point.  JX 1629 at 5; JX 1786 (Wood Dep.) at 158:15–159:5.  There are other troubling facts relating to the change-in-control payments, including that Franklin arranged for his long-time legal counsel to advise the Board with respect to the payments and the payments ultimately resulted in the lead negotiators for Jarden receiving substantially more in Merger consideration than Jarden's other stockholders.  *See* JX 1145; JX 1234; JX 1235; JX 1236; Trial Tr. 534:18–536:11–18 (Franklin); JX 1780 (Franklin Dep.) at 362:20–22.  Respondent argues the RSAs that made up most of the Merger consideration differential Franklin and the other Jarden managers received were owed to them "in the regular course absent a sale."  Resp't Jarden Corp.'s Opening Post-Trial Br. ("ROB") at 57.  The Merger agreement, however, terminated the employment contracts under which the RSAs were granted.  *See* JX 1235.  Franklin and the other Jarden managers claimed they were

66

advisor for the deal without fully disclosing his prior substantial relationship with the bank, just as he nudged the Board to hire UBS as a second banker as a "kiss" in gratitude for its prior uncompensated work for the Company.[305]

As factfinder, these flaws in the sale process, coupled with the fact that there was no effort to test the Merger Price through any post-signing market check, raise legitimate questions regarding the usefulness of the Merger Price as an indicator of fair value.[306] As explained below, the difficulty in assessing the extent to which Newell ceded synergies to Jarden in the Merger makes the Merger Price less synergies an even less reliable indicator of fair value.

In *Merion Capital LP v. BMC Software Inc.*, the court set forth a useful framework to approach the appraisal statute's mandate that the court appraise "the fair value of the shares exclusive of any element of value arising from the

contractually owed the 2017 and 2018 RSAs under their employment agreements before the separation agreements even existed. JX 906 at rows 15–17; JX 1057; JX 1072; JX 1786 (Wood Dep.) at 158:15–159:5. The Board then justified the disconnect by explaining the 2017 and 2018 RSAs served as consideration for the commitment to add two more years to the non-compete covenants. JX 1565 at 146. Of course, when the dust settled, the separation agreements extended the term of the non-compete covenants by only one year. JX 1234; JX 1235; JX 1236.

[305] JX 1805; Trial Tr. 546:11–17 (Franklin); JX 438; JX 1789 (Welsh Dep.) at 50:25–54:4; JX 1780 (Franklin Dep.) at 269:6–19.

[306] By so finding, I do not intend to suggest that Franklin or any Jarden fiduciary breached any fiduciary duty. That inquiry is beyond the scope of this appraisal proceeding. *See In re Unocal Expl. Corp. S'holders Litig.*, 793 A.2d 329, 340 (Del. Ch. 2000) (noting that a breach of fiduciary finding is beyond the scope of statutory appraisal).

accomplishment or expectation of the merger or consolidation."[307] *BMC* recommends a "two-step analysis[:]" "first, were synergies realized from the deal; and if so, were they captured by the sellers in the deal price?"[308]

There is no dispute here that synergies were realized in the Merger, as one would expect when two strategic partners combine.[309] Indeed, the synergies created the "logic for the deal" from Newell's perspective.[310] The first announcement of the Merger stated, "[Newell] anticipates incremental annualized cost synergies of approximately $500 million over four years."[311] This remained the case through the release of the joint proxy statement.[312] Internally, Newell believed the $500 million estimate was conservative.[313] Nevertheless, the experts have focused on the expected synergies as disclosed in the joint proxy statement ($500 million), and they

---

[307] *Merion Capital LP v. BMC Software Inc.*, 2015 WL 6164771 (Del. Ch. Oct. 21, 2015).

[308] *Id.* at *17.

[309] JX 1817 at ¶¶32–33, 41–43.

[310] Trial Tr. 686:17–687:13 (Polk) ("We wanted as part of—the deal terms, to get control of the company. Because there was no way that, without our leadership of the change agenda, those synergies were going to be realized."); JX 1778 (Ashken Dep.) at 153:15–19.

[311] JX 1269 at 3.

[312] JX 1565 at 85.

[313] JX 1228 at 7. Bain had estimated synergies ranging from $585 million to $1 billion, comprised of $500–$700 million in cost synergies and $85–$320 million in revenue synergies. JX 1139 at 50.

have assumed that estimate is accurate.[314] In the absence of any real expert analysis of the issue, I have no basis in the evidence to depart from that assumption.

As for whether Jarden captured the synergies in the Merger, the evidence is less clear. There is evidence in the trial record that would suggest Newell believed it was not paying any of the synergies at the $59.21 per share Merger Price.[315] During negotiations, Polk told his board that if Newell could "get the deal done between $60 and $65 [per share], we are basically getting the synergies with no value ascribed to them."[316] After the Merger, Polk further suggested that the premium over market price that Newell paid in the Merger was not for synergies but instead was for control of the combined company.[317] Polk explained, "Jarden shareholders get a premium versus their current stock price for [Jarden]. The Newell shareholders get ownership of [Jarden], and after the synergies are delivered, the future value creation

---

[314] JX 1817 at ¶40; JX 1816 at ¶183;

[315] JX 1100 at 18; JX 1804 (Polk Dep.) at 100:2–5, 101:15–16.

[316] JX 1100 at 18.

[317] Trial Tr. 649:5–8 (Polk); JX 2022 ("The premium is designed to get Newell management control."); JX 1804 (Polk Dep.) at 100:2–5, 101:15–16 (When asked "how did you come to the conclusion that a modest premium to their current market valuation would give Newell control," Polk responded "I knew that it was a quid pro quo" and "[i]f we were going to pay a premium for the asset, we need management control."). Of course, Polk clarified that control was necessary to achieve the synergies since Newell was not satisfied that Jarden management would take the steps needed to create synergies. *See* Trial Tr. 686:17–22 (Polk).

that comes through the new combination."[318]  Even Franklin questioned whether the premium to market price that Newell paid was for control of the combined entity.[319]

On the other hand, Jarden points out that there is evidence Newell was keenly aware of synergies and that it was incorporating synergies into its value thesis for the Merger.[320]  Dr. Hubbard supported Jarden's view of the evidence that Jarden stockholders realized the value of the synergies by conducting two separate analyses. First, he performed a "discounted value of cash flows" analysis, in which the expected future cash flows from the synergies (net of the costs to achieve them) were discounted to their value as of the Merger Date, to conclude that the synergies had a value of $4.2 billion, or $17.43 per Jarden share.  This happens to line up nicely with the delta between the unaffected market price ($48.31) and the Merger Price ($59.21), indicating that the delta, or premium, represented expected synergies.[321] He then prepared a market-based analysis of the expected synergy value in which he observed that the rise in stock price of both companies after the leak of merger

---

[318] JX 1804 (Polk Dep.) at 115:4–9.

[319] Trial Tr. 476:3–5 (Franklin).

[320] Trial Tr. 598:10–21, 599:14–600:6, 614:4–18, 678:12–6 (Polk); JX 1803 (Cowhig Dep.) at 62:20–63:2; JX 1779 (Tarchetti Dep.) at 29:6–30:9; JX 674 at 2 (September 2015 Polk email, emphasizing the "tons of synergies" to be realized by employing the Project Renewal strategy) (emphasis in original); Trial Tr. 725:7–14, 742:3–743:19 (Torres); JX 973 at 36; JX 1139 at 50, 56; JX 1565 at 67.

[321] JX 1816 at ¶¶181–83; JX 1831 at ¶4, Figure 25; Trial Tr. 1087:23–1091:9 (Hubbard).

negotiations revealed that the market appreciated the presence of significant synergies. The fact that Newell's stock price fell when Jarden's rose after announcement of the Merger indicates the market appreciated that the anticipated synergies would accrue to the Jarden stockholders.[322]

Jarden bears the burden of demonstrating "what, if any, portion of [the synergies] value was included in the price-per-share . . . ."[323] The evidence on this point stands in equipoise. It is difficult to square Polk's contemporaneous assessment of where the synergies would land with Newell's internal valuation exercises and Dr. Hubbard's straightforward analysis of the issue. Given the state of the evidence, I give little weight to the Merger Price less synergies evidence when assessing fair value.[324] Not because I believe the Merger created no synergies. And

---

[322] JX 1816 at ¶188 ("These results indicate that the market expected nearly all of the synergy value to accrue to Jarden shareholders, consistent with academic research finding that most of the benefits of mergers accrue to target-firm shareholders."); Trial Tr. 1090:18–20 (Hubbard).

[323] *BMC Software*, 2015 WL 6164771, at *17.

[324] To be clear, and as explained below, I am satisfied from the evidence that the Merger Price exceeded fair value. It is less clear, however, what exactly justified the premium Newell was willing to pay for Jarden. This is partially a product of the complications in valuing synergies where the merger consideration includes stock, versus a strictly cash-for-stock merger.

> In such a transaction, shareholders of both constituent corporations remain shareholders in the continuing combined enterprise. Thus, both groups— acquirer shareholders and target shareholders—are able to participate pro rata in gains arising out of the merger. Therefore, a premium to the target's shareholders cannot be justified, as in a cash acquisition, on the premise that

not because I believe that Jarden stockholders probably did not receive the value of the synergies that were created by the deal. I place less weight on this market-based valuation approach in this case because the sales process was not well-conceived or well-executed and the expert analysis of the transaction synergies raised more questions than it answered.

## B. Unaffected Market Price

Jarden has proffered its unaffected stock trading price, $48.31 per share (the "Unaffected Market Price"), as strong evidence of the Company's fair value.[325] According to Jarden, "[t]his value impounded the collective judgments of thousands of stockholders, as well as the more than twenty professional analysts that followed Jarden."[326] Jarden supports its position that the Unaffected Market Price is indicative

---

it is the only way to permit those shareholders to share in the gains arising from the merger.

Lawrence A. Hamermesh, *Premiums in Stock-for-Stock Mergers and Some Consequences in the Law of Director Fiduciary Duties*, 152 U. Pa. L. Rev. 881, 884 (2003).

[325] As noted, news of the potential merger between Jarden and Newell leaked to the public on Monday, December 7, 2015. *See* JX 1150 at 1–2; JX 1148; PTO ¶164; JX 1164; Liz Hoffman, Dana Mattioli & Dana Cimilluca, *Newell Rubbermaid, Jarden in Merger Talks, The Wall Street Journal* (2015), https://www.wsj.com/articles/newell-rubbermaid-jarden-in-merger-talks-1449521419 (last visited July 19, 2019). The last day Jarden stock was traded without being affected by news of the merger negotiations was Friday, December 4, 2015. JX 1231 at 2. On that day, Jarden stock closed at $48.31 per share. JX 1816 at ¶47.

[326] ROB at 2.

of fair value with detailed analysis from Dr. Hubbard.[327]  Petitioners elected not to counter that evidence with expert evidence of their own.[328]  Instead, they attacked Dr. Hubbard's opinion as lacking in doctrinal and factual foundation.  For reasons explained below, I find Dr. Hubbard's analysis of the reliability of Jarden's Unaffected Market Price as an indicator of fair value both credible and persuasive.

### 1. The Market for Jarden's Stock Was Efficient

In an efficient stock market, "a company's market price quickly reflects publicly available information."[329]  In this environment, the company's trading price "balances investors' willingness to buy and sell the shares in light of [available] information, and thus represents their consensus view as to the value of the equity in the company."[330]  Efficient markets aggregate all available information and quickly digest new information, which is then reflected by proportionate changes in

---

[327] Trial Tr. 1267:17–1268:5 (Hubbard) ("I've seen nothing in the record that would suggest to me the unaffected stock price is not the right anchor [for fair value].").

[328] Trial Tr. 323:15–326:14 (Zmijewski).  *See also* Trial Tr. 1021:2–9 (Hubbard) ("Does Dr. Zmijewski in his reports dispute that either Newell or Jarden traded in an efficient market?  A. Not in his reports, no.  Q. And did you hear that in his testimony?  A. I did not. I was present, and I didn't hear that.").

[329] JX 1816 at ¶45. *See also* JX 2032, Jonathan Berk & Peter DeMarzo, *Corporate Finance* 301 (Pearson Education Limited, 4th ed. 2017) ("Berk & DeMarzo, *Corporate Finance*"); JX 2515, Aswath Damodaran, *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset* 4 (Wiley, 3d ed. 2012) (Damodaran, *Investment Valuation*); JX 2516, Tim Koller et al., McKinsey & Co., *Valuation: Measuring and Managing the Value of Companies* 37–38 (Wiley, 6th ed. 2015) ("Koller, *Valuation*").

[330] JX 1816 at ¶45.

market price.[331] When the market is efficient, the trading price of a company's stock can be a proxy for fair value.[332]

As Dr. Hubbard explained, several factors support the conclusion that Jarden's stock traded in a semi-strong efficient market.[333] The stock was traded on the New York Stock Exchange ("NYSE") and Jarden became a member of the S&P 400 index in 2012.[334] In 2015, Jarden's shares traded with a daily and weekly average trading volume in the top 25% of the S&P 500.[335] High trading volume contributes to the efficiency of the market.[336] Jarden's market capitalization of

---

[331] JX 2032, Berk & DeMarzo, *Corporate Finance* at 302.

[332] JX 1816 at ¶45; Trial Tr. 323:15–324:4 (Zmijewski) (acknowledging that one "can look to stock price to corroborate a fair value conclusion"); Trial Tr. 1017:11–14 (Hubbard) ("For the unaffected stock price to be relevant, Your Honor, to your consideration, you need to believe that it's an unbiased indicator of the value of the firm. That's an efficient market.").

[333] Dr. Hubbard stated,

> [t]here are tests for whether a market is efficient, tests that economists suggest, but tests that have been widely used in courts. So I used a number of factors that capture the scope of the firm, whether analysts follow it, transactions cost, liquidity, and so on. I do those tests for both Jarden and Newell and conclude that both trade in an efficient market, semi-strong form.

Trial Tr. 1017:11–14 (Hubbard).

[334] Resp't Jarden Corp.'s Pre-Trial Br. at 6.

[335] JX 1816 at ¶44, Figure 10.

[336] JX 242, Robert W. Holthausen & Mark E. Zmijewski, *Corporate Valuation: Theory, Evidence & Practice* 301–03 (Cambridge Business Publishers, 1st ed. 2014) ("Holthausen & Zmijewski, *Corporate Valuation*").

approximately $10.2 billion placed it in the top 20% of all publicly traded firms.[337] High market capitalization leads to greater "interest in the security being analyzed," which, in turn, "increases the likelihood that new information will be quickly incorporated into the stock price."[338]

Jarden had no controlling shareholder.[339] In fact, Jarden had a 94% public float.[340] A high public float is another factor indicating an efficient market for Jarden's stock because the more holders of a security that are not insiders with access to non-public information, the more likely the market will demand that information be released for public consumption.[341] Jarden stock exhibited a "bid-ask spread" of only 0.02%.[342] A narrow bid-ask spread indicates minimal information asymmetry between insiders and the public markets and, as a result, higher market efficiency.[343] Approximately twenty professional market analysts covered and disseminated

---

[337] JX 1345, Duff & Phelps LLC, *2016 Valuation Handbook: Guide to Cost of Capital* (Chapter 3) 9 (John Wiley, 2016) ("Duff & Phelps, *Valuation Handbook*").

[338] JX 1816 at ¶46.

[339] *Id.* at ¶48.

[340] *Id.*

[341] JX 2032, Berk & DeMarzo, *Corporate Finance* at 73.

[342] JX 1816 at ¶¶47–48.

[343] *Id.* at ¶47.

reports on Jarden in the year prior to the Merger Date.[344] Jarden exhibited no serial correlation, meaning there were no patterns detached from events or news from the Company that would enable the market to divine future price movements based purely on past performance.[345] Additionally, Jarden's Unaffected Market Price aligned with options market pricing, suggesting there were no arbitrage opportunities for Jarden stock.[346]

Dr. Hubbard summarized the factors allowing him to conclude that Jarden's stock traded in a semi-strong efficient market in a helpful chart:

[344] *Id.* at ¶48.

[345] *Id.*

[346] *Id.*; JX 2032, Berk & DeMarzo, *Corporate Finance* at 73 ("The term *efficient* market is also sometimes used to describe a market that, along with other properties, is without arbitrage opportunities.") (emphasis in original).

| Indicator | Jarden | Comment |
|---|---|---|
| Market Capitalization | $10.2 bn | Top 20% of public firms |
| Weekly Trading Volume (% of Shares Outstanding) | 4.24% | Top 25% of S&P 500 |
| Daily Trading Volume (% of Shares Outstanding) | 0.88% | Top 25% of S&P 500 |
| Bid-Ask Spread | 2.2 bps | Median of S&P 500 |
| Short Interest / Daily Trading Volume | 6.03 | < 10 |
| Analyst Coverage | 20 analysts | |
| Float | 93.9% | |
| Serial Correlation | -0.01 | Not significant ($t$-stat = -0.29) |
| Put-Call Parity Mispricing | No | 0/29 mispriced option pairs |
| Controlling Shareholder | No | |
| Reaction to News Consistent with Efficiency | Yes | |

For context, and to illustrate that Jarden's stock price historically reacted appropriately to material information, Dr. Hubbard performed an event study to trace how, in the two years prior to the Merger, Jarden's stock price responded quickly and appropriately to earnings announcements and other performance guidance, even when the news was unanticipated.[347] In each instance, Dr. Hubbard traced the public disclosure of material information, the reaction of analysts to the information and the commensurate adjustment, up or down depending upon whether the news was positive or negative, in the trading price of the stock.[348]

---

[347] JX 1816 at ¶49; JX 2514 at 8–11; Trial Tr. 1019:2–16 (Hubbard).

[348] *Id.*

The evidence shows that Jarden's stock reached a pre-Merger peak of $56.25 on July 20, 2015, and then declined gradually over the next few months in response to poor earnings reports.[349] The decline was marked by low quarterly growth and it prompted Jarden to lower its guidance for the second and third quarters of 2015.[350] Jarden's stock price recovered somewhat in the fourth quarter and closed at $48.31 on December 4, 2015 (i.e., the Unaffected Market Price).[351] After *The Wall Street Journal* article reported on the merger negotiations the following Monday, Jarden's stock price rose and continued to rise to $54.09 on December 14, 2015, the day Jarden and Newell officially announced the Merger.[352] The steady climb continued following the announcement and then plateaued before the calendar year ended.[353] Jarden's stock price oscillated between $59.00 and $50.00 until early March 2016.[354] In March, as the negotiations finalized and the Merger Date neared, Jarden's share

---

[349] JX 1816 at ¶51.

[350] *Id.*

[351] *Id.*

[352] *Id.* at ¶52.

[353] *Id.* at ¶¶52–53.

[354] *Id.*

price approached but never exceeded the Merger Price of $59.21.[355]  As Dr. Hubbard explained:

> The fact that Jarden's stock price never closed above the Merger Price is a strong indicator that fair value is no greater than the Merger Price.  If investors believed that the Company was worth materially more, then one would expect to see the market price exceeding the Merger Price in anticipation of a topping bid.  In more than five percent of M&A deals since 2001, the merger arbitrage spread the day after the merger announcement was negative, implying that the market expected a topping bid.[356]

Newell's stock also traded in an efficient market and the market's reaction to the announcement of the Merger with respect to Newell's trading price provides further evidence that the Unaffected Market Price is reflective of Jarden's fair value.[357]  Newell's stock price jumped after the leak of negotiations when the terms of the deal were unknown.[358]  The market reacted differently, however, when the terms of the Merger were announced.  Newell's stock price dropped significantly (6.9%).  Dr. Hubbard explained the significance: "The initial positive reaction to the deal rumors suggests that the market was hopeful that some value would

---

[355] *Id.* at ¶54.

[356] *Id.*

[357] The Merger marks the rare instance where two public companies of comparable size, comparable capital structure and comparable stock trading patterns combine. As Dr. Hubbard explained, for most of the reasons one can conclude that Jarden traded in an efficient market, the same can be said for Newell.  *Id.*, Figure 15.

[358] *Id.* at ¶58.

accrue to Newell, but after learning the terms of the deal and additional information about synergies, the market reassessed and shifted the value from Newell to Jarden."[359]

After carefully reviewing the evidence, I am satisfied that Jarden's Unaffected Market Price is a powerful indicator of Jarden's fair value on the Merger Date. Petitioners' attempts to undermine this evidence, as explained below, were not persuasive.

## 2. Petitioners Did Not Persuasively Rebut Jarden's Market Evidence

Petitioners mount three challenges to the reliability of Jarden's Unaffected Market Price: (a) as of the date fixed for the Unaffected Market Price (December 4, 2015), the market lacked material information concerning Jarden (i.e., information asymmetry) that skewed the trading price; (b) the Unaffected Market Price must be adjusted to account for a so-called "conglomerate discount" and a "minority discount;" and (c) the Unaffected Market Price was stale by the time the Merger closed on April 15, 2016.[360] I address each in turn.

---

[359] *Id.* at ¶60. *See also id.* at ¶62 ("According to the analysts covering Newell at the time, consumer recession fears, merger integration risks, and the high initial leverage resulting from the Merger were key factors affecting Newell's stock price.").

[360] Jarden is justified in pointing out that while he raised the criticisms, Dr. Zmijewski did "not explicitly opine on whether or not any of these factors actually depressed Jarden's [unaffected] market price relative to fair value." JX 1826 at ¶98. *See also* JX 1828 at ¶90 (Dr. Zmijewski making observations regarding the Unaffected Market Price but not correlating them).

### a. Information Asymmetry

According to Dr. Zmijewski, Jarden's market-based evidence should be disregarded because the market lacked material information as of the date fixed for Jarden's Unaffected Market Price.[361] Dr. Zmijewski cited the decline in the federal risk-free rate, the rise in Jarden's share price and the divergence between Jarden management and market analysts' projections for Jarden's future performance as reasons the Unaffected Market Price was not a reliable indicator of fair value.[362] Importantly, Dr. Zmijewski also observed that Jarden stockholders had no access to the November Projections as of the date fixed for the Unaffected Market Price. The evidence supports the factual predicates for these observations, but it does not support a conclusion that the absent facts resulted in the kind of information asymmetry that would render the Unaffected Market Price unreliable.

As for the decline in the federal risk-free rate, Dr. Zmijewski states that, "[a]ll else equal, the decline in the risk-free rate results in an increase in Jarden's Fair Value," and goes on to argue that because the federal risk-free rate declined from December 2015 to April 2016, Jarden's fair value must be higher than the Unaffected Market Price.[363] Interest rates on U.S. Treasury 20-year constant maturity bills

---

[361] JX 1828 at ¶90; JX 1826 at ¶98.

[362] *Id.*

[363] JX 1818 at ¶30.

declined 19%, from 2.65% to 2.14%, between December 4, 2015 and April 15, 2016.[364] Dr. Hubbard conceded that, if "all else" were, in fact, "equal," as Dr. Zmijewski posited, then Jarden's fair value would increase as the risk-free rate decreased.[365] But then Dr. Hubbard exposed the flaw in Dr. Zmijewski's elephant-sized assumption that "all else" remained "equal." Specifically, Dr. Hubbard referred directly to market data showing that, as the interest rate on 20-Year Treasury Bonds declined between December 2015 and April 2016, stock prices in general, represented by the S&P 500 Market Index, did not increase in response.[366] Contrary to Dr. Zmijewski's "all else equal" assumption, the evidence shows that the stock market declined just as the risk-free rate declined.[367] In other words, the correlation that supports the supposed information asymmetry is no correlation at all.

Regarding the lack of consensus between Jarden management and third-party analysts' projections, Dr. Hubbard emphasized the qualitative difference between unvarnished raw *information* tracking Jarden's performance and well-reasoned *opinions* about Jarden's prospects.[368] Jarden's revenue projections for 2016, 2017,

---

[364] *Id.* at ¶¶29–31.

[365] JX 1826 at ¶¶99–100.

[366] *Id.*, Figure 17.

[367] *Id.*

[368] *Id.* at ¶¶101–04.

and 2018 were 1.0%, 1.7% and 2.6% higher, respectively, than financial analysts' consensus forecast.[369] Jarden's EBITDA projections for 2016, 2017 and 2018 were 1.3%, 6.6% and 9.0% higher, respectively, than financial analysts' consensus forecasts. Jarden's November Projections incorporated this data but were not released to the public until March 2016, and thus would not have been incorporated into the Unaffected Market Price.[370] But is this evidence of information asymmetry? Dr. Hubbard hypothesized the answer is no.[371]

To test his hypothesis, Dr. Hubbard turned to his event study. The November Projections were disclosed in the joint proxy in March 2016. If the November Projections revealed information not previously incorporated in Jarden's stock price, Hubbard reasoned, then both Jarden and Newell's stock price should have proportionately reflected that information. In other words, if the November Projections justified more value (according to Dr. Zmijewski substantially more value), then Newell's stock price should have increased substantially to reflect that Newell was acquiring Jarden at less than fair value.[372] But, of course, that is not

---

[369] JX 1818 at ¶31.

[370] *Id.*

[371] Trial Tr. 1022:21–1023:14 (Hubbard).

[372] JX 1826 at ¶¶101–04.

what happened; Jarden's stock price climbed while Newell's stock price dropped.[373]

Moreover, Jarden's April Projections lowered the Company's financial guidance to forecasts more in line with the analysts' earlier projections.[374] Dr. Hubbard persuasively opined that the April Projection's convergence with the analysts' forecasts was a strong indication that the difference between the November Projections (as disclosed in the joint proxy) and the analysts' projections was not attributable to unreasonable market pessimism, but instead showed that market analysts had more accurately estimated Jarden's 2016 outlook than Jarden's management (who may have been motivated by factors other than actual anticipated results when making their forecasts).[375]

---

[373] *Id.* at ¶¶103–04. I acknowledge, and understand, Petitioners' "tethering" argument, but I reject it as not supported by the credible evidence. The argument is that the market was not efficient as of the Merger because, after the announcement of the Merger, "Jarden's stock price was tethered to Newell and to the perception of the stockholders of both companies that there was a large risk that Jarden could not be successfully integrated." Pet'rs' Post-Trial Opening Br. at 60. Newell's stockholders may have reacted to that risk, as reflected in the stock's performance after the announcement, but there is no evidence that Jarden's stockholders, or the market, associated that risk with Jarden. *See* Trial Tr. 1020:12–23 (Hubbard); JX 2514 at 9; JX 1816 at ¶¶184–90.

[374] JX 1826, Figures 18, 19.

[375] *Id.* That the November Projections did not really move the needle is not surprising. They were optimistic, to be sure, but their projected growth was consistent with prior forecasts, albeit at the top of the range. JX 927 at 1; Trial Tr. 106:1–107:3 (Lillie). They were also not out of line with the views of several of the many analysts that followed the Company. *See, e.g.*, JX 1401; JX 1407; JX 1439.

The credible evidence reflects no information asymmetry. The market was well informed and the Unaffected Market Price reflects all material information.

### b. The Conglomerate and Minority Discounts

Dr. Zmijewski also criticizes Dr. Hubbard's Unaffected Market Price analysis because it does not account for Jarden's massively diversified portfolio of operating companies (the conglomerate discount) and does not adjust for embedded agency costs (the minority discount).[376] Here again, Dr. Zmijewski flags the issues but makes no attempt to quantify their impact, if any.[377]

As for the conglomerate discount, the evidence does not support that this is even "a thing," meaning it is not clear that this notion is accepted within the academy or among valuation professionals.[378] With that said, there is evidence that Jarden's unique structure and diversified portfolio did pose valuation challenges. Newell's Tarchetti described Jarden as a "fast-changing company" that was difficult to

---

[376] JX 1818 at ¶¶37–39.

[377] JX 1826 at ¶¶108–12; JX 2505 (Zmijewski Dep.) 318:23–319:4, 320:8–11. Dr. Zmijewski's opinion that the market had not assessed Jarden's acquisitions of Jostens and Waddington, as best I can tell, is nothing more than speculation. The fact that the market reacted poorly to the Jostens acquisition does not mean it did not understand it. Nor is there credible evidence that the market did not know, or understand, that Jarden had leveraged up to do the Jostens and Waddington deals.

[378] Trial Tr. 1029:3–9 (Hubbard) ("academics differ in opinions on whether there is or isn't [a conglomerate discount]"); JX 1826 at ¶111 & n.176 (citing academic commentary rejecting the notion of a conglomerate discount).

appraise, in part, due to its complexity and tendency to grow and evolve at any point in time.[379]  Even so, the Company's high trading volume and the intense scrutiny paid it by market analysts has convinced me that the market understood Jarden's holding company structure as an operative reality, considered the high overhead costs associated with decentralized management and imputed those factors into Jarden's Unaffected Market Price.[380]

The minority discount, likewise, does not fit here.  For a company without a controlling stockholder, the premise is that the appraiser must consider the conflict of interest between Company management and a diffuse stockholder base and account for minority trading multiples.[381]  Setting aside that Petitioners have offered no credible evidentiary basis to quantify any minority discount here, I see no basis to even try given that the foundation for applying the discount has not been laid. Jarden's management was well known to stockholders and well known to the market.  But for the Merger, they were not going anywhere as the Company was not for sale.[382]  As Dr. Hubbard explained, under these circumstances, Jarden's agency

---

[379] JX 1779 (Tarchetti Dep.) at 32–33.

[380] JX 1826 at ¶¶108–10; Trial Tr. 1029:10-21 (Hubbard); Trial Tr. 335:9–21 (Zmijewski) ("Q. So the holding company structure of Jarden, whatever its affects may be, were the operative reality of Jarden.  Correct?  As of the merger date?  A. That's true.").

[381] JX 2505 (Zmijewski Dep.) at 319:22–320:16; JX 1818 at ¶¶37–39.

[382] JX 1778 (Ashken Dep.) 117:10–17; Trial Tr. 378:14–17 (Franklin).

costs were embedded in its operative reality and reflected in its Unaffected Market Price.[383]

### c. Staleness of the Unaffected Market Price

Petitioners also argue that the Unaffected Market Price was stale as of the Merger Date.[384] I disagree. There is no evidence to suggest that Jarden gained value from the date set for the Unaffected Market Price and the closing of the Merger, or that the market was deprived of information that might have been perceived as enhancing value. Indeed, following a period where Jarden had been especially acquisitive, the Company was experiencing declines in operating income and net income and management was giving the Board revised, more conservative projections for 2016.[385] The April Projections forecasted reduced revenue growth and increased working capital investment for FY17–20.[386] This is not a case where the credible evidence reveals that the Unaffected Market Price was demonstrably below Jarden's fair value as of the Merger.

\*\*\*\*\*\*\*\*\*\*

[383] JX 1826 at ¶¶106–07. *See also* JX 59, Lawrence A. Hamermesh & Michael L. Wachter, *The Short and Puzzling Life of the "Implicit Minority Discount" in Delaware Appraisal Law*, 156 U. Pa. L. Rev. 1, 2 (2007).

[384] JX 1818 at ¶30.

[385] JX 1519 at 68; JX 1514 at 2.

[386] JX 1562; Trial Tr. 821:6–828:1, 830:7–835:11 (Waldron).

After carefully considering the evidence, I find that the Unaffected Market Price is a reliable indicator of Jarden's value as a going concern on the Merger Date. I have given it substantial weight in my assessment of fair value.

## C. The Other Market Evidence

As Jarden was negotiating with Newell, it was also pursuing an acquisition of Jostens. To raise capital for that deal, Jarden initiated a share offering priced at $49.00 per share.[387] At the time, the stock was trading in the mid-$40s.[388] When the market reacted poorly to the Jostens acquisition, and the stock price fell, the Board believed it needed to send a signal that the Company and its management were optimistic about Jostens. So it authorized a $50 million stock buyback,[389] and it set the price cap again at $49.00 because, after internal assessments, it believed that price reflected Jarden's value.[390] Ultimately, Jarden repurchased 276,417 shares on November 2, 2015, at an average price of $45.96 per share, and another 775,685 shares on November 3, 2015, at an average price of $48.05 per share.[391] This evidence is by no means dispositive. But it is persuasive evidence that, in the weeks

---

[387] JX 2502.

[388] JX 1780 (Franklin Dep.) 201:19–24.

[389] Trial Tr. 404:1–9 (Franklin); JX 900.

[390] JX 1780 (Franklin Dep.) 241:11–14.

[391] JX 900 at 2.

leading up to the leak of the merger negotiations, uncluttered by transactional or forensic incentives, both the Company and the market saw Jarden's value well below what Petitioners seek here.

### D. Comparable Companies

Both parties' experts performed comparable companies analyses to estimate Jarden's value relative to sets of proposed peer firms. Applying his comparable companies analysis, Dr. Zmijewski concluded that Jarden's fair value on the Merger Date, based on Jarden's 2016 forecasted EBITDA using the 90th, 75th and 50th percentiles of his peer set, was $81.44, $70.49 and $66.30, respectively.[392] Based on Jarden's 2017 forecasted EBITDA, the market multiples based-valuation using the 90th, 75th and 50th percentiles of his peer set, revealed a per share value of $77.39, $72.20 and $65.56, respectively.[393] For his part, Dr. Hubbard disclaimed the efficacy of a comparable companies valuation for Jarden, but then performed his own comparable analysis for the sake of completeness, resulting in a value range of $40.12 to $55.21 per share.[394] Before addressing the experts' divergent analyses and conclusions, it is useful to review basic concepts, separated from forensics.

---

[392] *Id.* at 65.

[393] *Id.* It is not entirely clear to me that Dr. Zmijewski feels as strongly about his comparable companies valuation of Jarden as Petitioners do. *See* JX 1828 at ¶8 ("I do not consider revenue multiples to be reliable to value Jarden . . . .").

[394] JX 1816 at ¶200.

### 1. The Comparable Companies Methodology

As a threshold matter, before a comparable companies multiples analysis can be undertaken with any measure of reliability, it is necessary to establish a suitable peer group through appropriate empirical analysis.[395] In fact, nearly every text in the record states that the accuracy of a multiples-based valuation depends entirely on the existence of comparable peers:

- Holthausen & Zmijewski (JX 242): "While selecting comparable companies might not appear to be too difficult, we often quickly conclude that not many, if any, companies are truly comparable to the company we are valuing for purposes of a market multiple valuation once we understand all the different dimensions of comparability and begin to analyze the potential comparable companies . . . simply selecting close competitors is not sufficient to ensure the companies are comparable, as we observe a substantial amount of variation in multiples within an industry."[396]
- Koller (JX 2516): "Selecting the right peer group is critical to coming up with a reasonable valuation using multiples."[397]
- Damodaran (JX 2515): ". . . finding similar and comparable firms is often a challenge, and frequently we have to accept firms that are different from the firm being valued on one dimension or the other. When this is the case, we have to either explicitly or implicitly control for differences across firms on growth, risk, and cash flow measures."[398]

---

[395] JX 242, Holthausen & Zmijewski, *Corporate Valuation* at 510, 527–30; Trial Tr. 1068:13–15 (Hubbard) ("If you use [a] comparables [analysis], you have to be sure they are really comparable or you are introducing error yourself.").

[396] JX 242, Holthausen & Zmijewski, *Corporate Valuation* at 527–29.

[397] JX 2516, Koller, *Valuation* at 345.

[398] JX 2515, Damodaran, *Investment Valuation* at 20.

- Berk & DeMarzo (JX 2032): "Of course, firms are not identical. Thus, the usefulness of a valuation multiple will depend on the nature of the differences between firms and the sensitivity of the multiples to these differences."[399]

McKinsey recommends beginning the peer group identification process with the Standard Industrial Classification ("SIC") or Global Industry Classification Standard ("GICS") codes.[400] While these codes are a good starting point for selecting a peer group, the industry-specific company lists they produce require significant refinement to identify truly comparable firms.[401]

To isolate a relevant peer group from a larger industry data set, the appraiser must identify firms with similar risk profiles, costs of capital, return on invested capital and growth.[402] It is better to have a smaller number of peers that truly compete in the same markets with similar products than including aspirational or

---

[399] JX 2032, Berk & DeMarzo, *Corporate Finance* at 296.

[400] JX 2516, Koller, *Valuation* at 345–46.

[401] *Id.* at 346; JX 242, Holthausen & Zmijewski, *Corporate Valuation* at 528–29.

[402] JX 2516, Koller, *Valuation* at 346. *See also* JX 2032, Berk & DeMarzo, *Corporate Finance* at 710; Damodaran, *Investment Valuation* at 462 ("A comparable firm is one with cash flows, growth potential, and growth risk similar to the firm being valued . . . . The implicit assumption being made here is that firms in the same sector have similar risk, growth, and cash flow profiles and therefore can be compared with much more legitimacy").

nearly comparable companies.[403]  In order effectively to narrow down a list of potential comparables according to growth and risk, the analysis must consider whether the companies have similar "value drivers" as the target.[404] As Dr. Zmijewski described in his text:

> [A] company's product lines, customer types, market segments, types of operation, and so forth are all important aspects to consider when we identify comparable companies. Even after all these are taken into consideration, two companies can be in the same industry yet not be comparable on all of the characteristics that are important for a market multiple valuation.[405]

In addition, the finance literature advises against relying on peers provided by the target company's management.  This reasoning reflects common sense; optimistic executives often provide "aspirational peers" rather than companies that actually compete head-to-head with their firm.[406]

The importance of selecting a proper peer set in the performance of a proper comparable companies analysis cannot be overstated.  Because this threshold task is so important, and yet so difficult, the valuation treatises generally view the

---

[403] *Id.*  Trial Tr. 1068:13–15 (Hubbard) ("I mean, it's really just a restatement of garbage in, garbage out.  If you don't have genuine comparables, you're not going to get much out of the approach.")

[404] JX 242, Holthausen & Zmijewski, *Corporate Valuation* at 529–30.

[405] *Id.* at 529.

[406] JX 2516, Koller, *Valuation* at 346.

comparable companies methodology as inferior to other methodologies: "a *key shortcoming* of the comparables approach is that it does not take into account the important differences among firms," therefore "[u]sing a valuation multiple based on comparables is *best viewed as a 'shortcut'* to the discounted cash flow methods of valuation."[407]

If, and only if, a proper peer set can be selected, the next step in the comparable companies analysis is to select an appropriate multiple and then determine where on the distribution of peers the target company falls.[408] The Enterprise Value to EBITDA multiples valuation ("EV/EBITDA") is widely accepted as the most reliable data set for a comparable companies analysis.[409] In this regard, it appears that the preference is to use forward-looking projections instead of

---

[407] JX 2032, Berk & DeMarzo, *Corporate Finance* at 296–97 (emphasis supplied). *See* Trial Tr. 1068:13–15 (Hubbard) ("Given the difficulty of finding comparables for this company in particular, this is a methodology that I used for completeness and for the record for the Court, but it would not be a principal method I would advocate that the Court center on."). *See also* JX 1826 at ¶17.

[408] JX 1816 at ¶194; JX 2516, Koller, *Valuation* at 335 ("Empirical evidence shows that forward-looking multiples are indeed more accurate predictors of value than historical multiples are.").

[409] The EBITDA multiples valuation is generally considered more reliable than a revenue multiples approach because the EBITDA approach accounts for firms' operating efficiency and is not affected by leverage differences between firms. JX 2032, Berk & DeMarzo, *Corporate Finance* at 710.

a firm's historical earnings data.[410]  Forward-looking multiples are deemed more consistent with the principles of valuation, especially in the context of estimating the present value of a company as a going concern.[411]  Projections generally exhibit less variation across peer companies compared to historical data, and although long-term earnings projections are favored, one- and two-year forecasts are reliable when they uniformly represent the firm's long-term prospects.[412]

With these generally accepted features of a proper comparable companies valuation in mind, I turn to the experts' comparable companies valuation of Jarden.

---

[410] *Id.* at 710, 714; JX 2516, Koller, *Valuation* at 334–36; JX 242, Holthausen & Zmijewski, *Corporate Valuation* at 532.

[411] JX 2516, Koller, *Valuation* at 334; Trial Tr. 159:7–14 (Zmijewski) ("Well, value is derived from what's going to happen or what you expect to happen in the future, so looking forward is always better than looks backward. . . .  If historical information doesn't predict the future, it's not useful at all.  It's only the forward-looking information that's useful.").

[412] *Id.* at 335–36.

## 2. The Experts Attempt But Fail to Select a Valid Peer Set

Both experts developed their peer set by drawing from the peer set developed by Barclays in its valuation work for the Company with regard to the Merger. They then made adjustments based on their own sense of comparability. For his part, Dr. Zmijewski conceded that he "did not do any qualitative assessment of any inherent differences between the Jarden business and the business of its peers companies."[413] Giving such deference to the peer set selected by management, without any meaningful, independent assessment of comparability, is not useful and, frankly, not credible.[414] Dr. Zmijewski made no mention of GICS or SIC codes in

---

[413] Trial Tr. 294:16–20 (Zmijewski); JX 1818 at ¶55 ("I base my set of comparable companies on those companies identified by Jarden's CEO, Mr. Lillie and the comparable companies used by Jarden's financial advisor, Barclays."); JX 1828 at ¶¶68–70. I note it is not clear that Dr. Zmijewski drew his peer set from the right Barclays list. The list endorsed by management was prepared by Barclays' equity analyst team while Dr. Zmijewski drew his list from the one prepared by Barclays' investment banking team. Trial Tr. 264:23–268:14 (Zmijewski). Moreover, I find Dr. Zmijewski's narrow focus on the Barclays list as the sole basis for his comparable companies peculiar given the extent to which he is critical of the Barclays Fairness Opinion. *See* JX 1818 at ¶¶1–42; JX 1826 at ¶¶46–47.

[414] JX 1826 at ¶17; JX 2516, Koller, *Valuation* at 346; JX 242, Holthausen & Zmijewski, *Corporate Valuation* at 511 ("The key issues in valuing companies using market multiples are choosing appropriate comparable companies that would be priced similar to the company being valued and the making adjustments to the financial numbers used so that distortions to the valuation do not arise from accounting differences or certain events that can affect the financial statements in ways that render the numbers less useful for a market multiple valuation."). Dr. Zmijewski's decision apparently to ignore Barclays' qualification that its peer set would have to be adjusted to account for qualitative differences between Jarden and the peer set was never adequately explained. Trial Tr. 294:24–296:24 (Zmijewski); JX 1565 at 127–28; JX 1205 at 11, 17.

his report and there is no indication that he employed them, or any other objective criteria, in his selection of a peer set.[415]

Failing to ground his peer set in any objective methodology is all the more problematic given Dr. Zmijewski's apparent willingness to adjust the management/Barclays' peer set when it suited him to yield a higher valuation for Jarden. As stated in his report, Dr. Zmijewski excluded Kimberly-Clark Corporation and Colgate-Palmolive Company, which were both included in the Barclays list, because both companies maintain a significantly larger market capitalization than Jarden and the other comparables.[416] The notion that a company with a very large market capitalization is not a true peer of a company with a relatively smaller market capitalization has a certain lay appeal. But Dr. Zmijewski's own text makes clear that "there is no theoretical model we are aware of that includes size as a determinant of market multiples."[417] It may well be that Kimberly-Clark and Colgate-Palmolive are not "comparables" for Jarden, but the absence of any meaningful analysis or

---

[415] JX 1816 at ¶¶194–96.

[416] JX 1818 at ¶57.

[417] JX 242, Holthausen & Zmijewski, *Corporate Valuation* at 525. Given his willingness to defer to peer sets prepared by others, it is surprising that Dr. Zmijewski failed to reconcile his exclusion of Kimberly-Clark and Colgate-Palmolive from his peer set with the fact that those companies were included in the peer sets developed by several of the analysts who followed Jarden. JX 1826 at ¶¶43–45.

explanation in Dr. Zmijewski's report leaves the Court with no way to determine if the exclusion was arbitrary or principled.[418]

Before addressing Dr. Hubbard's peer set, it must be emphasized that Dr. Hubbard does not sponsor the comparable companies methodology as the appropriate means by which to assess Jarden's fair value.[419] His preferred methodology is DCF.[420] Nevertheless, Dr. Hubbard engaged with Dr. Zmijewski on comparable companies and, not surprisingly, reached a very different conclusion after doing so.

Dr. Hubbard assessed Jarden's peers by using GICS codes.[421] He then cited to over a dozen industry analyst reports that corroborated his peer set, which included companies that were larger and smaller than Jarden and companies that

---

[418] Dr. Hubbard flagged Dr. Zmijewski's size discrepancy in his rebuttal report. As Dr. Hubbard noted, although the market capitalization of Kimberly-Clark and Colgate-Palmolive were, respectively, 4.6 and 6.0 times *larger* relative to Jarden, three of Dr. Zmijewski's selected peers were correspondingly *smaller* than Jarden. JX 1826 at ¶¶40–43. WD-40 Company, Energizer Holdings and Helen of Troy were 7.3, 3.9 and 3.7 times *smaller* than Jarden, respectively, yet each of these firms remained in Dr. Zmijewski's peer set. *Id.* Dr. Zmijewski provided no credible justification for the disparate, asymmetrical treatment of large and small companies in his peer set. *Id. See also* Trial Tr. 935:6–936:17 (Zenner); JX 1827 at ¶¶45–47 (credibly addressing the fallacy created by Dr. Zmijewski's inconsistent approach to exclusion and inclusion of comparables based on size).

[419] JX 1826 at ¶¶15–17.

[420] Trial Tr. 1103:21–24 (Hubbard).

[421] JX 1816 at ¶195.

were not on the Barclays list.[422] Once he completed his peer set, however, Dr. Hubbard emphasized his view that Jarden's unique and highly diversified portfolio of businesses, its aggressively acquisitive growth strategy and its holding company structure made the selection of a valid peer set for a comparable companies analysis a fundamentally flawed exercise since Jarden "lack[ed] truly comparable peers."[423]

After carefully reviewing the evidence, I am convinced that Dr. Hubbard is correct—Jarden had no comparable peers, at least not as developed in the credible evidence presented at trial. Under these circumstances, the fact that Dr. Zmijewski engaged in no real analysis when developing his peer set is not surprising.[424]

Having found that the first, and most important, element of a proper comparable companies analysis is lacking in this record, I give the experts'

---

[422] JX 1826 at ¶¶38–35. Dr. Hubbard's peer set included firms with core business lines comparable to Jarden's core business, namely housewares, household appliances, consumer durables, apparel and personal products industry actors. JX 1816 at ¶195.

[423] JX 1826 at ¶17.

[424] JX 1818 at ¶¶55–57. As noted, Dr. Zmijewski offered no empirical analysis of Jarden's growth, risk, or value drivers as compared to any of the firms in his peer group. *Id. But see* JX 242, Holthausen & Zmijewski, *Corporate Valuation* at 529–30 (". . . simply selecting close competitors is not sufficient to ensure the companies are comparable . . . . Once we identify competitors, we analyze both the company being valued and the competitors with respect to characteristics that determine the variation in market multiples—such as future growth prospects, risk future profitability, and future expected investment requirements.").

comparable companies conclusions no weight in my fair value determination.[425]

Accordingly, I move next to the parties' competing DCF valuations.

### E. Discounted Cash Flow

As I approach the parties' fantastically divergent conclusions following their DCF analyses, I am mindful of our Supreme Court's admonition that, tempting as it is to select the entirety of one expert's analysis over the other's, my review of the experts' opinions must not be presumptively binary:

---

[425] The party sponsoring a comparable companies valuation has the burden of proving that the target has validly assessed peers. *See In re Appraisal of SWS Gp., Inc.*, 2017 WL 2334852, at *10 (Del. Ch. May 30, 2017). Petitioners have not met that burden. In reaching this conclusion, I am mindful that Jarden, itself, employed a comparable companies analysis, among other approaches, when it performed internal valuations. But Petitioners have not proffered those valuations as evidence of Jarden's fair value. Instead, they have presented Dr. Zmijewski's version of a comparable companies analysis, which differed substantially from the Company's valuations. Accordingly, they had the burden of proving that the *Zmijewski* comparable companies valuation was a reliable indicator of fair value. For reasons I have explained, I have determined they have not carried that burden. In other words, the fact the Company employed comparable companies analyses in the past to value Jarden might be evidence that the methodology can work for Jarden, but the appraiser still has to apply the methodology in a principled way. That principled application of the methodology is what is lacking here. As a final note, for what it's worth, I did find Dr. Zmijewski's approach to selecting a proper multiple for Jarden to be more credible than Dr. Hubbard's approach, particularly given that he focused his multiples analysis on Jarden's 2016 and 2017 projected earnings, as prescribed in the valuation texts, while Dr. Hubbard based his multiples analysis on Jarden's historical EBITDA and revenue data. *Compare* JX 1818 at ¶¶74–76 (Zmijewski) *with* JX 1816 at ¶¶194–200. *See* JX 2032, Berk & DeMarzo, *Corporate Finance* at 710, 714; JX 2516, Koller, *Valuation* at 334–36; JX 242, Holthausen & Zmijewski, *Corporate Valuation* at 532 (expressing preference for using forward-looking projections over a firm's historical earnings data when determining a proper multiple). Of course, this observation is worth little given the lack of credible evidence that Dr. Zmijewski created a proper peer set.

The role of the Court of Chancery has evolved over time to the present requirement that the court independently determine the value of the shares that are the subject of the appraisal action. Even though today a Chancellor may be faced with wildly divergent values presented by the parties' experts, the acceptance of one expert's value, *in toto*, creates the risk that the favored expert will be accorded a status greater than that of the now eliminated [expert appraiser]. This is not to say that the selection of one expert to the total exclusion of another is, in itself, an arbitrary act. The testimony of a thoroughly discredited witness, expert or lay, is subject to rejection under the usual standards which govern receipt of such evidence. The nub of the present appeal is not merely that the Chancellor made an uncritical acceptance of the evidence of SAP's appraiser but that he announced in advance that he intended to choose between absolutes.[426]

As I discuss below, in many important respects, the experts have utilized very different inputs in their DCF models leading to a substantial delta between their ultimate DCF valuations—Dr. Zmijewski's DCF valuation produced a range of $70.36 and $70.40 per share;[427] Dr. Hubbard's DCF valuation is $48.01 per share.[428] The number and degree of their differences has necessitated the lengthy discussion that follows. For reasons I explain, I have adopted some of both expert's inputs to

---

[426] *Gonsalves v. Straight Arrow Publ'rs, Inc.*, 701 A.2d 357, 361 (Del. 1997). *See also M.G. Bancorp., Inc. v. Le Beau*, 737 A.2d 513, 525–26 (Del. 1999) (reiterating the Chancellor's role "as an independent appraiser" and observing that "[i]n discharging its statutory mandate, the Court of Chancery has the discretion to select one of the parties' valuation models as its general framework or to fashion its own").

[427] Dr. Zmijewski made two DCF calculations: an industry-specific DCF, which incorporated his comparable companies analyses ("Composite DCF"), and a Jarden-specific DCF ("Jarden-Specific DCF"). JX 1818 at ¶¶70–72.

[428] JX 1816 at ¶149; JX 1831 at ¶3.

construct my own DCF model. Based on that model, my DCF valuation is $48.13 per share.

I begin by noting where the experts agree. First, they agree that DCF is a widely used and industry-accepted means of calculating the value of a corporation as a going concern. Dr. Hubbard likes DCF best to value Jarden, while Dr. Zmijewski uses his DCF valuation to corroborate his comparable companies analysis.[429] Both experts used the Weighted Average Cost of Capital ("WACC") method to determine the appropriate discount rate. Both agreed that the November Projections were the appropriate cash flow forecasts upon which their DCF models should be based. Both largely agreed on the required net investment to drive growth through the year 2020, which is the last year included in the November Projections. And both agreed that the Capital Asset Pricing Model ("CAPM") was appropriate to calculate Jarden's Cost of Equity. Because I see no basis in the evidence to depart from these stipulations, I adopt them without further analysis.

The bulk of the experts' disagreements relate to how Jarden will perform in the terminal period beyond the November Projections' explicit forecasts.[430] I address and do my best to resolve each of the disagreements below.

---

[429] Pet'rs' Pre-Trial Br. at 33.

[430] JX 2514 at 14. Indeed, as Jarden points out, "over 83% of value in each of [Dr.] Zmijewski's DCFs is from the terminal period." Resp't Jarden Corp.'s Answering Post-Trial Br. at 60.

### 1. Jarden's Future Cash Flows

As noted, both experts used the November Projections for their DCF analyses.[431] Even so, both made different adjustments to the projections to calculate Jarden's unlevered free cash flows.[432] After reviewing the adjustments, I find that their adjustments for EBITDA, depreciation and amortization, and Dr. Zmijewski's adjustment for projected taxes, are appropriate.[433] These adjustments yield the following for Jarden's Net Operating Profits after taxes ("NOPAT"):[434]

| FY2016-E | FY2017-E | FY2018-E | FY2019-E | FY2020-E |
|---|---|---|---|---|
| $869 million | $967 million | $1,062 million | $1,146 million | $1,235 million |

Using Jarden's NOPAT, I have calculated Jarden's unlevered free cash flows for each projection year by: (1) adding back depreciation; (2) deducting Jarden's year-over-year change in working capital; and (3) deducting Jarden's capital expenditures. These adjustments track those made by Dr. Hubbard (albeit at a 35%

---

[431] JX 1565 at 143.

[432] JX 1816 at ¶¶75–78, Ex. 9; JX 1818 at ¶51, Ex. VI-7A.

[433] I adopt Dr. Zmijewski's 35.0% marginal tax rate for Jarden because Dr. Hubbard made no effort to support his effective tax rate of 36.3%. JX 1816 at ¶¶96–97; JX 1828 at ¶¶9–11. A 35% marginal tax rate comports with the tax rates applied by Barclays, Centerview, Goldman Sachs and Jarden management—all of which set Jarden's marginal tax rate between 33% and 35%. JX 1828 at ¶¶9–10, 24.

[434] JX 1816 at ¶¶75–78, Ex. 9; JX 1818 at ¶51, Ex. VI-7A.

marginal rate),[435] and yield the following as Jarden's unlevered free cash flow in each of the projected years:

| FY2016-E | FY2017-E | FY2018-E | FY2019-E | FY2020-E |
|----------|----------|----------|----------|----------|
| $572 million | $701 million | $783 million | $853 million | $927 million |

## 2. Jarden's Terminal Value

Jarden's terminal value is the value of the Company beyond the discrete projection period as defined in a discounted future earnings model ("Terminal Value").[436] In the context of the experts' DCF analyses for Jarden, Terminal Value refers to Jarden's estimated value taking into account all future cash flows at the end of the November Projection's explicit forecast period assuming a stable growth rate in perpetuity.[437]

Dr. Zmijewski's Terminal Value calculation and accompanying analysis mostly relies on his comparable companies analysis,[438] which I have found not

---

[435] JX 1816 at ¶¶75–78, Ex. 9. I track Dr. Zmijewski's free cash flows analysis with respect to the tax rate because I agree with him that Dr. Hubbard's approach to estimating Jarden's tax rate in the projected years is not adequately supported. JX 1828 at ¶¶9–11.

[436] JX 2032, Berk & DeMarzo, *Corporate Finance* at 256.

[437] *Id.* ("[W]e estimate the value of the remaining free cash flow beyond the forecast horizon by including a[] . . . one-time cash flow at the end of the forecast horizon . . . . [The terminal value] represents the market value (as of the last forecast period) of the free cash flow . . . at all future dates.").

[438] Trial Tr. 300:17–24 (Zmijewski) ("I paired the comparable companies risk assessment with a lower growth rate because the comparable companies . . . were expected to perform

reliable for reasons already stated. Dr. Hubbard used a formula developed by McKinsey & Co. to calculate Jarden's Terminal Value. The McKinsey formula involves dividing the value of cash flow in the Terminal Period by the difference between the Discount Rate (the rate at which future cash flows are discounted to present) and Jarden's Terminal Growth Rate.[439] According to Dr. Hubbard, this formula generally provides that "all else remaining equal," a company's terminal value is larger when cash flow is high, and the discount rate is low or the growth rate is high.[440] The "all else remaining equal" caveat, Hubbard explains, assumes that increased growth will be supported by increased investment which, in turn, reduces cash flow.[441] In other words, increasing investment in the Terminal Period will proportionately reduce Jarden's cash flow and thereby lower Jarden's measurable value in the Terminal Period. To calculate Jarden's Terminal Value, it is necessary to estimate its Terminal Growth Rate, Terminal Investment Rate and Discount Rate.

---

at a lower growth rate. And for the Jarden-specific risk assessment, I used the midpoint of the expected inflation and expected GDP growth.")

[439] JX 1816 at ¶¶84–85.

[440] *Id.*

[441] *Id.*

### a. Terminal Growth Rate

"Of all the inputs into a discounted cash flow valuation model, none creates as much angst as estimating the [terminal] growth rate. Part of the reason for it is that small changes in the [terminal] growth rate can change the terminal value significantly[.]"[442] The terminal growth rate ("TGR") describes Jarden's long-term growth in revenue, earnings and cash flow in the Terminal Period, which includes the years starting in 2021 and onward. Since acquisitions are typically not considered in organic growth rate calculations,[443] a key question is whether Jarden's several tuck-in acquisitions should be included in the TGR.[444]

Both experts measure Jarden's TGR based on estimates of U.S. nominal GDP growth and long-term economic inflation. This method makes sense and is generally

---

[442] JX 2515, Damodaran, *Investment Valuation* at 308.

[443] Trial Tr. 930:2–9 (Zenner) ("So it's a little bit like saying I baked gluten-free bread for you, but I added some wheat because the consistency is going to be better. So it's kind of saying I'm providing organic growth, but I'm adding some tuck-in transactions.").

[444] For Jarden, "tuck-ins" were defined as an acquisition where the target company's last twelve months ("LTM") of revenue was less than 1.0% of Jarden's LTM revenue. JX 1828 at ¶¶46–47.

accepted.[445] The experts disagreed, however, as to what forecast sources provide the most useful data.[446]

Dr. Zmijewski derived a 2.1% projected long-term inflation rate from four estimates of U.S. economic outlooks and an expected nominal GDP growth rate of 4.3% from three projections of U.S. GDP growth.[447] Based on these projections, Dr. Zmijewski applied the midpoint of 3.2%, which he asserts is a reasonable long-term growth rate for Jarden.[448] Dr. Zmijewski's TGR analysis included an assessment of the Company's acquisition-driven and organic growth, and the results showed Jarden's historic organic growth rate to be roughly 3.1%.[449] As corroboration, Dr. Zmijewski emphasized that key players in the Merger projected that Jarden would grow between 2.0% to 4.0% annually in perpetuity.[450]

---

[445]JX 2515, Damodaran, *Investment Valuation* at 306–07 ("no firm can grow forever at a rate higher than the growth rate of the economy in which it operates"); JX 2516, Koller, *Valuation* at 122.

[446] JX 1816 at ¶¶87–92; JX 1818 at ¶¶52–53.

[447] JX 1818 at ¶¶52–53.

[448] *Id.* at ¶¶53–54.

[449] JX 1828 at ¶¶46–47.

[450] JX 1818 at ¶¶52–54, Ex. VI-2. Polk estimated Jarden would grow at 3.0% (mirroring U.S. GDP growth), while Bain forecasted Jarden's growth to be between 2.0% and 4.0%. *Id.*

For his Composite DCF calculation, Dr. Zmijewski used the 2.1% projected U.S. inflationary growth rate as Jarden's TGR.[451] Dr. Zmijewski explained he used U.S. inflation as Jarden's TGR as a "conservative" measure because the Composite DCF relies on calculations supplemented by comparable companies data, and Jarden's long-term growth was estimated to be much higher than any of the companies in Dr. Zmijewski's peer set.[452] For his Jarden-Specific DCF analysis, Dr. Zmijewski set Jarden's TGR at 3.2%, which he suggested conforms to the other Jarden-only measurements and calculations in that valuation.[453]

Dr. Hubbard's report set Jarden's TGR at 2.5% based on several inflation and nominal GDP growth forecasts for the U.S. economy and the European Union's Eurozone.[454] He noted that his TGR comports with the TGR utilized by Goldman Sachs and Centerview in advising Newell, both of which used a TGR of 2.0% in their valuations of Jarden.[455] He also pointed to analyst reports by Deutsche Bank and RBC Capital that estimated Jarden's TGR at 1.5% and 2.5%, respectively.[456]

---

[451] *Id.* at ¶¶67–69.

[452] *Id.*

[453] *Id.* at ¶¶70–72.

[454] JX 1816 at ¶¶86–92.

[455] *Id.* at ¶¶89–90, Figure 20.

[456] *Id.* at ¶¶89–92, Ex. 5A.

Finally, he noted that his TGR is consistent with Jarden's historic organic growth, which he determined to be 2.2% annually.[457] With all these factors considered, Dr. Hubbard concluded that his 2.5% TGR falls squarely between his estimated range of inflation and nominal GDP and aligns well with Jarden's historic organic growth when fairly adjusted for "tuck-in" acquisitions.[458]

Dr. Zmijewski took issue with Dr. Hubbard's adjustments for "tuck-ins" because the adjustments result in double counting certain companies that did not fit Jarden's definition of a "tuck-in."[459] Dr. Hubbard conceded this error, revised his analysis and found Jarden's organic, non-acquisitive growth rate to be 3.2% annually.[460] Despite his upward revision to Jarden's historic organic growth, Dr. Hubbard did not change his 2.5% TGR estimate.[461]

Jarden's "tuck-in" acquisitions, although relatively small in scale, are acquisition-driven growth, not organic growth.[462] Accordingly, Dr. Hubbard's

---

[457] JX 1826 at ¶¶32–34, Figure 6. Dr. Hubbard maintains that the Company's 3.0% to 5.0% growth projections in the years following 2015 do not agree with its 2.2% historic organic growth because management incorrectly failed to account for "tuck-in" acquisitions. *Id.*; JX 1816 at ¶¶90–92.

[458] JX 1816 at ¶¶90–92, Ex. 5A; JX 1826 at ¶¶32–34, Figure 6.

[459] JX 1828 at ¶¶46–48.

[460] Trial Tr. at 1116–18 (Hubbard); JX 1831 at ¶8.

[461] JX 1831 at ¶8.

[462] JX 1826 at ¶32 ("[I]n recent history, tuck-ins contributed approximately 1.8 percentage points to the "organic" growth reported by management, indicating that Jarden would need

attempt to account for "tuck-in" acquisitions when estimating Jarden's TGR is well taken. Dr. Hubbard's reluctance, however, to acknowledge the impact of his organic growth rate miscalculation on his estimate of Jarden's TGR is not.[463] Moreover, considering Dr. Hubbard's revised 3.2% historic organic growth rate in light of his economic research supporting long-run inflation in the range of 2.0% annually, and nominal GDP growth in the range of 4.07% annually, with a midpoint of roughly 3.04%,[464] Dr. Hubbard's 2.5% TGR is not supported.

Dr. Zmijewski calculated Jarden's historic organic growth rate to be 3.1%.[465] His economic research supported U.S. long-run inflation at 2.1% annually and nominal GDP growth at 4.3% annually.[466] And his estimates are within one- or two-tenths of a percentage point of Dr. Hubbard's. The midpoint of each experts' inflation and GDP estimates is approximately 3.1%, which aligns with Dr. Hubbard's 3.2% revised historic organic growth rate and Dr. Zmijewski's 3.2% midpoint TGR in his Jarden-Specific DCF.[467] The literature recommends a

---

to continue tuck-in acquisitions in order to achieve the five percent growth in the Proxy Projections.").

[463] Trial Tr. at 1116–18 (Hubbard); JX 1831 at ¶8.

[464] JX 1816 at ¶¶86–90.

[465] JX 1828 at ¶¶46–48.

[466] JX 1818 at ¶¶52–53.

[467] I note that the literature cautions against relying on comparable companies when estimating terminal value because inconsistencies in projected growth rates between the

conservative approach to estimating long-term growth rates for a DCF valuation, in recognition that many companies experience cyclical growth in relation to the overall economy.[468] Jarden was considered a GDP growth business.[469]

Based on these factors, and the credible evidence in the trial record, I apply a 3.1% TGR. In my view, this reflects the most credible aspects of the experts' analyses and comports with the most persuasive view of Jarden's historic growth.

### b. Terminal Investment Rate

The experts' disagreement over the terminal investment rate ("TIR") accounts for 87% of the disparity in their DCF valuations.[470] In other words, of the $22.39 difference between Dr. Hubbard's DCF per share value of $48.01 and Dr. Zmijewski's DCF per share value of $70.40, $19.56 is attributable to the disagreement over Jarden's TIR. After carefully considering the experts' analyses of TIR, and exposing what I believe to be flaws in both, I have determined that an appropriate TIR for Jarden is 27.75%.

---

target company and those of the peer group can either overvalue or undervalue the target business. JX 242, Holthausen & Zmijewski, *Corporate Valuation* at 212.

[468] Trial Tr. 215:20–216:17 (Zmijewski); JX 242, Holthausen & Zmijewski, *Corporate Valuation* at 216–17.

[469] JX 1818 at ¶¶52–53.

[470] JX 1816 at ¶¶149–150; JX 1818 at ¶¶70–72; JX 1831 at ¶3.

The disagreement between the experts boils down to whether Dr. Hubbard improperly relied upon accounting theory when calculating TIR.[471] Dr. Zmijewski's approach to Jarden's TIR aligns, in concept, with the Bradley-Jarrell Plowback Formula, which provides, in broad terms, that the rate of reinvestment must be measured by what is realistically required to drive real growth.[472] Real growth, under the plowback paradigm, is measured by the delta between the company's growth rate and inflationary growth, which is driven by the greater economy and not cash reinvestment.[473] In other words, as Jarden's growth slowed over time and became steadier, the Company required less capital expenditure to drive real growth because a greater percentage of its overall growth was driven by inflation and broader economic factors. According to Dr. Zmijewski, because Jarden was a steady-growth company that expected lower growth in the Terminal Period, it required a much lower TIR, which he calculated at only 4.9%.[474]

---

[471] Trial Tr. 195:18–20 (Zmijewski) ("He's using accounting data as if it were economic concepts. That doesn't work. And so that's my major disagreement with him."); Trial Tr. 197:14–17 (Zmijewski) ("These are all economic concepts. They're not—you can't sort of say here's an accounting number and it matches this. These are economic concepts, not accounting concepts").

[472] JX 63; JX 242, Holthausen & Zmijewski, *Corporate Valuation* at 235–37.

[473] *Id.*; JX 1828 at ¶¶37–38.

[474] JX 1828 at ¶¶34–35, 45. Dr. Zmijewski never expressly sets his TIR at 4.9%, but implicitly determines that net investment in 2021 and onward will equal $60 million, or approximately 4.9% of operating profits. JX 1826 at ¶¶54–55, 62, 66–67, Figure 14. Dr. Zmijewski also assumed that depreciation will equal capital expenditures in the Terminal Period, and that Jarden's cash investment required to drive terminal growth will

Dr. Hubbard calculated TIR by applying a formula from McKinsey & Co.[475] The McKinsey formula posits that a company's return on invested capital ("ROIC") should converge towards its WACC over time.[476] The formula rests on the premise that a company operating in a competitive industry will not "have both high and rising forever returns on invested capital."[477] Applying the McKinsey formula,[478] Dr. Hubbard used 2.5% as his TGR and 7.38% as his WACC/ROIC, yielding a TIR of 33.9%.[479]

Dr. Zmijewski expressed four principal criticisms of Dr. Hubbard's application of the McKinsey formula.[480] First, according to Dr. Zmijewski, Dr. Hubbard incorrectly assumes that any new investment Jarden made starting in

---

grow coequally with Jarden's other financial metrics. JX 1818, Ex. VI-6A (Dr. Zmijewski made some adjustments to the historical financial data such that normalized depreciation is equal to normalized capital expenditures of $308 million).

[475] Trial Tr. 1045:21–1046:2 (Hubbard).

[476] JX 1816 at ¶94.

[477] Trial Tr. 1055:16–18 (Hubbard).

[478] $IR = g/RONIC$, where $g$ is the terminal growth rate and $RONIC$ is the return on new invested capital. JX 1816 at ¶94; JX 2516, Koller, *Valuation* at 31; JX 2515, Damodaran, *Investment Valuation* at 312–14.

[479] JX 1816 at ¶94. As discussed in more detail below, Dr. Hubbard calculates WACC as follows: Jarden's capital structure weights 36.1% debt and 63.9% equity, coupled with a cost of debt (after tax) of 3.20% and a cost of equity of 9.74%, results in a WACC of 7.38%. JX 1816 at ¶128, Ex. 15.

[480] Trial Tr. 196:9 (Zmijewski) ("Well, I have four issues.").

2021 would not create any value.[481] Second, Dr. Zmijewski believes Dr. Hubbard improperly defined investments to include only working capital and capital expenditures, which, according to Dr. Zmijewski, is the accounting definition of investments (meaning "what you put on a balance sheet") that does not account for real world economics.[482] In other words, Dr. Hubbard's definition of investment excludes research and development, advertising and human capital expenditures that would create value for Jarden in years beyond 2021.[483] Third, Dr. Hubbard's definition of net investment as investment above depreciation is, again, an accounting definition that does not fit when calculating TIR.[484] Fourth, Dr. Hubbard improperly calculated WACC by "using accounting rates of return" instead of "economic rates of return," which do "not measure the same thing."[485]

Dr. Hubbard's testimony that, in competitive industries, the return on new invested capital should equal the company's WACC was credible, and it is supported by the valuation treatises.[486] Although I found credible Dr. Hubbard's well-reasoned

---

[481] Trial Tr. 196:11–16 (Zmijewski).

[482] Trial Tr. 197:19–198:17 (Zmijewski).

[483] Trial Tr. 198:7–15 (Zmijewski).

[484] Trial Tr. 198:18–199:6 (Zmijewski).

[485] Trial Tr. 199:7–11 (Zmijewski).

[486] Trial Tr. 1046:11–1049:23 (Hubbard); JX 2516, Koller, *Valuation* at 102, 250–56; JX 2515, Damodaran, *Investment Valuation* at 291, 299–300.

premise that companies like Jarden cannot maintain growth without sufficient investment to drive growth above inflation over time, his relatively high TIR raises at least yellow flags. At first glance, the empirical analysis Dr. Hubbard undertook to support his 33.9% TIR appears reasonable, particularly given Jarden's historic investment rates, which averaged roughly 26.9% of comparable growth over six years.[487] But why study six years here when Dr. Hubbard's TGR estimation was premised on five years of Jarden's historic growth?[488] By including the sixth year, 2010, in his calculation, Dr. Hubbard was able to reach a significantly higher number for Jarden's historical average growth. After excluding the 2010 investment rate of 64.3%, Jarden's five-year average investment rate is 21.6%.

In view of Jarden's five-year 21.6% average historic investment rate, Dr. Zmijewski's 4.6% TIR is too low; it unreasonably assumes rising ROIC for more than 40 years into the Terminal Period, unreasonably assumes all new investment in the Terminal Period will be comprised entirely of working capital, and is based on a methodology that conflicts with the valuation goal of striking a balance between investment and growth.[489] The November Projection's forecast of net investment in

---

[487] JX 1816 at ¶¶93–95, Ex. 10A; JX 1826 at ¶¶54–61.

[488] JX 1816, Exs. 5A–5D (*compare* Ex. 10A starting at FY10 *with* Exs. 5A, C, D starting at FY11).

[489] Trial Tr. 1055:14–18 (Hubbard) ("I just don't know of firms and industries that have both high and rising forever returns on invested capital."); Trial Tr. 1051:12–16 (Hubbard) ("you can't simply change your growth, particularly your real growth, which is what is

2021 at 9.8%, likewise, stands out as low relative to Jarden's five-year average investment rate. The midpoint of Dr. Hubbard's 33.9% TIR and Jarden management's projected 9.8% TIR is roughly 21.8%. With a calculated TGR of 3.1%, which coincides with Jarden's historic organic growth rate, the appropriate TIR should reflect Jarden's historic investment rate but account for a slight increase to accommodate sustained growth in the Terminal Period. The credible evidence, in my view, supports a TIR for Jarden of 27.75%.[490]

### c. Jarden's Weighted Average Cost of Capital/Discount Rate

As previously stated, both experts' DCF models used Jarden's WACC as the input for the Discount Rate in the DCF formula.[491] The Discount Rate converts Jarden's future cash flows from the November Projections to present value as of the Merger Date.[492] WACC reflects Jarden's cost of equity and debt financing and the

---

being done in this experiment, and not have any additional investment"); JX 2514 at 21 (a graph depicting the dramatically outsized ROIC implied by Dr. Zmijewski's TIR); JX 2516, Koller, *Valuation* at 19; JX 2515, Damodaran, *Investment Valuation* at 302; JX 2032, Berk & DeMarzo, *Corporate Finance* at 711.

[490] This sets the TIR at the midpoint between Dr. Hubbard's TIR of 33.9% and Jarden's historic average investment rate of 21.6%. It also assumes a ROIC for Jarden of 11.2%, which is reasonable given Jarden's innovative and highly acquisitive growth strategy and a WACC of 6.94% (as discussed below). JX 1828 at ¶39.

[491] Trial Tr. 1066:21–23 (Hubbard) ("Q. And if we could, did you estimate the weighted average cost of capital for purposes of your DCF analysis? A. I did. Both Professor Zmijewski and I tendered estimates of the weighted average cost of capital."); JX 1816 at ¶¶98–129; JX 1818 at ¶¶65–66.

[492] JX 1816 at ¶¶98–99.

relative weight of each in Jarden's capital structure.[493]  Given that a DCF valuation is meant to calculate Jarden's value as a going concern, the components relied upon to calculate WACC should represent Jarden's prospective outlook.[494]  The experts agreed on one of the relevant inputs to calculate Jarden's WACC, the risk-free rate of return.  They differed, however, in their respective estimates of Jarden's capital structure, beta, equity risk premium, and whether a size premium was appropriate.[495]  I address each issue below.

The application of a discount rate to financial projections converts the target company's future income stream at its expected opportunity cost of capital to its present value.[496]  A company's WACC represents the cost (to the company) of financing its business operations; it comprises the weighted average of the company's cost of debt and equity:[497]

---

[493] *Id.*; JX 1818 at ¶¶46–49; Trial Tr. 190:1–3 (Zmijewski) ("[WACC] is a standard calculation.  You calculate the equity costs of capital, the after-tax debt cost of capital.  You weight those two.").

[494] *Id.*; JX 2516, Koller, *Valuation* at 295–97.

[495] Trial Tr. 244:2–6 (Zmijewski) ("[W]e have the same risk-free rate.  We have a different equity risk premium, a slightly different beta.  He doesn't use a size premium.  I do.  So we have some differences in our calculations here.").

[496] JX 1818 at ¶68; JX 1816 at ¶98; JX 2516, Koller, *Valuation* at 269.

[497] JX 1818 at ¶49; JX 2516, Koller, *Valuation* at 269–72.

$$\textbf{WACC} = \left( r_{equity} \times \frac{E}{V} \right) + \left( r_{debt} \times \frac{D}{V} \times (1 - t) \right)$$

*where:*

| | | |
|---|---|---|
| $r_{equity}$ | = | cost of equity capital |
| $E$ | = | market value of the company's equity |
| $r_{debt}$ | = | cost of debt capital |
| $D$ | = | value of the company's debt |
| $V = E + D$ | = | total value of the company's equity and debt |
| $t$ | = | marginal tax rate |

### i. Jarden's Capital Structure

A company's capital structure indicates what percentage of its activities is financed by debt and what percentage is financed by equity.[498]  Determining the correct capital structure is essential to WACC because without a clear picture of a company's debt-to-equity ratio, the cost of financing future operations will be improperly weighted.[499]

Both experts recognized the impact of the substantial amount of convertible debt in Jarden's capital structure.[500]  Jarden's convertible debt conceptually existed as both debt and equity components in its capital structure, and both experts valued the debt and equity components of Jarden's convertible notes separately.[501]

---

[498] JX 1816 at ¶99; JX 2516, Koller, *Valuation* at 215–19.

[499] *See* Trial Tr. 1070:2–6 (Hubbard).

[500] JX 1816 at ¶¶100–03; JX 1818 at ¶63.

[501] *Id.*

Dr. Zmijewski calculated Jarden's capital structure based on Jarden's median capital structure ratios in the last four quarters before December 4, 2015.[502] According to the previous year's ratios, Dr. Zmijewski selected a Jarden capitalization ratio of 69% combined equity and 31% debt.[503]

For his part, Dr. Hubbard examined Jarden's capital structure ratio for the five years prior to the Merger.[504] He noted that Jarden maintained a debt level of roughly 50% from the last quarter of 2010 through 2011, but beginning in 2012, Jarden's debt to equity ratio began shifting due to Jarden's increased acquisition activity.[505] As Jarden stepped up acquisitions between 2012 and 2015, its total debt nearly doubled but its equity value expanded in even greater proportions.[506] By the third quarter of 2015, Jarden's market capitalization nearly tripled and its capital structure had shifted from nearly a 50:50 ratio to 37.5% debt and 62.5% equity.[507] Following

---

[502] JX 1818 at ¶64.

[503] *Id.*

[504] JX 1816 at ¶98.

[505] *Id.* at ¶¶100–04, Figure 21.

[506] *Id.*

[507] *Id.*

the Yankee Candle acquisition in 2013, Jarden's goal was to de-lever itself to three times its bank leverage-to-EBITDA ratio.[508]

Dr. Hubbard observed that, in order to capture Jarden's value as a going concern, the capital structure ratio used in the WACC analysis should reflect Jarden's long-run target capital structure.[509] He concluded that, because Jarden was on a trajectory of lower debt leading up to the Merger, and its long-term goal was to achieve an even lower debt-to-equity ratio, Jarden's average debt in the one-year period before the Merger was the best estimate of Jarden's target capital structure for WACC.[510] Based on that judgment, Dr. Hubbard calculated a capital structure equal to Jarden's one-year average ratios of 36.1% debt and 63.9% equity.[511]

The valuation literature suggests that because of the increased use of convertible securities, assessing the debt-to-EBITDA ratio alongside capital structure helps build a more comprehensive picture of a company's leverage risk.[512] Both experts were cognizant of the effect of Jarden's convertible securities on its

---

[508] *Id.* at ¶¶100–07, Figure 21; JX 1777 (Lillie Dep.) at 86–87.

[509] JX 1816 at ¶¶98–99.

[510] *Id.* at ¶¶104–05.

[511] *Id.*

[512] JX 2516, Koller, *Valuation* at 217.

capital structure, and Dr. Hubbard went on to consider changes in Jarden's debt-to-EBITDA ratio and the corresponding effect on Jarden's future leverage risk.[513]

The two experts relied on one year of debt-to-equity information to calculate their capital structure estimates. Dr. Zmijewski calculated Jarden's capital structure according to its median debt-to-equity ratios prior to the unaffected trading date of December 4, 2015.[514] That is where Dr. Zmijewski's analysis ended. Dr. Hubbard made a similar assessment of Jarden's capital structure as it stood just prior to the unaffected trading date, but did not end his analysis there. Instead, Dr. Hubbard assessed Jarden's target debt-to-EBITDA ratios, which reflected the capital structure Jarden set as a forward-looking goal well before merger negotiations began.[515]

This further analysis makes sense. The cost of capital analysis should be based on target debt-to-equity ratios instead of current ratios.[516] Target capital structure represents the ratios expected to prevail over the life of the business and the literature stresses that relying solely on current capital structure can distort the cost of capital analysis.[517] Overly optimistic capital structure targets must be

---

[513] JX 1816 at ¶¶100–07, Figure 21; JX 1818 at ¶63. *See also* Trial Tr. 161 (Zmijewski) (explaining how he accounted for convertible securities).

[514] JX 1818 at ¶64.

[515] JX 1816 at ¶¶103–07, Figure 21.

[516] JX 1816 at ¶105; JX 2516, Koller, *Valuation* at 295–97.

[517] JX 2516, Koller, *Valuation* at 295–97.

accounted for if they are expected to take many years to be realized.[518] Jarden's target capital structure and debt-to-EBITDA ratio was not overly optimistic under the circumstances. As of 2015's third quarter, Jarden's leverage had shifted downward to 37.5% as its market capitalization grew,[519] and Jarden planned to continue its deleveraging strategy until it reached a debt-to-EBITDA ratio of 3.0x.[520] Adjusting Jarden's 37.5% debt as of September 30, 2015, to conform to its target leverage ratio would lower Jarden's debt ratio to 33.3%.[521] Based on the dramatic swings in Jarden's capital structure in the five years prior to the Merger, a 4.2% deleveraging was well within Jarden's ability to achieve in the short term.

Because Dr. Hubbard's analysis conservatively includes Jarden's forward-looking target capital structure in his capitalization analysis, I adopt Dr. Hubbard's capital structure of 63.9% equity and 36.1% debt.[522] Accordingly, I adopt Hubbard's estimated equity and debt values for Jarden at $10,596,000,000 and $5,043,000,000, respectively.[523]

---

[518] *Id.* at 295; JX 1816.

[519] JX 1816.

[520] *Id.* at ¶¶100–07, Figure 21; JX 1777 (Lillie Dep.) at 86–87.

[521] JX 1816 at ¶¶103–07, Figure 21.

[522] *Id.* at ¶105.

[523] *Id.*, Ex. 11A.

### ii. Jarden's Cost of Debt

A company's cost of debt reflects "the current cost to the firm of borrowing funds to finance projects."[524] Generally, it is derived from three variables: (1) the riskless rate, (2) the default risk (and associated default spread) of the company and (3) the tax advantage associated with debt.[525]

Dr. Zmijewski estimated Jarden's after-tax Cost of Debt at 2.8%.[526] He arrived at this figure by calculating a Debt Beta of 0.36 based on Moody's Long-Term Corporate Family Rating of Ba3 for Jarden as of December 4, 2015, and the Duff & Phelps debt beta estimate for Ba debt as of March 2016.[527]

Dr. Hubbard estimated Jarden's Cost of Debt based on a tax adjusted yield to maturity rate of 5.30%.[528] This yielded a Cost of Debt of 3.2%.[529]

---

[524] JX 2515, Damodaran, *Investment Valuation* at 211. *See also* JX 1816 at ¶106; JX 1818 at ¶63.

[525] *Id.*

[526] JX 1818, Ex. VI-5.

[527] *Id.* at ¶64.

[528] JX 1816 at ¶¶108–09. Trial Tr. 1218:11–13 (Hubbard) (Q. "You measured Jarden's cost of debt by using yield to maturity. Correct? A. I did.").

[529] *Id.*

I agree with Dr. Zmijewski that calculating the cost of below-investment-grade debt by using yield to maturity sets the cost of debt too high.[530]  I adopt his Cost of Debt of 2.8%

### iii. Jarden's Tax Rate

Jarden's tax rate is 35%, which is the top marginal corporate tax rate for U.S. companies at the time of the Merger.[531]

### iv. Jarden's Cost of Equity

Establishing an accurate Cost of Equity is an essential subcomponent of Jarden's WACC.  Both experts used the Capital Asset Pricing Model ("CAPM") to calculate Jarden's cost of equity capital.[532]  This approach calculates Jarden's risk separately from systematic risk to produce a reliable estimate of Jarden's Cost of Equity.[533]  CAPM has four components: the risk-free rate, equity beta, equity risk

---

[530] JX 1828 at ¶20; JX 2032, Berk & DeMarzo, *Corporate Finance* at 412 ("When the firm's debt is risky, however, the debt yield will overestimate the debt cost of capital, with the magnitude of the error increasing with the riskiness of the debt.").

[531] Trial Tr. 1213:16–18 (Hubbard).

[532] JX 1818 at ¶64; JX 1816 at ¶110.

[533] *Id.*

premium, and if necessary, a size premium.[534]  Following CAPM, a company's cost of equity is calculated as follows:[535]

$$r_{equity} = r_{no\text{-}risk} + (\beta \times ERP) + SS$$

*where:*

| | | |
|---|---|---|
| $r_{no\text{-}risk}$ | = | risk-free rate of return |
| $\beta$ | = | beta coefficient of the subject company |
| *ERP* | = | equity risk premium |
| *SS* | = | size premium |

- **The Risk-Free Rate**

The only point of agreement between the experts in the WACC analysis is the risk-free rate of return.  Both experts set their analyses' risk-free rate at the 20-year constant maturity U.S. Treasury Bonds return as of the Merger.[536]  That rate was 2.14%.[537]  Relying on 20-year U.S. Treasury Bonds for the risk-free rate is universally accepted practice in corporate valuation.[538]

---

[534] JX 1816 at ¶110; JX 2516, Koller, *Valuation* at 278–87; JX 2032, Berk & DeMarzo, *Corporate Finance* at 385–92.

[535] JX 1818 at ¶64; JX 2516, Koller, *Valuation* at 279; JX 2515, Damodaran, *Investment Valuation* at 208; JX 2032, Berk & DeMarzo, *Corporate Finance* at 387.

[536] JX 1816 at ¶111; JX 1818 at ¶64.

[537] *Id.*

[538] JX 2515, Damodaran, *Investment Valuation* at 155; JX 2516, Koller, *Valuation* at 275–76; JX 2032, Berk & DeMarzo, *Corporate Finance* at 411–12.

- **Beta**

Beta, in short, is a measurement of the systemic risk that a particular security adds to a market portfolio.[539] The consensus from the corporate finance literature in the record is that the conventional approach for estimating equity beta for a publicly traded company, like Jarden, is through a regression analysis of the historical returns of its stock against the returns of a market index.[540] In other words, equity beta is derived by assessing a stock's sensitivity to and correlation with changes in the aggregate market. A beta regression analysis requires three parameter-setting choices. First, the time period for measuring returns must be established.[541] Second, the return interval at which measurements will be taken over the duration of the designated time period must be specified.[542] Third, an appropriate market index must be identified that will represent the cumulative market over time as a control to measure the target company's market price.[543]

---

[539] JX 1818 at ¶58; JX 1816 at ¶112; JX 2516, Koller, *Valuation* at 279; JX 1345, Duff & Phelps, *Valuation Handbook* at 2–14; JX 2515, Damodaran, *Investment Valuation* at 183; JX 2032, Berk & DeMarzo, *Corporate Finance* at 413. *See* Trial Tr. 187:10–13 (Zmijewski) ("beta is a measure of risk of a company or an asset that you—that you can measure statistically using a statistical model.").

[540] JX 2515, Damodaran, *Investment Valuation* at 183. *See also* JX 1816 at ¶¶113–20.

[541] *Id.*

[542] *Id.*

[543] *Id.*

The experts disagreed on the relevant time periods and return intervals to use in their regression analyses. From the evidence, it appears the most appropriate (and commonly used) parameters are two- or five-year time periods and weekly or monthly return intervals.[544]

The control market index should be one developed from the exchange where the target company's stock trades.[545] For companies traded on the NYSE, like Jarden, it is reasonable to use either the NYSE Composite or the S&P 500 Index.[546] The experts agreed that the S&P 500 is an appropriate market index and both used the S&P 500 as their control to measure Jarden.[547]

In addition, both experts relied on Jarden's historical market returns data and estimated Jarden-specific betas. Yet, they disputed whether it was necessary to balance Jarden's beta with betas estimated from historical returns of comparable companies.

In his report, Dr. Zmijewski calculated two equity betas to use in his Jarden-Specific DCF and Composite DCF analyses. To estimate Jarden's beta as of the Merger Date, Dr. Zmijewski measured the equity beta for Jarden and for each of a

---

[544] JX 2516, Koller, *Valuation* at 283–84. *See* JX 1816 at ¶114.

[545] JX 2515, Damodaran, *Investment Valuation* at 188.

[546] *Id.*; JX 2032, Berk & DeMarzo, *Corporate Finance* at 413. *See* JX 1816 at ¶115.

[547] JX 1816 at ¶¶111–20; JX 1818 at ¶¶58–61.

list of comparable companies based on five years of weekly returns ending on the Merger Date.[548] He then performed a regression analysis for each company against the S&P 500 for the same period that showed Jarden's unlevered beta was 1.04 and that the unlevered beta for his comparable companies (plus Jarden) was 0.86.[549] Finally, he made adjustments to account for Jarden's cash and other financial assets and relevered each beta to produce a Jarden-specific equity beta of 1.24 (the "Jarden-Specific Beta") and a combined equity beta for his comparable companies (plus Jarden) of 1.01 (the "Composite Beta").[550]

Dr. Hubbard's regression analysis yielded an equity beta of 1.18 (the "Hubbard Beta") that was based on Jarden's daily returns for one year ending on December 4, 2015.[551] Unlike Dr. Zmijewski, Dr. Hubbard did not balance his Jarden-specific beta regression analysis with beta estimates of comparable companies. Instead, he regressed Jarden's single year daily returns against the S&P 500 during the one-year period and calculated an unlevered beta of 0.771.[552]

---

[548] JX 1818 at ¶¶58–61.

[549] *Id.* at ¶¶60–61, Ex. VI-4.

[550] *Id.* at ¶¶59–61, Ex. VI-5; JX 1828 at ¶16. Dr. Zmijewski explained that the Jarden-Specific Beta was higher due to a "lack of precision relative to the precision [of] using a set of comparable companies" and because of Jarden's higher long-term growth relative to that of his comparable companies. JX 1818 at ¶¶60–61.

[551] JX 1816 at ¶¶114–16.

[552] *Id.* at ¶¶117–20.

Like Dr. Zmijewski, he then adjusted for cash and financial assets and re-levered the beta to produce a Jarden equity beta of 1.18.[553] Dr. Hubbard also calculated Jarden-specific betas from two years of weekly returns and five years of monthly returns, but ultimately decided to use the single year daily returns beta to mitigate the potential confounding effects of several large acquisitions Jarden completed in the five years prior to the Merger.[554] Dr. Hubbard explained that he chose the year ending on December 4, 2015, in order to avoid contaminating his regression analysis with news of the possible merger.[555]

The literature in the record supports the use of comparable companies in a beta regression because companies in the same industry face similar "operating risks" and therefore should have similar operating betas.[556] This, of course, assumes that "truly" comparable peers exist that can meaningfully be compared to the target company.[557] Here again, Dr. Zmijewski failed convincingly to demonstrate that his

---

[553] *Id.*

[554] *Id.* at ¶¶114–16. Dr. Hubbard noted that the single year daily beta of 1.18 was "not substantially different" from his two-year weekly beta of 1.22. *Id.* at ¶¶117–20.

[555] *Id.* at ¶¶114–16.

[556] JX 2516, Koller, *Valuation* at 286.

[557] *Id.* at 283–85; JX 242, Holthausen & Zmijewski, *Corporate Valuation* at 306 (". . . if we have a set of *truly* comparable companies, we feel we can gain precision in our estimate of the cost of capital by using multiple companies.") (emphasis supplied).

comparable companies shared similar risk profiles with Jarden.[558] As Dr. Hubbard persuasively testified, Dr. Zmijewski provided no analysis or discussion to support this assumption.[559] Without a thorough explanation and corroborating evidence of how Dr. Zmijewski's comparable companies had risk profiles comparable to Jarden's "complex"[560] and "unique"[561] structure and business model, I am disinclined to consider on Dr. Zmijewski's Composite Beta.

Jarden's stock consistently traded in the upper quartile of market volume on the NYSE from 2011 to 2015.[562] And its share price had a positive correlation with the market, as defined by the S&P 500, throughout the same time period.[563] With this in mind, I am persuaded that Dr. Hubbard's decision to use daily interval measurements is reasonable, and his opinion that Jarden's market returns data

---

[558] JX 1828 at ¶¶12–16.

[559] Trial Tr. 1068:13–1069:15 (Hubbard); JX 1826 at ¶¶72–75.

[560] JX 1818 at ¶29 ("More specifically, I discuss . . . complexity of Jarden's information and holding company (or platform) business model strategy").

[561] Trial Tr. 104:7–105:18 (Lillie), 262:19–263:23 (Zmijewski) ("None of those companies is an apple-to-apple comparison to Jarden or each other. Comparable Companies—there just isn't any such thing as a twin company. It doesn't exist.").

[562] JX 1816 at ¶¶45–50. In addition, both experts' beta estimates are positive, which indicates a parallel correlation with changes in the overall market.

[563] JX 1816 at ¶¶112–20.

provide a reliable measurement of Jarden's beta is supported by the literature in the record.[564]

Dr. Hubbard corroborated his calculated beta with a second regression using two-year weekly returns that yielded a Jarden-specific beta of 1.22.[565] Dr. Zmijewski's beta estimates were derived from a five-year period of weekly returns, and his Jarden-specific analysis produced a beta of 1.24 for Jarden alone.[566] The spread between Dr. Hubbard's beta and Dr. Zmijewski's Jarden-specific beta is 0.06, which, according to the literature, suggests that the Jarden-specific beta estimates have a low error rate across different time and interval measurements.[567] A narrow error rate between firm-specific beta estimates of different intervals and time periods indicates the estimates are converging on the company's true beta.[568]

Moreover, it is important to note that, when estimating beta, the goal is to evaluate Jarden's *future* beta, and by extension, the sensitivity of Jarden's share price

---

[564] *Id.*; JX 2516, Koller, *Valuation* at 284; JX 2515, Damodaran, *Investment Valuation* 183, 187–95.

[565] *Id.*

[566] JX 1818 at ¶¶58–61.

[567] JX 2515, Damodaran, *Investment Valuation* at 192–95; JX 1816, Ex. 22F; JX 1818 at ¶¶60–61.

[568] JX 2516, Koller, *Valuation* at 286; JX 2515, Damodaran, *Investment Valuation* at 192–93.

to *future* market risk as predicted by its historical performance.[569] Because betas generally converge on the general market beta (1.0) over time,[570] and Jarden, by all indicators, was a mature, highly traded company, I am satisfied that Dr. Hubbard's beta (1.18) is a reasonable estimate of Jarden's share price sensitivity to future market risk.

- **Equity Risk Premium**

Equity Risk Premium ("ERP") "captures the compensation per unit of risk that investors demand in order to hold risky investments rather than riskless investments."[571] The experts' disagreement over the proper methodology for estimating Jarden's ERP reflects the lack of consensus regarding this issue within the valuation community at large.[572] One aspect of the broader debate that has played out here is whether to approach ERP as Long-Term Historical ERP, Supply-Side ERP, or an adjusted hybrid ERP derived from the available data. As explained by Dr. Hubbard, when appraisers estimate ERP from Long-Term Historical ERP, they consult historical data regarding stock premiums, in his case from 1926 through

---

[569] JX 2516, Koller, *Valuation* at 281; JX 2032, Berk & DeMarzo, *Corporate Finance* at 413; JX 241, Holthausen & Zmijewski, *Corporate Valuation* at 295.

[570] JX 2515, Damodaran, *Investment Valuation* at 187.

[571] JX 1816 at ¶121.

[572] *See* Trial Tr. 1072:2–4 (Hubbard) ("So the question is, what is the equity risk premium. And this is one where economists have a range of views.").

2015.[573] As explained by Dr. Zmijewski, Supply-Side ERP incorporates adjustments to the Long-Term Historical ERP to account for a long-term decline in risk premiums that upwardly bias the Long-Term Historical rate in order more effectively to represent recent market conditions.[574]

Dr. Zmijewski set Jarden's ERP at the Supply-Side ERP estimate of 6.03%.[575] Dr. Hubbard determined the proper ERP to be 6.47%, which is the mid-point between the Long-Term Historical ERP and Supply-Side ERP.[576] After considering the evidence, I am satisfied that Dr. Zmijewski's estimate of ERP reflects a more principled approach. First, there is strong support for the use of the forward-looking

---

[573] JX 1816 at ¶¶122–24. *See* Trial Tr. 1072:5–8 (Hubbard) ("My own view in my own work and in the work I'm tendering here is that the so-called historical risk premium is the best measure of the equity risk premium."). *See also* JX 2515, Damodaran, *Investment Valuation* at 161 ("In practice, we usually estimate the risk premium by looking at the historical premium earned by stocks over default-free securities over long time periods.").

[574] JX 1828 at ¶18. *See* Trial Tr. 1072:8–15 (Hubbard) ("There is an alternative view . . . a so-called supply-side risk premium. I'm not quite sure why that word, because it's not about supply and demand, it's really about whether you include price earnings multiples expansion. That number is lower.") *See also* JX 1345, Duff & Phelps, *Valuation Handbook* at 11.

[575] JX 1828 at ¶17.

[576] JX 1816 at ¶126. Dr. Hubbard took the mid-point of the Long-Term Historical ERP at 6.9% and Supply-Side ERP at 6.03% to produce his 6.47% ERP estimate for Jarden. Trial Tr. 1072:16–19 (Hubbard) ("I prefer the historical risk premium. I'm cognizant of the fact Delaware courts have also paid attention to the supply-side risk premium. So I picked the midpoint of the two.").

Supply-Side ERP in the valuation literature.[577]   Second, as Dr. Zmijewski persuasively observes, Dr. Hubbard's "mid-point" ERP estimate is unexplained and appears to lack any methodological foundation.[578]

- **Size Premium**

Dr. Zmijewski opined that a size premium must be incorporated in the calculation of Jarden's equity cost of capital given that, according to the Duff & Phelps classification, Jarden is within the second decile of public companies, which justifies a size premium of 0.57%.[579] Dr. Hubbard implied that a Size Premium was not necessary but provided no credible explanation for that position.[580] The valuation texts in the record make the point that beta captures some, but not all of a company's size premium and that a size premium is an empirically observed

---

[577] JX 1345, Duff & Phelps, *Valuation Handbook* at 5.

[578] JX 1828 at ¶18. The lower Supply-Side ERP is supported by Duff & Phelps' later recommended estimates of adjusted Long-Term ERP of 5.0% as of March 31, 2018. *See* Trial Tr. 1073:1–4 (Hubbard) ("But if one's view is your interest in supply side is governed by Duff & Phelps' recommendation, Duff & Phelps has, indeed, changed its recommended approach.").

[579] JX 1818 at ¶64.

[580] JX 1826 at ¶78; Trial Tr. at 1078:4–9 (Hubbard) ("I don't have a size premium. He does. My quibble is more the way he's estimated it, given the data source he has. But, again, for the Court's consideration in the interest of the Court's time, I don't think these are super important.").

correction to the CAPM.[581]  I agree with Dr. Zmijewski and the literature that the CAPM should include a size premium when appropriate, as here, and adopt his size premium of 0.57% for Jarden.

**********

Dr. Zmijewski calculated a Composite Cost of Equity, but for reasons previously stated, I have disregarded estimates based on Jarden's so-called comparable companies.  Dr. Zmijewski calculated a Jarden-specific Cost of Equity at 10.21%.[582]  Dr. Hubbard calculated Jarden's Cost of Equity at 9.74%.[583]  In my view, for reasons stated, neither view lines up entirely with the credible evidence. Accordingly, I have calculated Jarden's Cost of Equity with the following CAPM inputs that reflect what I deem proven by a preponderance of the evidence: Dr. Hubbard's Beta of 1.18, Dr. Zmijewski's Equity-Risk Premium of 6.03%, Dr. Zmijewski's Size Premium of 0.57% and both experts' risk-free rate of 2.14%. With these inputs, I have calculated Jarden's Cost of Equity to be 9.83%.

---

[581] JX 242, Holthausen & Zmijewski, *Corporate Valuation* at 320–21 (discussing the "empirical evidence that the CAPM overstates the returns to large firms and understates the returns to small firms").

[582] JX 1818, Ex. VI-5.

[583] JX 1816 at ¶127.

**Jarden's Calculated WACC:** Dr. Zmijewski calculated a Jarden-Specific WACC of 7.88%.[584] Dr. Hubbard calculated a WACC of 7.38%.[585] Once again, for reasons stated, I have found that neither experts' calculated WACC is supported entirely by the credible evidence. Instead, I calculate WACC with the following inputs: a 9.83% Cost of Equity, a 2.8% Cost of Debt, a 35% marginal tax rate and a capital structure of 63.9% equity and 36.1% debt. These inputs yield a WACC of 6.94% for Jarden.[586] Thus, I adopt a Discount Rate of 6.94%.[587]

### 3. The Final Calculation of Terminal Value

Based on the credible evidence, I calculate Jarden's terminal value to be $17.7 billion, using the following equation:[588]

---

[584] JX 1818 at ¶66.

[585] JX 1816 at ¶11.

[586] I note that this WACC is within the range calculated by Centerview but below the WACC calculated by Goldman Sachs, Deutsche Bank, RBC and Barclays.

[587] JX 2516, Koller, *Valuation* at 295–97.

[588] JX 1816 at ¶95; JX 2515, Damodaran, *Investment Valuation* at 313.

$$TV_t = \frac{NOPLATPA_{T+1}\left(1 - \frac{g_\infty}{ROIC}\right)}{WACC - g_\infty}$$

*where*:

| | | |
|---|---|---|
| $TV_t$ | = | terminal value (at time T) |
| $NOPLATPA_{T+1}$ | = | unlevered free cash flow (at time T + 1). |
| $ROIC$ | = | incremental return on new invested capital |
| $g_\infty$ | = | terminal growth rate |
| $WACC$ | = | Weighted Average Cost of Capital |

In order to arrive at the unlevered free cash flow for year 2021, I subtracted the predicted revenue for 2021 from the predicted capital expenditures for 2021.[589] The predicted revenue for 2021 is $12.9 billion, 4.964% higher than the 2020 revenue.[590] The predicted capital expenditure for 2021 is $334 million, 2.6% higher than the 2020 capital expenditure.[591]

### 4. The DCF Calculation of Fair Value

Using 6.94% as the Discount Rate, I calculate Jarden's enterprise value using the following formula:[592]

---

[589] *See* JX 1818 at ¶51.

[590] I took the average of the revenue growth rates for the provided fiscal years of 2017–20 to determine the percentage increase.

[591] I took the average of the capital expenditure growth rates for the provided fiscal years of 2017–20 to determine the percentage increase.

[592] JX 2515, Damodaran, *Investment Valuation* at 585. *See* JX 1818 at ¶60.

$$EV = \sum_{t=1}^{t=\infty} \frac{FCF_t}{(1 + WACC)^t}$$

*where*:

$FCF_t$     =     unlevered cash flow in period t, terminal value in the final period

$WACC$     =     Weighted Average Cost of Capital

The final adjusted enterprise value is $16.6 billion.[593]

### 5. Jarden-Specific Adjustments to the DCF Valuation

In order to determine the final share price under a DCF approach, the appraiser must account for Jarden's excess cash and debt in its enterprise value.[594] Dr. Hubbard additionally adjusts for tax effects related to future profits not captured by tax rates, liability from net unrecognized tax benefits and pensions.[595] I do not find any of Dr. Hubbard's arguments for these additional adjustments persuasive and, in any event, his proposed further adjustments have a marginal impact on the final share value.[596]

---

[593] In other words, I added the discounted cash flows from each time period in the FY16–FY21 range—$558 million, $646 million, $675 million, $687 million, $698 million, $13.3 billion respectively—to arrive at the total enterprise value.

[594] JX 1818 at ¶¶69–72; JX 1816 at ¶¶130–47.

[595] JX 1816 at ¶¶143–47.

[596] *See* Trial Tr. 1079:17–21 (Hubbard) ("Maybe I should start with the bottom line. If you were to look at all of these [enterprise value adjustments], they're a little over a dollar a share, and I think $1.06 altogether, because they go in different directions.").

### a. Excess Cash

Companies commonly keep liquid cash in order to conduct their operations.[597] If the company holds more cash than necessary, the surplus is a source of value to the equity holders and must be added to the DCF valuation.[598]  Jarden held $799 million of cash and cash equivalents at the end of the first quarter of 2016.[599] As of the Merger, Jarden required $50 million in cash for working capital purposes.[600]  The excess cash balance, or the difference between the total cash and the required cash, is $749 million, which I add to the enterprise value.

### b. Nonconvertible Debt

As of March 31, 2016, Jarden's non-convertible debt totaled $5.04 billion.[601] Debt is a claim on the assets of the firm and must, therefore, be subtracted from the DCF enterprise value.[602]

---

[597] JX 1816 at ¶139.

[598] Trial Tr. 1081:17–20 (Hubbard) ("[E]ssentially you want to add back excess cash that the company has.  And we both agree on that, and we both agree on what the total cash was.  It was $799 million.").

[599] JX 1816 at ¶140.

[600] *Id.*

[601] *Id.* at ¶141.

[602] *Id.*; JX 2516, Koller, *Valuation* at 309; JX 2515, Damodaran, *Investment Valuation* at 440.

### c. Convertible Debt

To measure the value of Jarden's unconverted convertible notes at the Merger Date, Dr. Hubbard uses a standard options pricing methodology to estimate the embedded warrants value since they are economically analogous to an option on Jarden's common stock.[603] This formula relies on various inputs for each series of notes, including the time remaining until maturity, the conversion price, the current value of Jarden's stock, the risk-free rate and the expected volatility of Jarden's stock returns.[604] Using these inputs, Dr. Hubbard estimated the equity components of the convertible notes to be $0.71 billion in total at the Merger Date.[605] He further valued the debt component of the convertible notes by discounting the remaining coupons and principal value of each note at Jarden's 5.3% cost of debt. In total, the value of the debt component of the convertible notes is $1.00 billion. The total value of Jarden's convertible securities is the sum of the debt and equity components. At the Merger Date, the value of Jarden's convertible debt totaled $1.71 billion.[606] Dr. Hubbard's approach was conservative, made sense and I adopt it here.

---

[603] JX 1816 at ¶142.

[604] *Id.*, Ex. 18C.

[605] *Id.*, Ex. 18A.

[606] *Id.*

### 6. Number of Shares

I calculate the shares outstanding, following Dr. Zmijewski's calculation,[607] by subtracting the Jarden stock awards issuable to executives in connection with the merger transactions and the Jarden common stock expected to be issued upon assumed conversion of outstanding Jarden convertible notes from the total estimated shares of Jarden's common stock entitled to the Merger consideration. With these inputs, the total amount of outstanding shares and restricted stock units as of the Merger was 219.9 million common shares.[608]

### 7. Equity Value per Share from DCF Analysis

After adding non-operating assets to the enterprise value, and subtracting non-operating liabilities, Jarden's equity value as of the Merger Date was $10.59 billion. On a per share basis, the DCF valuation is $48.13.

REMAINDER OF PAGE INTENTIALLY LEFT BLANK

---

[607] JX 1818 at ¶70. Dr. Hubbard adjusted his final share count number to align with Dr. Zmijewski's number after double counting Jarden's restricted stock. JX 1831.

[608] JX 1565 at 242.

| Discounted Cash Flow Analysis[609] | | | | | | |
|---|---|---|---|---|---|---|
| ($ in Millions, except per share value) | FY16 | FY17 | FY18 | FY19 | FY20 | FY21 |
| Revenue[610] | $10,147 | $10,640 | $11,172 | $11,731 | $12,317 | $12,928 |
| Growth Rate | – | 4.9% | 5.0% | 5.0% | 5.0% | 5.0% |
| Unlevered Cash Flow from Operations | $869.05 | $966.55 | $1,062 | $1,145.95 | $1,235 | $1,273 |
| Capital Expenditures[611] | $297 | $266 | $279 | $293 | $308 | $334 |
| As % of Revenue | 2.9% | 2.5% | 2.5% | 2.5% | 2.5% | 2.6% |
| Unlevered Free Cash Flow | $572 | $701 | $783 | $853 | $927 | $939 |
| Terminal Value | | | | | | $17,688 |
| Time Period[612] | 0.36 | 1.21 | 2.22 | 3.22 | 4.22 | 4.22 |
| Discounted Cash Flows | $558 | $646 | $675 | $687 | $698 | $13,326 |
| Enterprise Value | $16,591 | | | | | |
| Non-Convertible Debt | ($5,043) | | | | | |
| Value of Convertible Debt | ($1,712) | | | | | |
| Cash | $749 | | | | | |
| Equity Value | $10,585 | | | | | |
| Shares | 219.9 | | | | | |
| Share Price | $48.13 | | | | | |

---

[609] As explained above, the DCF Analysis makes the following assumptions: WACC equals 6.9%; Terminal Growth equals 3.1%; ROIC equals 11.2%; FY21 Revenue Growth equals 5%; FY21 Capital Expenditure as a percent of Revenue equals 2.6%; Fully Diluted Share Count equals 219.9 million.

[610] Drs. Hubbard and Zmijewski both agree on Jarden's Revenue numbers for FY16–FY20 reported in Standard and Poor's Capital IQ. *See* JX 1816, Ex. 9; JX 1818, Ex. VI-7A.

[611] Drs. Hubbard and Zmijewski both agree on Jarden's Capital Expenditure numbers for FY16–FY20 as derived from Standard and Poor's Capital IQ and Jarden's FY10-15 10K. *See* JX 1816, Ex. 9; JX 1818, Ex. VI-1.

[612] Time Period is calculated based on the mid-year convention used by Dr. Hubbard. JX 1816, Ex. 16. I note, for 2016, the mid-point uses the period from April 15, 2016 to December 31, 2016. *Id.*

**8. The DCF Valuation Comports With the Market Evidence**

As indicated above, I have determined that the Unaffected Market Price, $48.31, is a reliable indicator of Jarden's fair value as of the Merger Date. While I have questioned the reliability of the Merger price less synergies approach, I recognize that the most reliable estimate of fair value under that approach is approximately $46.21. My DCF valuation yields a fair value of $48.13. What stands out here, of course, is that Petitioners' proffered estimate of fair value for Jarden of $71.35 is, to put it mildly, an outlier.

Based on the preponderance of evidence, I am satisfied that the Unaffected Market Price is the best evidence of Jarden's fair value on the Merger Date. Insofar as I am obliged to articulate a principled, evidence-based explanation for the delta between the Unaffected Market Price and the DCF valuation (here, $0.18 per share), I am satisfied the difference reflects the subjective imperfections of the DCF methodology. The DCF valuation corroborates the most persuasive market evidence and provides comfort that I have appraised Jarden as best as the credible evidence allows.

## III. CONCLUSION

For the foregoing reasons, I have found the fair value of Jarden shares as of the Merger was $48.31 per share. The legal rate of interest, compounded quarterly,

shall accrue from the date of closing to the date of payment.  The parties shall confer and submit an implementing order and final judgment within ten days.